In the
United States Court of Appeals
for the Sixth Circuit

United States of America,

      Plaintiff-Appellant,

v.

Kyle Wagner,

      Defendant-Appellee.

_____/

## Emergency Motion to Stay the District Court's Pretrial Release Order

Kyle Wagner is a self-described Antifa member who has incited violence by encouraging his thousands of online followers to take up arms and "kill" ICE agents in Minneapolis, threatening and doxing an ICE supporter in Michigan, and requesting online donations to help him "evade" law enforcement. After his arrest, Wagner warned, "don't let [him] back out." Yet the district court ordered his pretrial release, disregarding the detention recommendation of the very pretrial services officers who will have to supervise him in Minnesota. The United States moves to stay the release order pending the outcome of the government's appeal from that order. Fed. R. App. P. 8(a)(2)(A)(ii).

### Background

Kyle Wagner is a 38-year-old Minnesota resident. Until recently, he has led an averagely dysfunctional life—working unsteady carpentry jobs, bouncing between homes, and pulling a few drug and traffic-related misdemeanors over the years. At some point, though, he began radicalizing. By January 2026, he was a radicalized Antifa extremist with tattoos to match.

In January, Wagner made escalating calls for violence against federal law enforcement and their supporters. Wagner views the federal government and federal law enforcement as Nazis, and he feels morally compelled to resist and fight federal law enforcement and their supporters at every turn—preaching violence as the only solution. He has repeatedly incited violence from his followers—from "hands on" fighting to armed confrontation. Consider some of his posts:

*First week of January.* Wagner was frank about his goals: a "constant harassment of ICE" to "cripple them." (R.1: Complaint, 48). He wanted to dox agents—to "unmask and identify" them—including with physical force. (*Id.* at 51–52). But he issued straightforward calls to violence, too, like "hunt ice . . . disable their vehicles – surround them

and disarm them - arm yourself and work in crowds"; "rise up now . . . and fight ice. This is kill or be killed"; "we need to put our hands on them"; and "Take their f------ guns." (*Id.* at 49-53). These threats extended to federal law enforcement supporters: "If you side with the gunman[, w]e're coming for you too." (*Id.* at 55). Wagner directed people to specific locations where law enforcement was staying, working, or gathering—like "[t]he ICE bunk houses in West End and around the Twin Cities" and "gold medal park and at the quarry NE." (*Id.* at 48, 52). Wagner wasn't alone in his efforts. He often pointed to the broader work of his team, saying things like "we're ready this time, ICE we're f------ coming for you" and explaining they were "really well organized." (*Id.* at 48, 53). Through all this, Wagner viewed himself as a martyr. "So, either we're going to win, or I will die in this process," he said, and "we are at f------ war." (*Id.* at 53).

*Second week of January.* Wagner continued to advocate confrontation and violence, saying "it's not enough to film [ICE] and scream and yell." (*Id.* at 57). He repeated death threats toward ICE agents: "This is where ICE has come to die"; "If [ICE's removal] has to be done at the barrel of a gun, then let us have a little f------ fun"; "ICE

3

came here to die." (*Id.* at 58-59, 62). Many people responded in kind—

e.g., "Time for them to meet your friends. Namely AR15 and 9MM":





(*Id.* at 59). Wagner continued to monitor and report on federal law enforcement's location. "[W]e found them checking into hotels all over the city," he said, "We want to know who [agents] are. We will identify every single one of them." (*Id.* at 57, 59). He threatened others that if they kept "f----- around," he would "escalate th[e] situation." (*Id.* at 60). And he told federal law enforcement supporters: "we crushed you in the 90s and we will crush you" again. (*Id.* at 60–61). Several times he urged "every armed citizen" to stop ICE actions in Minneapolis: "If you are armed and you witness an unlawful arrest and you stand by without action," he said, "you are complicit." (*Id.* at 56-57). And he remained as fanatically committed as ever: if he had "to die for" others "to figure it out - that's a price [he] will gladly pay,"—he was in the fight "to the end." (*Id.* at 57, 60). He also asked for money to "help [him] evade" law enforcement and "organize." (*Id.* at 55).

