# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff-Appellant,                         Case No.: 26-1294

v.

KYLE WAGNER,

       Defendant-Appellee.

_____/

## RESPONSE IN OPPOSITION
## TO EMERGENCY MOTION TO STAY PRETRIAL RELEASE ORDER

## INTRODUCTION

Kyle Wagner should remain free on bond. After Wagner appealed a Minnesota magistrate judge's denial of bond, the district court in the Eastern District of Michigan conducted a thorough de novo review.  Over two days of hearings, the district court reviewed the magistrate judge's detention order; heard proffers and argument from both sides; weighed the factors set forth in 18 U.S.C. § 3142(g); and concluded that a set of release conditions could reasonably assure both the safety of the community and Mr. Wagner's appearance at future proceedings. The government's emergency motion to stay that carefully considered order should be denied.

The traditional stay factors set forth in *Nken v. Holder*, 556 U.S. 418, 433-4 (2009), all weigh against a stay. The government fails to make a strong showing that it can likely succeed on the merits of its appeal because the district court's factual findings are not clearly erroneous and its legal conclusions are well-supported. The government cannot show irreparable harm because the district court imposed extensive, enforceable conditions of release that directly address the government's stated concerns. The equities favor Mr. Wagner's continued liberty. He would be substantially injured by a remand to pretrial detention.  And the public interest is served by adherence to the Bail Reform Act's presumption of release, and the Constitution's presumption of innocence.

## BACKGROUND

Mr. Wagner is charged by indictment in the Eastern District of Michigan with one count of cyberstalking, in alleged violation of 18 U.S.C. § 2261A(2), and one count of communicating a threat transmitted via interstate commerce, in alleged violation of 18 U.S.C. § 875(c). Both charges relate to social media posts directed at J.S., who is alleged to reside in the Eastern District of Michigan.  Mr. Wagner lives in the District of Minnesota.

Mr. Wagner was arrested on February 5, 2026, in Minneapolis. Subject to Rule 40 removal proceedings, he was given a detention hearing immediately following his initial appearance before Magistrate Judge David Schultz of the District of Minnesota. The assistant federal defender on duty had only approximately thirty minutes to

interview Mr. Wagner and prepare for the detention hearing; she wasn't even given a copy of the complaint prior to the hearing. (*United States v. Wagner*, Case No. 26-mj-0141 (D. Minn.), R.13: 2/5/2026 Hrg. Tr., 5.)   Mr. Wagner—who is not a lawyer and had no previous experience in federal criminal court—insisted, against his counsel's advice, on moving forward immediately with the detention hearing rather than requesting a continuance under 18 USC § 3142(f)(2)(B). (*See id.* at 5-6, 9.)  Due to the time constraints, Pretrial Services was unable to prepare a written report prior to the hearing and made only an oral recommendation for detention. (*Id.* at 10).[1]   Pretrial Services reported to the parties only that Mr. Wagner had been "living couch to couch for over a year" (*see id.* at 39) and didn't explore any possibility of Mr. Wagner residing at a relative's home.

The government attorney, on the other hand, had flown out from Detroit for the occasion and came prepared with a 30-page complaint and a PowerPoint presentation. (*Id.* at 9.) The Government is not at fault for the disparity in preparation.

---

[1] A written Pretrial Services report was not produced until the day after the hearing, on February 6. (*See* D. Minn. Pretrial Services Report.) It also scored Mr. Wagner as Category 3 on the Pretrial Risk Assessment instrument. (*Id.*)  The PTRA "is an objective, quantifiable instrument that provides a consistent and valid method of predicting risk of failure to appear, new criminal arrest, and technical violations while on pretrial release." (*Id.*) Category 3 is halfway between Category 1 (lowest risk) and Category 5 (highest risk).  Pretrial Services' own "objective", "consistent and valid" tool scored Wagner as middle of the road in terms of risks of nonappearance and danger. There is no mention of the PTRA score during the first detention hearing, perhaps because it had not yet been calculated.  But the district court in the Eastern District of Michigan was later able to consider the entirety of the Pretrial Services reports from both districts, including the PTRA score.