*Third week of January*. After an officer-involved shooting, something in Wagner snapped. He began posting some of his most extreme content. In one video, he appears shirtless, screaming into the camera, visibly unhinged, saying: "You can't march and bang drums

5

and sing songs when they're shooting people in the f------ head. Go and

f----- fight them. Or shut the f--- up and die for them":



(*Id.* at 65). Later that day, he posted a longer video while wearing a

bullet-proof vest. (*Id.* at 67). He called for "every armed American that's

within a reasonable distance of 26th and Nicollet," the location of the

shooting, to "come and stand." (*Id.* at 66). His video promised organized

violent action: "I have gas masks on the ground there, as much as I

could deliver. I have people en route. . .  [W]e're done with peaceful

protests now. The gloves come off and ICE needs to get out. Run for the

hills, boys." (*Id.*). He insisted on "putting hands on these murderers." (*Id.*). His third video was captioned: "Suns out guns out… stfu [shut the f--- up] and fight back." (*Id.* at 68). He urged people "to suit up. Boots on the ground" to go "[a]nywhere between Franklin and Nicolette and 26th and Nicolette." (*Id.*). He lamented that he and his Antifa comrades hadn't already assaulted the local federal building: "This is exactly what I said was going to f------ come when we didn't f------ go and march on f------ Whipple with guns." (*Id.*). And he meant violence: "no, not talking about peaceful protests" or "polite conversations anymore." (*Id.*). Wagner urged, "Get your f------ guns and stop these f------ people." (*Id.*). Many people responded, asking how they could help from out of state and promising to head his way:





(*Id.*).

*Fourth week of January*. Wagner's escalating threats led Instagram to remove his account. (*Id.* at 69). But Wagner resurfaced a couple days later with a different username and new video showing him distributing gas masks and riot shields from his truck to agitators in Minneapolis. (*Id.* at 69–70). Wagner also announced he was "on the run now" and had safe places and evacuation plans. (R.21: Gov't Br., 87).

At the same time, Wagner was beefing with online personality, J.S., who lives in the Eastern District of Michigan. (*Id.* at 71–72). Wagner posted what he believed was J.S.'s birth month and year, phone number, and parents' address while calling him a "bb nazi boy." (*Id.*). Wagner also threatened: "we can all knock on strangers doors … See you soon kiddo - stay safe out here":



(*Id.*). Wagner later bragged in an online video that he had J.S.'s phone number and his parents' address. (*Id.* at 72).

*Wagner's arrest.* Having seen this threat, federal law enforcement filed a sealed criminal complaint on February 3 in the Eastern District of Michigan. (*See generally id.*). Agents arrested Wagner on February 5 at his Minneapolis apartment. (R.21: Gov't Br., 90). As they handcuffed and began transporting Wagner, he harassed, spit on, and physically resisted them. (*Id.*). He warned them not to "let [him] back out" and then immediately expressed an intent to kill. (*Id.* at 81, 90). In his

booking photo, Wagner held up two middle fingers, declaring, "This is for the judge":



(*Id.* at 91).

*Wagner's first detention hearing.* Wagner insisted on a same-day detention hearing in Minnesota. *United States v. Wagner*, Case No. 26-mj-0141 (D. Minn.), R.13: 2/5/2026 Hrg. Tr., 9. That district's pretrial services department interviewed Wagner and made a report about his biography and criminal history. (*See generally* D. Minn. Pretrial Services Report). The report said, for the past several years, Wagner had lived in Minneapolis. (*Id.* at 1.) For work, Wagner claimed to make $5,000 a month doing carpentry gigs (although he had also received

about $10,000–$15,000 in online donations through Venmo and GoFundMe that he did not disclose). (*Id.* at 2; E.D. Mich. Pretrial Services Report at 2). Wagner told pretrial services (falsely) that he had no history of substance abuse treatment. (D. Minn. Pretrial Services Report at 2). These inaccurate details were confirmed by his mom, who lives near Minneapolis. (*Id.*).