However, the disparity impacted the relative persuasive weight of the proffers and arguments put forward for consideration by the magistrate, and the short time frame prevented Pretrial Services from investigating the suitability of alternative bond addresses for Mr. Wagner, including that of his mother, and from producing a written report in time for the detention hearing.

The magistrate ordered detention and removal to the Eastern District of Michigan. (*See id.* at 51-52; *see also Wagner*, Case No. 26-mj-0141 (D. Minn.), R. 3: Minutes; R.11: Order of Det.)  The transfer from Minneapolis to Detroit took three weeks and involved transfers through BOP facilities in Oklahoma, during which Mr. Wagner was violently assaulted by another inmate.[2]

Following removal to the Eastern District of Michigan, Mr. Wagner appealed the detention order to the district court assigned to the case. The district court conducted a full de novo hearing that started on March 24, 2026 and continued on the following day.  By that time, the Eastern District of Michigan's Pretrial Services department had completed a thorough investigation—including coordinating with its colleagues in Minnesota to conduct a home visit of Mr. Wagner's mother—and reversed the original recommendation, now recommending release under a comprehensive set of conditions

---

[2] Counsel for Defendant-Appellee confirmed with a BOP counselor at Milan FDC in Milan, Michigan—where Mr. Wagner was most recently incarcerated before his release—that the Oklahoma attack was under investigation and was the basis for Mr. Wagner being in protective custody.

in addition to other standard conditions of pretrial supervision. The special conditions included:

- home detention;
- GPS-based location monitoring;
- substance abuse treatment;
- participation in and adherence to the computer and internet restriction/monitoring program; and
- no assaultive, threatening, or harassing behavior or statements.

(*See* E.D. Mich. Pretrial Services Report.) Upon request by the district court, Pretrial Services conducted a further interview of Mr. Wagner's mother and found her willing and suitable to be a third-party custodian (although Pretrial Services did not recommend third-party custodianship as necessary in this case). (See E.D. Mich. Third-Party Custodian Memo.)

The district court then ordered Mr. Wagner released, adopting Pretrial Services' recommendations but adding several other stringent conditions:

- appointment of Mr. Wagner's mother as Third Party Custodian;
- "Resolve all warrants within 45 days";
- "Do not encourage others to have contact with alleged victim(s)";
- "Refrain from posting on social media, or directing others to post on his behalf";
- "Not participate or encourage participation in protests/demonstrations"; and
- "Permission of [Pretrial Services] to enter city limits of Minneapolis or St. Paul."

(R. 23: Order Setting Cond. Of Release). On the record, the court additionally noted that Mr. Wagner could have access to at most one computer and one cell phone

5

approved by Pretrial Services and loaded with supervision software. (R. 24: 3/25/26 Hrg. Tr., Pg.ID 153.)

Mr. Wagner was released from Marshal's custody following the hearing. After attending a further meeting with Pretrial Services to review the conditions and to fit and affix his GPS tether, Mr. Wagner left Detroit in the custody of his mother, who drove him through the night to his approved residence and site of his home detention in the suburbs outside the 'Twin Cities' limits. Mr. Wagner has remained in full compliance with the conditions of his release.

The government now seeks an emergency stay of the release order pending appeal. (*See* Doc. 2, Appellant Emergency Mot..)

## ARGUMENT

A stay pending appeal of a release order "is not a matter of right" of the Government; it is an exercise of judicial discretion. . . the propriety of [which] is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433. The government must overcome the burden of showing that the circumstances justify such an exercise of this Court's discretion. *Id.* at 433-34 (2009). The Court considers the following four factors: (1) likelihood of success on the merits of the Government's appeal; (2) irreparable injury to the Government absent a stay; (3) whether a stay will substantially injure the defendant; and (4) where the public interest lies. These factors "are not prerequisites that must be met, but are interrelated factors that must be

6

balanced together." *Cooey v. Strickland*, 604 F.3d 939, 943 (6th Cir. 2010). "[N]o single factor dictates the outcome." *Smith v. Davis*, 2025 WL 1826652 *3 (6th Cir. Jul. 2, 2025). But here, every factor weighs against the government. The motion for stay should be denied. *See, e.g., United States v. Abrego Garcia*, 788 F.Supp.3d 937 (M.D. Tenn. 2025).