As for criminal history, around 2007 to 2009, Wagner was charged with several low-level criminal violations in Colorado state court— littering, minor in possession, drug paraphernalia, and some traffic citations. (*Id.* at 2–3). He pleaded guilty to a few, and the others were dismissed. (*Id.*). He was charged with disorderly conduct in Minnesota state court in 2014, but the charge was later dismissed. (*Id.* at 3). In 2016, he was charged with possessing a controlled substance in Iowa. (*Id.*). And he had three misdemeanor traffic cases in Hennepin County in 2024 and 2025, which remain active. (*Id.*). All told, Wagner has eight failures to appear from four different states, was listed as an absconder, and has an active warrant in Iowa. (*Id.*). The Minnesota pretrial services department did not believe that any bond conditions could

ensure Wagner's appearance or the safety of the community, so it recommended detention. (*Id.* at 4).

The magistrate judge in Minnesota agreed. He detained Wagner on dangerousness grounds, holding: "Mr. Wagner's recorded social media posts in which he expresses his anger and frustration, and encourages his supporters to join him in obstructing, impeding, and assaulting officers and those who support the efforts of law enforcement are voluminous." *United States v. Wagner*, Case No. 26-mj-0141 (D. Minn.), R.11: Order of Det., 3. It also detained him because of nonappearance concerns, giving weight to his "lack of job security," "his admitted lack of stable housing over the last year," "his posts on social media" in which he "expressed a desire to 'evade' law enforcement," and because the complaint was filed in a district where he has no ties. *Id.*

*Wagner's second detention hearing.* A grand jury in the Eastern District of Michigan indicted Wagner a week later for one count of interstate communications involving threats and one count of cyberstalking. (R.10: Indictment). In early March, Wagner appealed the detention order. (R.17: Def.'s Mot.). The pretrial services department in Michigan completed a report with the same basic biographical and

13

criminal history material as the pretrial services report prepared in Minnesota—just with a bit more detail and a few contradictions in Wagner's story (e.g., Wagner used to abuse opioids and received treatment for it). (E.D. Mich. Pretrial Services Report). But this second report changed the recommendation from detention to bond and proposed Wagner's mom, who lives in Minnesota, as a third-party custodian. (*Id.* at 5; E.D. Mich. Third Party Custodian Investigation Mem., 1).

Largely tracking his brief, at the hearing, Wagner argued that this is a vindictive prosecution; that he was merely urging people to peacefully protest; that J.S. was not actually threatened; and that Wagner would faithfully abide by any bond conditions the court imposed, including several conditions that he proposed. (*See generally* R.17: Def.'s Mot.).

The government sought detention on dangerousness and nonappearance grounds. (*See* R.21: Gov't Br., 81–82). In addition to the facts above, the government noted the 180-degree turn in the second pretrial services recommendation and Wagner's contradictions to the two different pretrial services officers. (R.24: 3/25/26 Hrg. Tr., 136-38).

14

It described private messages from Wagner, just days before his arrest, in which he talked to an unknown person who wants to kill J.P.—a public figure—took J.P.'s personal identifying information, and promised to pass it along to his "team." (*Id.* at 131–32).

Nevertheless, the court released Wagner on bond. It admitted that Wagner was accused of "very serious" conduct. (*Id.* at 149–50). But it said some of the evidence "could be things that were actual threats, or the use of words that could be viewed in more than one way when used against persons in a way that might not be as specific a threat with an intention to carry out some bad outcome." (*Id.* at 145). It found Wagner had "some contacts with law enforcement," (*id.*), but releasing Wagner to Minnesota would keep him and J.S. far apart. (*Id.* at 147). The court admitted that much of the evidence pointed to "active" but not "physically active" concerns relative to danger. (*Id.* at 146–47). It noted that the government had made a "very strong" argument that Wagner posed a danger to the public. (*Id.*). Yet confusingly, it said that protecting the public is a "two-way street. It depends on what side of the street you're on whether or not an individual might feel they are protected or in need of protection. And that's, of course, a sad state of

affairs." (*Id.* at 147). The court agreed that some of Wagner's statements to pretrial services were contradictory. (*Id.* at 149). As for nonappearance, despite his failures to appear and his absconder status, it said Wagner had "no normal indicators of flight." (*Id.*). The court vaguely gestured toward Wagner's "feelings" about the judiciary but nonetheless thought it could ensure the safety of the community and Wagner's appearance with bond conditions. (*Id.* at 156-57).