## I.    The Government Is Unlikely to Succeed on the Merits.

The district court's release order was the product of a careful, individualized analysis under the Bail Reform Act. On any standard of review, the government cannot show reversible error. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (clear error for fact finding, de novo for legal questions); *see United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002) (abuse of discretion).)

### A.    The district court properly weighed the nature and circumstances of the charged offenses.

In its motion, the government devotes considerable space discussing Mr. Wagner's social media posts about ICE operations in Minneapolis—First Amendment-protected posts for which he has not been charged with any crime. And the government devotes far less space to the alleged acts for which Wagner is actually charged. (*See* Doc. 2 at 2-9).[3] But the actual charges and alleged criminality in this case are limited to cyberstalking and interstate threats directed at a single individual, J.S. The district court

---

[3] Similarly, the government's complaint in this case devotes 26 of its 30 pages (87%) to sensationalizing Mr. Wagner's uncharged and constitutionally-protected online speech regarding ICE operations in Minneapolis. (*See* R.1: Complaint, Pg.ID 3-29).

7

properly focused its analysis on the charged conduct rather than the government's attempt to recast constitutionally protected political speech as evidence of dangerousness.

Context matters. This prosecution was brought following the express direction of senior Department of Justice officials who instructed federal prosecutors to "go big and go loud" against anti-ICE protesters. *See* Alan Feuer, Alexandra Berzon and Ernesto Londoño, *"Go Big and Go Loud": Inside the Justice Dept.'s Push to Prosecute Protesters*, N.Y.Times, Mar. 19, 2026, available at *https://perma.cc/7X3H-7XTA* (last accessed Mar. 30, 2026). The Attorney General's own public statement upon Mr. Wagner's arrest accused him of conduct for which he was never charged—purportedly "doxx[ing] and call[ing] for the murder of law enforcement officers"—and explicitly framed the case as a political message from "the Trump Administration." *See* Justice Dept. Office of Public Affairs Press Release, Feb. 5, 2026, available at *https://perma.cc/Y65K-T34U* (last accessed Mar. 30, 2026). Even the White House press secretary publicly displayed Mr. Wagner's photograph, declaring him "a domestic terrorist" who "will be held accountable," despite the absence of charges alleging domestic terrorism. *See* Steve Karnowski, Minneapolis man accused of cyberstalking, threatening ICE supporter amid crackdown in Minnesota, Associated Press, Feb. 10, 2026, available at *https://perma.cc/8A83-3FYS* (last accessed Mar. 30, 2026).

**B.    The weight of the evidence does not favor continued detention.**

The government's case on the charged offenses is weaker than its motion suggests. The threat charge rests on language the magistrate himself found to be no more than "implied." The thirty-page criminal complaint is revealing in this regard: the actual conduct underlying the charges does not appear until page 28, preceded by twenty-seven pages of constitutionally protected political speech offered to make the defendant look dangerous. (*See* R.1: Complaint, Pg.ID 3-29.)

The government's characterization of Mr. Wagner's broader social media activity as evidence of dangerousness conflates charged and uncharged conduct. While Mr. Wagner's posts about ICE are admittedly provocative and, at times, intemperate, they must be understood in their context. The posts were made during a period when two Minneapolis-area civilians (one of whom Wagner had known personally for 15 years (*See Wagner*, Case No. 26-mj-0141 (D. Minn.), R.13, 41)) had been killed by federal law enforcement officers during protests and immigration enforcement activities. Mr. Wagner's exhortations to "stand ground" and "defend" against ICE—whatever one thinks of their wisdom—were expressions of political opposition, and he repeatedly and expressly cautioned his followers against instigating violence. Mr. Wagner's attorney at the first detention hearing summed it up well:

> what the government didn't highlight is some of his other statements that they include in their complaint. "<u>Do not attack them</u>. Document everything. Make your voices heard. The Epstein files must be released and detailed to the public through trial and investigation, <u>not through mass mob violence</u>. Through trial and investigation. The National Guard

should be deployed to detain and disarm." Again, resorting to the system, to the government, to handle these things. "<u>If you're armed, declare it. Don't hide it.</u> If you're armed, declare it." That's what he said. "<u>We do not shoot first. Keep your heads. We're not the violent ones</u>. . . . We are at war. A war for our souls." So yes, it's inflamed. Yes, it sounds combative. But that's also figurative war, for our souls. That's a lot of what Mr. Wagner is saying.