The court imposed normal bond conditions—like restricted travel, no crime, report as directed, no firearms or weapons, reside at an approved address. (R.23: Bond Conditions, 115–18). But it also ordered home detention with GPS monitoring, named Wagner's mother as his third-party custodian, and imposed the following further conditions: (1) to avoid contact with any victims or witnesses; (2) not to post or direct anyone to post on social media; (3) not to participate, encourage, or organize protests or activist events aimed at ICE or federal agencies; (4) not to travel outside Minnesota and the Eastern District of Michigan without permission; and (5) not to engage in threatening or assaultive behavior, including contacting or encouraging anyone to act on his behalf to threaten another person. (*Id.*). Finally, Wagner may use only

16

one phone and one computer, which pretrial services in Minnesota must approve, and both must have supervision software. (R.24: 3/25/26 Hrg. Tr., 153). Wagner may not use anyone else's devices, nor may he possess other devices. (*Id.*).

On Friday, March 27, 2026, the Solicitor General of the United States authorized this appeal, and a notice of appeal was promptly filed. The government now files this emergency motion for stay of the district court's release order. Fed. R. App. P. 8(a)(2)(A)(ii).

## Argument

**The government's emergency motion to stay the district court's pretrial release order should be granted.**

When presented with a motion to stay, this Court considers four factors: (1) whether the movant is likely to succeed on the merits; (2) whether the movant will suffer irreparable injury without a stay; (3) whether a stay will substantially injure the other interested party; and (4) where the public's interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009). "These factors are not prerequisites that must be met, but are interrelated factors that must be balanced together." *Cooey v. Strickland*, 604 F.3d 939, 943 (6th Cir. 2010) (quotations omitted).

17

"[A] movant need not always establish a high probability of success on the merits." *Mich. Coal. of Radioactive Material Users v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [that the movant] will suffer absent the stay. Simply stated, more of one excuses less of the other." *Id.* Still, the movant must show "serious questions going to the merits." *Id.* The government has met that burden here. Viewing the factors in their totality, an emergency stay of the release order pending a resolution of this appeal is warranted.

### A.    The government is likely to succeed on the merits.

Under the Bail Reform Act, a district court must detain a defendant pending trial when "no condition or combination of conditions" can reasonably assure his appearance and the safety of any other person and the community. 18 U.S.C. § 3142(e)(1). Several factors inform this analysis: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence" going to dangerousness and risk of nonappearance, (3) the defendant's "history and characteristics," and (4) "the nature and seriousness of the danger" posed by the

defendant's release. 18 U.S.C. § 3142(g). The burden to show a risk of nonappearance is by a preponderance of the evidence, and the burden to show dangerousness is by clear and convincing evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).

On appeal, the Sixth Circuit will "review the district court's factual findings for clear error," but it considers "mixed questions of law and fact—including the ultimate question whether detention is warranted—*de novo*." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (citing *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985)); *but see United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002) (observing that a bail decision is reviewed for an abuse of discretion).

Here, the United States is likely to succeed on the merits in this appeal from the district court's pretrial release order for three reasons.

*First*, the district court's legal conclusion is not supported by the facts it purported to rely on and ignores salient facts about Wagner's risk of dangerousness and nonappearance. For example, it dismissed the first pretrial services recommendation that Wagner be detained, surmising that there was less time to prepare that report, without grappling with the fact that the two reports were nearly identical in

19

substance. That was a crucial error because they reached opposite conclusions about dangerousness and nonappearance risk. The court also unreasonably discounted the first recommendation, which is from the district that will have to supervise Wagner—placing its officers in potential danger by a person who has expressed a desire to kill federal law enforcement—and knows its capabilities and resources best.