(*See id.*, 24-5) (emphasis added).  The defense at the second detention hearing similarly paraphrased the mitigating portions of Mr. Wagner's posts where he warned against instigating violence.  (R. 27, Pg.ID 206-7.)  The district court was not required to accept the government's one-sided characterization of this speech.

## C.   Mr. Wagner's history and characteristics support release.

At the initial detention hearing in Minnesota, the defense had approximately thirty minutes to prepare. It is unsurprising that little mitigating evidence was available at that time. But by the time of the de novo hearing before the district court, the picture was far more complete.

Mr. Wagner has no criminal history of violence—none. He has no weapons offenses and no history of assaultive conduct.  His prior criminal record consists of minor traffic citations, and a youthful drug-related offense in Colorado for which he successfully completed a diversion program and was subsequently vacated. (*See* E.D. Mich. Pretrial Services Report.).  He has one outstanding bench warrant from Iowa for a marijuana possession case in which a deferred judgment was entered; Mr. Wagner took substantial steps to resolve that case in 2016, and it appears the warrant was

10

reissued soon after—Mr. Wagner found out about the outstanding warrant at his Minneapolis detention hearing. (R. 27, Pg.ID 184-5.)

The government emphasizes Mr. Wagner's behavior during his arrest: spitting on and "resisting" the agents processing his arrest; making statements about "not letting him out;" "express[ing] an [unspecified] intent to kill"; flipping the bird to the camera in his booking photo. (*See* Doc. 2 at 10-11.) But the district court considered this evidence and properly weighed it. A chaotic and hostile response to arrest—while certainly not commendable—does not establish that no conditions of release can ensure safety. The relevant question is whether Mr. Wagner—subject to home detention, GPS monitoring, device restrictions, third-party custodian supervision, and a comprehensive ban on social media and protest activity—poses a danger that cannot be adequately managed. The district court reasonably concluded that he does not.

The government's reliance on Mr. Wagner's self-identification as a member of Antifa and as a "crazy leftist" is troubling. Political affiliation, political self-description and anti-government activism are not themselves evidence of dangerousness under the Bail Reform Act. *See, e.g., United States v. Munchel*, 991 F.3d 1273, 1283-4 (D.C. Cir. 2021).[4]

---

[4] "The District Court did not adequately demonstrate that it considered whether Munchel and Eisenhart posed an articulable threat to the community in view of their conduct on January 6, and the particular circumstances of January 6. The District Court based its dangerousness determination on a finding that 'Munchel's alleged conduct indicates that he is willing to use force to promote his political ends,' and that '[s]uch conduct poses a clear risk to the community.' In making this determination, however,

The suggestion that Mr. Wagner's political identity and his fiery rhetoric, rather than his actual conduct, renders him unfit for supervised release is antithetical to the principles of individual liberty that the Act is designed to protect.

### D.     The conditions of release adequately address any danger.

The government argues that Wagner "could access social media nearly anonymously. . . and reengage with his followers." (Doc. 2 at 25.) But the district court addressed this concern head-on by imposing strict device restrictions: Mr. Wagner may possess only one phone and one computer, both of which must be approved by pretrial services and equipped with supervision software. (R. 24: 3/25/26 Hrg. Tr., Pg.ID 153-4.) He may not use anyone else's devices. (*Id.*) He may not post on social media or direct anyone to do so on his behalf. (*Id.* at 154.) He is under home detention with GPS monitoring. (*Id.* at 152-3.) And his mother—a near-retirement professional who has committed to driving her son to every court appearance in Detroit—provides an additional layer of supervision and accountability as third-party custodian. (Id. at 154; *see also*, generally, R. 23.)

---

the Court did not explain how it reached that conclusion notwithstanding the countervailing finding that 'the record contains no evidence indicating that, while inside the Capitol, Munchel or Eisenhart vandalized any property or physically harmed any person,' and the absence of any record evidence that either Munchel or Eisenhart committed any violence on January 6. That Munchel and Eisenhart assaulted no one on January 6; that they did not enter the Capitol by force; and that they vandalized no property are all factors that weigh against a finding that either pose a threat of 'using force to promote [their] political ends.'"