The court failed to properly weigh Wagner's pattern of inciting violence against federal law enforcement. The court focused on the nature of the two indicted charges but never addressed the circumstances underlying them—i.e., Wagner's escalating threats and incitement of violence against federal law enforcement, including Wagner calling for his followers to "put hands on ICE," "kill [ICE] or be killed," and to "get your f------ guns and stop these f------ people." Wagner also explained that "this is where ICE has come to die… if it has to be done at the barrel of a gun, then let us have a little f------ fun." Some of Wagner's statements—like urging "every armed American that's within a reasonable distance of 26th and Nicollet" to "come and stand"—are designed to incite violence at specific locations and times against specific targets. Courts must take threats like this seriously because the

20

"targeting of public officials has become a virulent issue which must be universally condemned." *United States v. Lidderdale*, 795 F. Supp. 3d 1024, 1028 (S.D. Ohio 2025). And the "recent attacks on ICE officers," which Wagner promotes, including his advocacy of "violence, in lieu of democratic processes, toward political ends," *id.* at 1029, presents significant danger to the community and federal law enforcement. Yet the court effectively ignored these facts, only mentioning near the end of the hearing that his charges are "very serious." (R.24: 3/25/26 Hrg. Tr., 149–50). Given what the magistrate judge in Minnesota called "voluminous" evidence of Wagner's dangerousness, failing to meaningfully address that evidence was error. *United States v. Wagner*, Case No. 26-mj-0141 (D. Minn.), R.11: D. Minn. Det. Order, 3.

The court also disregarded Wagner's blatant disrespect for the court, vaguely gesturing to his booking photo where he displayed two middle fingers and stated, "this is for the judge." (R.21: Gov't Br., 91). And the court ignored Wagner's express warning not to "let [him] back out" before expressing an intent to kill. (*Id.* at 81). Instead of properly weighing this troubling warning against Wagner's release, the court

21

largely ignored it, concluding that Wagner will appear and does not pose a danger to the public. (R.24: 3/25/26 Hrg. Tr., 150).

Further, despite the government's "very strong argument," (*id.* at 147), and the court's "active" concerns about Wagner's danger to the public, victims, and himself, (*id.* at 146), it concluded that a condition keeping the victim (in Michigan) "far apart" from Wagner (in Minnesota) would be sufficient. (*Id.* at 147). But the court improperly discounted the danger that Wagner poses from home confinement with internet or phone messaging access, relying heavily on Wagner's agreement to abide by pretrial services' device-monitoring conditions. The court also never mentioned Wagner's self-identification as a radically committed member of Antifa—a designated domestic terrorist organization—or his messages indicating that he would coordinate with others to commit violence against law enforcement and other people. And Wagner will necessarily travel to Michigan, where the victim lives, for court appearances. Finally, the court did not grapple with Wagner's willingness to foment violence against other people or groups he perceives as ideological adversaries. His release to Minnesota provides little assurance of the victim's or the public's safety.

22

*Second*, the district court committed legal error when it assessed Wagner's nonappearance risk. The court narrowly assessed Wagner's nonappearance as his ability to flee to another country. (*Id.* at 148–49). But the Bail Reform Act requires courts to assess a defendant's appearance in court, 18 U.S.C. § 3142(b), not a defendant's likelihood that he will flee to a non-extraditable country. And the court diminished his income, (R.24: 3/25/26 Hrg. Tr., 149), which ranges from $5,000 to $10,000 a month, plus approximately $10,000 to $15,000 from social media donations, (*id.* at 136), which increases his ability to flee. The court entirely ignored Wagner's prior attempts to raise money to "evade" law enforcement and discounted his failures to appear, incorrectly concluding that Wagner did not present a strong risk of flight. (*See id.* at 148). And the court's conclusion that it has released defendants to be supervised in other districts, (*id.*), is not the individualized determination required when deciding whether to release Wagner. *Stone*, 608 F.3d at 946. Wagner has previously held himself out as possessing substantial resources and means to evade law enforcement, and he manifests a blatant disrespect for judicial authority. But the court disregarded this evidence, instead concluding

23

that Wagner had "no normal indicators of flight risk," which erroneously imposed a categorical framing on an individualized risk assessment.