The government contends that Mr. Wagner's "disdain" for law enforcement means he cannot be trusted to follow conditions. But the mere fact a defendant holds strong political views—even extreme ones—does not render release conditions inherently inadequate.  The district court also ordered that Mr. Wagner not participate in, organize, or encourage any protest or activist activity related to ICE or any federal agency, and barred him from threatening or assaultive behavior of any kind. These conditions specifically and directly target the conduct the government finds most concerning.

The magistrate in Minnesota failed to explain why conditions short of detention could not work. (*See Wagner*, Case No. 26-mj-0141 (D. Minn.), R.13 at 51-2; *Wagner*, Case No. 26-mj-0141 (D. Minn.), R.11 at 3.) The district court, by contrast, articulated a detailed set of conditions tailored to the specific risks Mr. Wagner presents. The government's disagreement with that conclusion does not constitute clear error; indeed, the district court's discussion of conditions corrects the error made by the magistrate.

### E. The risk of nonappearance does not support continued detention.

The government argues that Mr. Wagner is a flight risk based on his lack of stable employment, his social media statement about being "on the run," and his prior failures to appear. The district court addressed each of these points.

Mr. Wagner has worked as a carpenter and has job prospects available to him. He is currently residing with his mother and stepfather in Eden Prairie, Minnesota—a

13

stable home with family ties. His mother has committed to driving him to every court appearance in Detroit and has the vacation time and approaching retirement to make this feasible. The Eastern District of Michigan Pretrial Services department—after conducting its own thorough investigation, including a home visit—was satisfied that this arrangement could work and recommended release.  And Mr. Wagner's mother has made the commitment to be a third-party custodian, taking on additional responsibilities and accountability for her son's compliance with his conditions.

Mr. Wagner's prior failures to appear are minor. They arise from traffic cases and a misdemeanor marijuana case, not from any attempt to flee prosecution. His social media reference to being "on the run" was made, with sarcasm, in the context of the federal government broadly (and likely, illegally) designating "Antifa" as a "domestic terror organization," and of right-wing trolls making over-the-top threats online.  This was all social media bravado, not evidence of an actual flight plan. Indeed, Mr. Wagner regularly posted videos that clearly revealed the location of the apartment where he had been living—not consistent with being "on the run".  The district court did not err in concluding that these facts—in light of GPS monitoring, home detention, and third-party custodian supervision, were insufficient to justify detention on nonappearance grounds.

The government's motion mischaracterizes the record made by the district court to support its decision in several ways.

*First*, the district court did not improperly frame nonappearance as flight to a foreign country. The court's point was that Mr. Wagner has no passport, no international connections, and no realistic means of evading supervision. Under home detention with GPS monitoring, Mr. Wagner's whereabouts will be known at all times.

*Second*, the court did not ignore the various selected quotes taken by the government from Mr. Wagner's social media posts; it also heard, and acknowledged, the defense's proffer that Mr. Wagner generally noted in the same social media posts that he did not advocate for protestors to instigate violence, but only to be willing to defend themselves and others if ICE agents attacked them with excessive force.

*Third*, there was nothing "confusing" about the district court's comments about the "two-way street" in today's political climate, where many members of the public— particularly in Minneapolis—reasonably believe they need protection <u>from</u> the surge of inadequately trained and physically aggressive ICE agents occupying their communities. The government's arguments that anti-ICE protestors pose a risk to public safety rings particularly hollow in the wake of the killings of Renee Good and Alex Pretti at the hands of ICE officers. The district court was accurately highlighting the current climate of uncertainty, division, distrust, and fear—that was "the sad state of affairs" to which she referred.

*Finally*, the court did not fail to individualize her analysis by noting it has previously released other defendants to supervision in other districts, or imposed conditions restricting internet usage, with success. On the contrary, the court was

15

directly responding to conclusory assertions made by the Government that supervision in another district was inherently unworkable, and that staying off social media would be impossible for a defendant who had previously spent much of their time there.