*Third*, the totality of the circumstances shows that Wagner is a danger to the community and poses a substantial nonappearance risk. His danger is "multifaceted" because it "encompasses a risk of physical harm and violence to actual people" as well as the "interference with and disruption of the administration of justice. These risks are unquestionably grave." *United States v. Comberger*, No. 5:21-MJ-05138, 2021 WL 1725516, at *6 (E.D. Ky. Apr. 30, 2021). Wagner has shown a pattern of threatening the physical safety of those he regards as "Nazis" and their allies. And far from being a mere keyboard warrior, Wagner's physical resistance to his arrest and his warning to the arresting agents that they should not "let [him] back out" suggest that he will not be deterred from violence by the prospect of judicial sanctions.

So the government is likely to succeed. There are no conditions that could reasonably assure Wagner's appearance as required or adequately protect the safety of J.S., any other person, or the community.

24

## B.    Releasing Wagner will likely cause irreparable harm.

The second stay factor, whether failure to grant a stay risks irreparable injury, also favors the government. If Wagner engages in violence, encourages any of his thousands of followers online to do so, or otherwise continues his pattern of crime while on release, that harm cannot be undone. Notably, Wagner could access social media nearly anonymously under a different account name and reengage with his followers, just as he did when Instagram shut down his account. And the United States has a strong interest in the safety of federal law enforcement, whom Wagner has specially targeted. Finally, if Wagner flees or otherwise fails to appear, justice cannot be served in this prosecution.

## C.    Briefly staying the release order during this appeal would not substantially harm Wagner.

Conversely, a stay of Wagner's release during this appeal would not substantially harm him. Although an individual has a strong interest in liberty, when the government presents clear and convincing evidence that a defendant presents "an identified and articulable threat to an individual or the community," a court may "disable" the defendant "from executing that threat." *Salerno v. United States*, 481 U.S. 739,

25

748 (1987) (upholding the constitutionality of the Bail Reform Act). And this Court must decide bond appeals promptly, *see* 18 U.S.C. § 3145(c), which lessens Wagner's harm.

### D.    Granting the stay serves the public interest.

Finally, a stay is in the public's interest. This factor weighs overwhelmingly in favor of detention. The government has an "interest in community safety" that "can, in appropriate circumstances, outweigh an individual's liberty interest." *Salerno*, 481 U.S. 748. That interest is set forth in the Bail Reform Act—to be reasonably assured that the defendant will appear as directed and will not pose a risk of harm to any person or the community. Here, as the court admitted, the government has a "very strong" argument that Wagner is a danger to the broader community. (R.24: 3/25/26 Hrg. Tr., 147). The release of a self-described Antifa member and absconder who threatens and incites violence against federal law enforcement and their supporters is against the public's interest, including the interest of the court officers who will be required to supervise him. His calls inciting violence against federal law enforcement and their supporters endanger not just the victim in this case, but all federal law enforcement and those who support them.

26

And Wagner's advocacy to replace civil discourse and political process with violence endangers our rule-of-law foundations. No conditions can adequately protect that interest.

## Conclusion

The district court's release order should be stayed pending appeal.

Respectfully submitted,

Jerome F. Gorgon Jr.
United States Attorney

/s/ Danielle Asher
Danielle Asher
Assistant United States Attorneys
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9518
Danielle.Asher@usdoj.gov

Dated: March 27, 2026

# Certificate of Compliance

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because, excluding the parts of the document exempted by Rule 32(f), it contains 4,383 words. This motion complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Danielle Asher
Assistant U.S. Attorney

Dated: March 27, 2026

# Certificate of Service

I certify that on March 27, 2026, I electronically filed this motion for the United States with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system, which will send notification of the filing to the following counsel of record:

Jean Pierre Nogues, Jean_Nogues@fd.org

/s/ Danielle Asher
Assistant U.S. Attorney