Indeed, the district court, in weighing all the proffered facts and legal arguments, made an individualized determination that took all the § 3142 factors into account. (R. 24, Pg.ID 142-50.) *See Stone*, 608 F.3d at 946. The district court committed no clear error in its factual findings, and under those circumstances, the government is unlikely to prevail in its argument on appeal that not even the stringent set of conditions imposed by the court could reasonably assure the safety of J.S., any other person, and the community, and assure Mr. Wagner's appearance in court. (Certainly, no abuse of discretion occurred. *See Chilingirian*, 280 F.3d at 709.)

## II.　The Government Has Not Shown Irreparable Harm.

The government speculates that Mr. Wagner might access social media "nearly anonymously" and reengage with his followers. But speculation is not evidence, and it is certainly not irreparable harm. The district court's conditions directly address this risk: Mr. Wagner is limited to one phone and one computer, both subject to pretrial services approval and equipped with monitoring software. (R. 24 at Pg.ID 153-4.) He is under home detention with GPS. (*Id.* at 152-3.) He is barred from social media entirely. *Id.* at 154; *see also*, generally, R. 23.) These are precisely the types of enforceable conditions that the Bail Reform Act contemplates as alternatives to detention.

16

The government's argument effectively asserts that any defendant charged with an internet-based offense must be detained because compliance with technology restrictions cannot be perfectly guaranteed. This Court has never adopted such a categorical rule, and the Bail Reform Act does not require perfect assurance—only reasonable assurance. *See* 18 U.S.C. § 3142(e)(1). The district court's conditions provide that reasonable assurance.

### III.   The Equities Strongly Favor Mr. Wagner.

The third *Nken* factor asks whether a stay will substantially injure the opposing party. Here, the injury to Mr. Wagner is plain. He faces reincarceration—the most severe deprivation of liberty our system permits—while presumed innocent, and without having committed any violations of his pretrial release conditions. The Supreme Court has recognized that pretrial detention implicates "the fundamental nature" of the liberty interest at stake. *Salerno v. United States*, 481 U.S. 739, 750 (1987).

Mr. Wagner is not charged with any violent crime. He has no prior violent criminal history. He poses no physical threat to J.S.—he does not know where J.S. actually lives, and the two are separated by approximately 700 miles. The district court has imposed conditions that specifically and directly target every concern the government has raised. Continued detention under these circumstances inflicts substantial harm on Mr. Wagner with no corresponding benefit to public safety.

Furthermore, given that Mr. Wagner has been released and returned home to Minnesota, a granting of a stay of the district court's order would likely result in Mr. Wagner being taken back into custody in Minnesota and subjected once again to the onerous removal process, delaying proceedings in his case and exposing him once again to the harassment and violence he faced the first time around.

## IV.    The Public Interest Favors Release Under Appropriate Conditions.

The Bail Reform Act reflects a congressional determination that pretrial detention is the exception, not the rule. *See Salerno*, 481 U.S. at 755 ("In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception"). The public interest is served by faithful application of that principle.

The government argues that Mr. Wagner's release endangers federal law enforcement officers and their supporters. But the conditions the district court imposed—home detention, GPS monitoring, a total ban on social media and protest activity, device monitoring, and third-party custodian supervision—are specifically designed to address that concern. The public interest lies in the court's ability to fashion and enforce individualized conditions, not in the wholesale incarceration of every defendant whose speech the government finds objectionable.

The broader context of this prosecution cannot be ignored. This case was brought as part of an express campaign to generate headlines and chill political dissent. The public interest is not served by using pretrial detention as a tool of political

18

intimidation. It is served by ensuring that the constitutional presumption of innocence and the statutory preference for release are given full effect—even when, indeed especially when—the defendant holds views that are unpopular with those in power.

## CONCLUSION

For the foregoing reasons, the government's emergency motion to stay the district court's pretrial release order should be denied.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER**
**EASTERN DISTRICT OF MICHIGAN**
Attorneys for Defendant-Appellee
By:

s/Jean Pierre Nogues
Jean Pierre Nogues
Assistant Federal Defender

Dated: March 30, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2026, I electronically filed the foregoing paper with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system which will send notification of such filing to opposing counsel.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF MICHIGAN**
Attorneys for Defendant-Appellee
By:

s/Jean Pierre Nogues
Jean Pierre Nogues
Assistant Federal Defender

Dated:  March 30, 2026