## No. 26-1294

In the United States Court of Appeals
for the Sixth Circuit

# United States of America,

Plaintiff-Appellant,

v.

# Kyle Wagner,

Defendant-Appellee.

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 26-cr-20059 (Hon. Denise Page Hood)

## Brief for the United States

Jerome F. Gorgon Jr.
United States Attorney

Danielle Asher
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9518
danielle.asher@usdoj.gov

# Table of Contents

Table of Authorities................................................................... iii

Oral Argument Is Unnecessary ....................................................v

Jurisdictional Statement................................................................1

Introduction...................................................................................2

Issue Presented ............................................................................1

Statement of the Case .................................................................2

    First week of January. ............................................................2

    Second week of January...........................................................3

    Third week of January. ............................................................5

    Fourth week of January............................................................8

    Wagner's arrest. .....................................................................10

    Wagner's first detention hearing. ........................................11

    Wagner's second detention hearing .....................................13

Summary of the Argument ........................................................19

Argument.....................................................................................20

A.    The nature and circumstances of Wagner's offense—and the nature and seriousness of the danger he poses—supports detention....................................................................................21

    i.    Wagner poses a significant danger if released. ...................21

    ii.    The district court did not properly consider Wagner's dangerousness. ...............................................................28

i

iii.   The district court erred in concluding that Wagner did not pose a nonappearance risk...................................................31

B.   The weight of the evidence against Wagner is strong...................33

C.   Wagner's history and characteristics support detention. .............34

D. The district court's bond conditions do not adequately protect the community.................................................................................37

Conclusion .......................................................................................41

Certificate of Compliance with Rule 32(a).............................................42

Certificate of Service ................................................................................43

Relevant District Court Documents........................................................44

# Table of Authorities

Cases

*United States v. Bailey,*
No. 8:25-CR-387, 2025 WL 2897026 (M.D. Fla. Oct. 10, 2025) ..........35

*United States v. Chilingirian,*
280 F.3d 704 (6th Cir. 2002).........................................................20

*United States v. Cole,*
465 F. Supp. 3d 1175 (W.D. Wash. 2020).....................................35, 36

*United States v. Comberger,*
No. 5:21-MJ-05138, 2021 WL 1725516 (E.D. Ky. Apr. 30, 2021) ......26, 27,35, 36, 37

*United States v. Cooper,*
No. 3:19-MJ-04254-1, 2019 WL 4259454 (M.D. Tenn. Sept. 9, 2019) .... 26, 33, 35, 37, 39

*United States v. Hazime,*
762 F.2d 34 (6th Cir. 1985)...............................................................20

*United States v. Hinton,*
113 F. App'x 76 (6th Cir. 2004)........................................................21

*United States v. Jeffries,*
No. 3:10-CR-100, 2010 WL 3619946 (E.D. Tenn. Sept. 10, 2010).27, 29

*United States v. Lidderdale,*
795 F. Supp. 3d 1024 (S.D. Ohio 2025) ............................ 23, 24, 28, 29

*United States v. Meister,*
No. 1902738001, 2020 WL 1935523 (D. Ariz. Apr. 22, 2020) .............21

*United States v. Poulsen,*
521 F. Supp. 2d 699 (S.D. Ohio 2007) ...............................................37

*United States v. Richardson,*
No. 2:11-CR-220, 2011 WL 5026456 (S.D. Ohio Oct. 21, 2011) ..........24

*United States v. Rodriguez,*
  950 F.2d 85 (2d Cir. 1991) ..................................................................34

*United States v. Stone,*
  608 F.3d 939 (6th Cir. 2010).................................................. 20, 33, 34

*United States v. Wagner,*
  Case No. 26-mj-0141 (D. Minn., 2026), ..............................................29

Statutes

18 U.S.C. § 3142(b)...............................................................................32

18 U.S.C. § 3142(e)(1)...........................................................................20

18 U.S.C. § 3142(g) ...............................................................................21

18 U.S.C. § 3142(g)(3)(A).......................................................................34

18 U.S.C. § 3231 ......................................................................................1

18 U.S.C. § 3731 ......................................................................................1

## Oral Argument Is Unnecessary

The government has appealed a pretrial-release order. To avoid unnecessary delay in deciding the appeal and because the record is adequate to decide the single issue presented, the government does not request oral argument.

## Jurisdictional Statement

This is a government appeal from the district court's order granting the defendant's motion for pretrial release in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231 because the case involves "offenses against the laws of the United States." This Court has jurisdiction under 18 U.S.C. § 3731, which permits the government to appeal "a decision or order, entered by a district court of the United States, granting the release of a person charged with . . . an offense."

The district court entered its release order on March 25, 2026. (R.23: Order Setting Release Conditions, 114). The government timely appealed on March 27, 2026. (R.25: Notice of Appeal, 165). The government also sought an emergency stay of the release order, which this Court granted on April 3, 2026. Doc. 10, Order.

## Introduction

Kyle Wagner is a self-described Antifa member who has encouraged his thousands of online followers to "kill" ICE agents, threatened and doxed an ICE supporter in Michigan by publishing what he thought was his personal information and his parents' address online, sought donations to "evade" law enforcement, and fomented violence against people or groups he perceives as his ideological adversaries, referring to them as "Nazis." After his arrest, Wagner warned agents, "don't let me back out."

At Wagner's first detention hearing in Minnesota, the magistrate judge considered the pretrial services officer's detention recommendation along with the relevant evidence presented during the hearing, concluding that Wagner posed a danger to the community and a risk of nonappearance, and ordered him detained pending trial. But after Wagner appeared on his charges in Michigan, he appealed the detention order and the district court ordered his pretrial release back to Minnesota, disregarding the detention recommendation of the very pretrial services officers who will have to supervise him there.

2

The district court incorrectly determined that Wagner is not a danger to the community or a risk of nonappearance and ordered his release. Indeed, a panel of this Court granted an emergency stay of the release order pending this appeal, in part, because it found that the government would likely prevail on the merits. Doc. 10, Order.

This Court should reverse the district court's order releasing Wagner on bond.

## Issue Presented

Did the district court err when it decided that Wagner was not a danger to the community or a nonappearance risk and ordered his release?

## Statement of the Case

Until recently, Minnesota resident Kyle Wager has led a marginally dysfunctional life—working unsteady carpentry jobs, bouncing between homes, and pulling a few drug and traffic-related misdemeanors over the years. (*See generally* D. Minn. Pretrial Services Report). At some point, though, he began radicalizing. Doc. 2, Stay Mot., 2. By January 2026, 38-year-old Wagner was an Antifa extremist with tattoos to match. *Id.*

In January, Wagner made escalating calls to violence against federal law enforcement and their supporters to his thousands of online followers via his Instagram account (@kaos.follows). (*See* R.1: Complaint, 46–73). Wagner views the federal government and federal law enforcement as "Nazis," and he feels morally compelled to resist and fight them at every turn, preaching violence as the only solution. (*Id.* at 49, 51, 63, 68, 71). He has repeatedly incited violence from his followers—from "hands on" fighting to armed confrontation. (*Id.* at 49, 53, 59, 66—68). Consider some of his posts:

**First week of January**. Wagner was frank about his goals: a "constant harassment of ICE" to "cripple them." (R.1: Complaint, 48).

He wanted to dox agents—to "unmask and identify" them—including with physical force. (*Id.* at 51–52). But he issued straightforward calls to violence, too, like "hunt ice . . . disable their vehicles - surround them and disarm them - arm yourself and work in crowds"; "rise up now . . . and fight ice. This is kill or be killed"; "we need to put our hands on them"; and "take their f------ guns." (*Id.* at 49–53). These threats extended to federal law enforcement supporters: "If you side with the gunman[, w]e're coming for you too." (*Id.* at 55).

Wagner directed people to specific locations where law enforcement officers were staying, working, or gathering—like "[t]he ICE bunk houses in West End and around the Twin Cities" and "gold medal park and at the quarry NE." (*Id.* at 48, 52). Wagner wasn't alone in his efforts. He often pointed to the broader work of his team, saying things like "we're ready this time, ICE we're f------ coming for you" and explaining they were "really well organized." (*Id.* at 48, 53). Through all this, Wagner viewed himself as a martyr: "So, either we're going to win, or I will die in this process," because "we are at f------ war." (*Id.* at 53).

**Second week of January.** Wagner continued to advocate confrontation and violence, saying "it's not enough to film [ICE] and

scream and yell." (*Id.* at 57). He repeated death threats toward ICE agents: "This is where ICE has come to die"; "If [ICE's removal] has to be done at the barrel of a gun, then let us have a little f------ fun"; "ICE came here to die." (*Id.* at 58–59, 62). Many people responded in kind— *e.g.*, "Time for them to meet your friends. Namely AR15 and 9MM":





4

(*Id.* at 59).

Wagner continued to monitor and report on federal law enforcement's location. "[W]e found them checking into hotels all over the city," he said, "We want to know who [agents] are. We will identify every single one of them." (*Id.* at 57, 59). He threatened others that if they kept "f----- around," he would "escalate th[e] situation." (*Id.* at 60). And he told federal law enforcement supporters: "we crushed you in the 90s and we will crush you" again. (*Id.* at 60–61). Several times he urged "every armed citizen" to stop ICE actions in Minneapolis: "If you are armed and you witness an unlawful arrest and you stand by without action," then "you are complicit." (*Id.* at 56–57). And he remained as fanatically committed as ever: if he had "to die for" others "to figure it out - that's a price [he] will gladly pay,"—he was in the fight "to the end." (*Id.* at 57, 60). He also asked his supporters for money to "help [him] evade" law enforcement and "organize", listing (*Id.* at 55). And he listed his Venmo, Cashapp, and Paypal accounts. (*Id.*).

**Third week of January.** After an officer-involved shooting in Minneapolis, something in Wagner snapped. He began posting some of his most extreme content. In one video, he appears shirtless, screaming

5

into the camera, saying: "You can't march and bang drums and sing songs when they're shooting people in the f------ head. Go and f----- fight them. Or shut the f--- up and die for them":



(*Id.* at 65).

Later that day, he posted a longer video while wearing a bullet-proof vest. (*Id.* at 67). He called for "every armed American that's within a reasonable distance of 26th and Nicollet," the location of the shooting, to "come and stand." (*Id.* at 66). His video promised organized violent action, too: "I have gas masks on the ground there, as much as I could deliver. I have people en route. . . [W]e're done with peaceful protests now. The gloves come off and ICE needs to get out. Run for the

6

hills, boys." (*Id.*). He insisted on "putting hands on these murderers." (*Id.*).

His third video was captioned: "Suns out guns out… stfu [shut the f--- up] and fight back." (*Id.* at 68). Again donning a bullet-proof vest, he urged people "to suit up. Boots on the ground" to go "[a]nywhere between Franklin and Nicolette and 26th and Nicolette." (*Id.*). He lamented that he and his Antifa comrades had not already assaulted the local federal building (the Whipple building): "This is exactly what I said was going to f------ come when we didn't f---- go and march on f----- Whipple with guns." (*Id.*). And he meant violence: "no, not talking about peaceful protests" or "polite conversations anymore." (*Id.*). Wagner urged, "Get your f------ guns and stop these f------ people." (*Id.*). Many people responded, asking how they could help from out of state and promising to head his way:

7





(*Id.*).

**Fourth week of January.** Wagner's escalating threats and violent incitement led Instagram to remove his account. (*Id.* at 69). But Wagner resurfaced a few days later with a different username (@antifa.kaos)

8

and a new video showing him distributing gas masks and riot shields from his truck on the streets of Minneapolis. (*Id.* at 69–70). Wagner also announced he was "on the run now," but he had safe places and evacuation plans. (R.21: Gov't Br., 87).

At the same time, Wagner was beefing with online personality, J.S., who lives in the Eastern District of Michigan. (*Id.* at 71–72). Wagner posted to his thousands of followers what he believed was J.S.'s birth month and year, phone number, and parents' home address while calling him a "bb nazi boy." (*Id.*). Wagner also threatened J.S.: "we can all knock on strangers (sic) doors … See you soon kiddo - stay safe out here":



9

(*Id.*). Wagner later bragged in an online video that he had J.S.'s phone number and his parents' address. (*Id.* at 72).

**Wagner's arrest**. Having seen this threat, federal law enforcement filed a sealed criminal complaint on February 3 in the Eastern District of Michigan. (*See generally* R.1: Complaint). Agents arrested Wagner on February 5 at his Minneapolis apartment. (R.21: Gov't Br., 90). As they handcuffed and began transporting Wagner, he harassed, spit on, and physically resisted them. (*Id.*). He warned them not to "let [him] back out" and then immediately expressed an intent to kill. (*Id.* at 81, 90). In his booking photo, Wagner held up two middle fingers, declaring, "This is for the judge":



(*Id.* at 91).

**Wagner's first detention hearing.** Wagner insisted on a same-day detention hearing in Minnesota. *United States v. Wagner*, Case No. 26-mj-0141 (D. Minn.), R.13: 2/5/2026 Hrg. Tr., 9. That district's pretrial services department interviewed Wagner and made a report about his biography and criminal history. (*See generally* D. Minn. Pretrial Services Report). The report said that, for the past several years, Wagner has lived in Minneapolis. (*Id.* at 1). For work, Wagner claimed to make $5,000 a month doing carpentry gigs (although he had also received about $10,000–$15,000 in online donations through Venmo and GoFundMe that he did not disclose). (*Id.* at 2; E.D. Mich. Pretrial Services Report at 2). Wagner told pretrial services (falsely) that he had no history of substance abuse treatment. (D. Minn. Pretrial Services Report at 2). These inaccurate details were confirmed by his mom, who also lives near Minneapolis. (*Id.*).

As for criminal history, between 2007 to 2009, Wagner was charged with several low-level criminal violations in Colorado state court—littering, minor in possession, drug paraphernalia, and some traffic citations. (*Id.* at 2–3). He pleaded guilty to a few, and the others

11

were dismissed. (*Id.*). He was charged with disorderly conduct in Minnesota state court in 2014, but the charge was later dismissed. (*Id.* at 3). In 2016, he was charged with possessing a controlled substance in Iowa. (*Id.*). And he had three misdemeanor traffic cases in Hennepin County in 2024 and 2025, which remain active. (*Id.*). All told, Wagner has eight failures to appear from four different states, was listed as an absconder, and has an active warrant in Iowa. (*Id.*). The Minnesota pretrial services department did not believe that any bond conditions could ensure Wagner's appearance or the safety of the community, so it recommended detention. (*Id.* at 4).

The magistrate judge in Minnesota agreed and detained Wagner on both grounds. As for dangerousness, the magistrate judge found: "Mr. Wagner's recorded social media posts in which he expresses his anger and frustration, and encourages his supporters to join him in obstructing, impeding, and assaulting officers and those who support the efforts of law enforcement are voluminous." *United States v. Wagner*, Case No. 26-mj-0141 (D. Minn.), R.11: Order of Det., 3. The judge also found that Wagner posed a risk of nonappearance, weighing his "lack of job security," "his admitted lack of stable housing over the

last year," "his posts on social media" in which he "expressed a desire to 'evade' law enforcement," and because the complaint was filed in a district where he has no ties. *Id.*

**Wagner's second detention hearing**. A grand jury in the Eastern District of Michigan indicted Wagner a week later for one count of interstate communications involving threats and one count of cyberstalking. (R.10: Indictment). In early March, Wagner appealed the detention order. (R.17: Def.'s Mot.). The pretrial services department in Michigan completed a new report with the same basic biographical and criminal history material as the pretrial services report prepared in Minnesota—just with a bit more detail and a few contradictions in Wagner's story (e.g., Wagner used to abuse opioids and received treatment for it). (E.D. Mich. Pretrial Services Report). But this second report, from the district that would not supervise him, changed the recommendation from detention to bond and proposed Wagner's mom, who lives in Minnesota, as a third-party custodian. (*Id.* at 5; E.D. Mich. Third Party Custodian Investigation Mem., 1).

At the hearing before the district court judge in Michigan, Wagner argued that this is a vindictive prosecution; that he was merely urging

13

people to peacefully protest; that J.S. was not actually threatened; and that Wagner would faithfully abide by any bond conditions the court imposed, including several conditions that he proposed. (R.27: 3/24/26 Hrg. Tr., 170–89; *see generally* R.17: Def.'s Mot.).

The government argued that Wagner should remain detained on dangerousness and nonappearance grounds. (R.27: 3/24/26 Hrg. Tr., 192; R.21: Gov't Br., 81–82). In addition to the facts above, the government noted the 180-degree turn in the second pretrial services recommendation and Wagner's contradictions to the two different pretrial services officers. (R.24: 3/25/26 Hrg. Tr., 136–38).

The government also highlighted new facts that supported Wagner's dangerousness. It described private messages from Wagner, just days before his arrest, in which he talked to an unknown person who wants to kill J.P., a former high-ranking government official. (*Id.* at 131–32, 139). The user asked Wagner to help bring J.P. to justice. (*Id.* at 131). Wagner was interested in J.P. because of his frequent mention in the Epstein files. (*Id.* at 139). So Wagner responded: "Okay. Well, we do stuff, me and my family of friends. We like to know about people who deserve consequences." (*Id.* at 131). And Wagner promised

14

the user that if he received "credible verifiable information" that it would go to people who could bring J.P. to justice. (*Id.*). Wagner explained that once he "put [the information] in the hands of [his] team" they would "assess the situation for" everyone's "security" and better "understand what [they] have to work with." (*Id.* at 132). After Wagner convinced the user that he could be trusted, the user sent J.P.'s driver's license, phone number, address, and email address and J.P.'s wife's name and email address. (*Id.*). At the end of the conversation, Wagner explained, "We have to walk through fire." The user agreed: "I'm ready to overthrow this sh-- Nepal style." (*Id.* at 132–33). In response to the government's reading of these messages to the court, Wagner's counsel oddly discounted them because J.P. is a "democrat." (*Id.* at 139).

The government also described Wagner's January 2026 messages about locating N.S., an investigative journalist in Minnesota, where Wagner explained, "I may have found where he's hiding" and sent a True People Search that included a current address and phone numbers. (*Id.* at 135).

Nevertheless, the court released Wagner on bond. It admitted that Wagner was accused of "very serious" conduct. (*Id.* at 149–50). But it

15

said some of the evidence "could be things that were actual threats, or the use of words that could be viewed in more than one way when used against persons in a way that might not be as specific a threat with an intention to carry out some bad outcome." (*Id.* at 145). It found Wagner had "some contacts with law enforcement," (*id.*), but releasing Wagner to Minnesota would keep him and J.S. far apart. (*Id.* at 147). The court admitted that much of the evidence pointed to "active" but not "physically active" concerns relative to danger. (*Id.* at 146–47). It noted that the government had made a "very strong" argument that Wagner posed a danger to the public. (*Id.*). Yet confusingly, it said that protecting the public is a "two-way street. It depends on what side of the street you're on whether or not an individual might feel they are protected or in need of protection. And that's, of course, a sad state of affairs." (*Id.* at 147). The court agreed that some of Wagner's statements to pretrial services were contradictory. (*Id.* at 149). As for nonappearance, despite his failures to appear and his absconder status, the court said Wagner had "no normal indicators of flight." (*Id.*). The court vaguely gestured toward Wagner's "feelings" about the judiciary

16

but nonetheless thought it could ensure the safety of the community and Wagner's appearance with bond conditions. (*Id.* at 156–57).

The court imposed normal bond conditions—like restricted travel, no crime, report as directed, no firearms or weapons, reside at an approved address. (R.23: Bond Conditions, 115–18). But it also ordered home detention with GPS monitoring, named Wagner's mother as his third-party custodian, and imposed the following further conditions: (1) to avoid contact with any victims or witnesses; (2) not to post or direct anyone to post on social media; (3) not to participate, encourage, or organize protests or activist events aimed at ICE or federal agencies; (4) not to travel outside Minnesota and the Eastern District of Michigan without permission; and (5) not to engage in threatening or assaultive behavior, including contacting or encouraging anyone to act on his behalf to threaten another person. (*Id.*). Finally, Wagner may use only one phone and one computer, which pretrial services in Minnesota must approve, and both must have supervision software. (R.24: 3/25/26 Hrg. Tr., 153). Wagner may not use anyone else's devices, nor may he possess other devices. (*Id.*).

17

The government requested that the court stay its order granting bond pending the outcome of any appeal by the government to the Sixth Circuit, but the district court refused to issue a stay. (*Id.* at 157–58). The government soon obtained authorization from the Solicitor General of the United States to appeal the release order and to seek an emergency stay pending appeal from this Court. (R.25: Appeal Notice, 165), Doc. 2, Stay Mot. A week later, this Court granted the government's stay request, which meant that Wagner again became subject to the magistrate judge's detention order, and it ordered expedited briefing. Doc. 10, Order.

## Summary of the Argument

Kyle Wagner has incited violence by encouraging his followers to take up arms and "kill" ICE agents in Minneapolis, threatening and doxing an ICE supporter, and requesting online donations to help him "evade" law enforcement. Despite Wagner's warning not to "let [him] back out," and holding up two middle fingers "for the judge," the district court in Michigan reversed the Minnesota magistrate judge's detention order and released him back to Minnesota over the detention recommendation of the very pretrial services agency who will be forced to supervise him.

The district court's legal conclusion is unsupported by the facts and ignores significant evidence of Wagner's dangerousness and risk of nonappearance. The district court also committed a legal error when it evaluated Wagner's nonappearance risk by assessing his ability to flee the country and failed to conduct an individualized assessment of Wagner's likelihood to appear. Because there are no conditions that will adequately protect the safety of the community at large, the victim J.S., or Wagner's appearance as required, the release order should be reversed.

## Argument

Kyle Wagner poses a grave danger to the community and a significant nonappearance risk, and the district erred by concluding otherwise. On appeal from a bail decision, this Court will "review the district court's factual findings for clear error," but it considers "mixed questions of law and fact—including the ultimate question whether detention is warranted—*de novo*." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (citing *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985)); *but see United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002) (observing that a bail decision is reviewed for abuse of discretion).

Under the Bail Reform Act, a district court must detain a defendant pending trial when "no condition or combination of conditions" can reasonably assure his appearance and the safety of any other person and the community. 18 U.S.C. § 3142(e)(1). Several factors inform this analysis: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence" going to dangerousness and risk of nonappearance, (3) the defendant's "history and characteristics," and (4) "the nature and seriousness of the danger" posed by the

20

defendant's release. 18 U.S.C. § 3142(g). The burden to show a risk of nonappearance is by a preponderance of the evidence, and the burden to show dangerousness is by clear and convincing evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).

All four factors weigh in favor of Wagner's detention, and a panel of this Court agreed that the government is likely to prevail on the merits. Doc. 10, Order, 1.

## A. The nature and circumstances of Wagner's offense—and the nature and seriousness of the danger he poses—supports detention.

### i. Wagner poses a significant danger if released.

Section 3142(g)'s first and fourth factors strongly support detention. Because they are so closely connected in this case, the government addresses them together.

By their very nature, charges like "threats made in interstate commerce" are "sufficiently serious to weigh in favor of [a defendant's] detention." *United States v. Meister*, No. 1902738001, 2020 WL 1935523, at *3 (D. Ariz. Apr. 22, 2020). The district court agreed to some extent, calling Wagner's charges alone "very serious." (R.24: 3/25/26 Hrg. Tr., 149–50). But Wagner's threats and cyberstalking show that he is more dangerous than a defendant in a typical threats case.

21

Wagner is bent on fomenting chaos and violence. For weeks, on a near-daily basis, he published videos and messages to an audience of thousands, encouraging them to impede, harass, and injure law enforcement. These posts promoted physically assaulting and using weapons against federal agents. Consider a few:

- "ICE we're f----ing coming for you"
- "we need to put our hands on them."
- "hunt ice"
- "fight ice. This is kill or be killed"
- "This is where ICE has come to die… If that has to be done at the barrel of a gun, then let us have a little f------ fun."
- "f------ fight [law enforcement]"
- "Go and f------ fight them!"
- "we're done with peaceful protests now. The gloves come off . . . Run for the hills, boys."
- "put[] hands on these murderers."
- "[g]et your f----- guns and stop these f------ people"

Crucially, Wagner told his thousands of followers to go to specific places—for example, certain ICE locations "in West End and around the Twin Cities" and "gold medal park and at the quarry NE." He admitted he had urged "march[ing]" on the local ICE headquarters with "guns." And he repeatedly told his followers to arm themselves before physically engaging law enforcement. Shortly after one officer-involved shooting in Minneapolis, he combined a specific time and place with a call to arms—putting out an urgent request to his followers for "[b]oots

22

on the ground . . . [a]nywhere between Franklin and Nicolette and 26th and Nicolette." Wagner directed, "Get your f------ guns and stop these f------ people."

Wagner's calls to violence were not abstract screams into the void. They were repeated, concrete requests to a large, receptive, and responsive audience to come armed and ready to fight federal law enforcement at specific places and times. And Wagner himself was on the front lines shortly after, distributing gas masks and riot shields. This confirms the sincerity of his repeated claims that he would "gladly" die fighting federal law enforcement.

Even without Wagner's front-line actions, his repeated online calls to violence endanger public safety at a time when assaultive and obstructionist behavior in cities like Minneapolis have resulted in countless assaults on law enforcement. Wagner's aggressive rhetoric directly fans these flames. "Now more than ever, th[is] Court must take seriously [Wagner's] statements." *United States v. Lidderdale*, 795 F. Supp. 3d 1024, 1028 (S.D. Ohio 2025). From Donald Trump to Nancy Pelosi's husband to state and federal lawmakers to Supreme Court justices to district court judges, the "targeting of public officials has

23

become a virulent issue which must be universally condemned." *Id.* And the "recent attacks on ICE officers" that Wagner stridently promotes is just a "different strain[] of the same virus." *Id.* at 1029. This Court should take seriously Wagner's role in this "macabre phenomenon"— that is, his advocacy "of violence, in lieu of democratic processes, toward political ends." *Id.* The more people see "public support" for political violence, "the more common it is." *Id.* And as a diehard member of Antifa—a designated domestic terrorist organization—Wagner has fomented civil unrest. Because even "non-violent forms of obstruction of justice"—let alone the openly violent and murderous form Wagner espouses— "pose a sufficiently serious danger to the community," Wagner's "pretrial detention is warranted." *United States v. Richardson*, No. 2:11-CR-220, 2011 WL 5026456, at *6 (S.D. Ohio Oct. 21, 2011).

Wagner did not just threaten federal law enforcement—he extended his threats against supporters of federal law enforcement: "If you side with [ICE, w]e're coming for you too" and "we crushed you in the 90s and we will crush you" again. Once again, showing that he could make these abstract threats concrete, he doxed federal law enforcement

24

supporter J.S.—posting what he believed was J.S.'s personal information and address to his thousands of online followers. Wagner then threatened J.S., writing: "Awe bb nazi boy @[J.S.'s username] - we can all knock on strangers doors… See you soon kiddo - stay safe out here." But this wasn't the only address that Wagner found—he hunted for the location of N.S., an investigative journalist in Minnesota. Wagner sent a message, "'I may have found where [N.S.'s] hiding," and then sent a True People Search for N.S. that listed a current address and phone numbers.

Wagner's willingness to dangerously expose people was not limited to J.S. and N.S. and did not cut along party lines. Two days before his arrest, Wagner exchanged messages with a Signal user who told Wagner that he wanted to kill J.P.—a former government official. Wagner took J.P.'s personal identifying information and promised to pass it along to his "team." Wagner explained: "Okay. Well, we do stuff, me and my family of friends. We like to know about people who deserve consequences." At the end of the conversation, Wagner explained, "We have to walk through fire." The user agreed: "I'm ready to overthrow this sh-- Nepal style."

25

To assess the danger posed by Wagner's public release of J.S.'s information to his thousands of followers, his attempt to track down N.S.'s information, and his acquisition of J.P.'s information, this Court should consider Wagner's earlier anti-government, anti-law enforcement, and anti-law-enforcement supporter posts. *See United States v. Cooper*, No. 3:19-MJ-04254-1, 2019 WL 4259454, at *4 (M.D. Tenn. Sept. 9, 2019) (considering an earlier threatening post when assessing the weight or gravity of a defendant's threat). Wagner has repeatedly threatened and incited violence against federal law enforcement and worked with others to achieve his violent goals. Given this context, Wagner's "online post[] . . . promise[s] the most serious" danger to J.S.—with the conviction that his promise is "not idle." *Id.*

In short, Wagner's danger "is multifaceted" because it first "encompasses a risk of physical harm and violence to actual people"— J.S., N.S., and J.P., in particular. *United States v. Comberger*, No. 5:21-MJ-05138, 2021 WL 1725516, at *6 (E.D. Ky. Apr. 30, 2021). But Wagner also poses a danger to law enforcement and their supporters more generally—"as well as interference with and disruption of the administration of justice. These risks are unquestionably grave." *Id.* In

26

*Comberger*, a defendant charged with facilitating interstate prostitution made an online threat, saying of police cooperators: "a piece of shit snitch informant ranks side by side with a child molester and a rapist. They ALL deserve a bullet between the eyes." *Id.* at *4. Like Wagner, the defendant had no violent past. But because of prior violent and intimidating online comments—like saying he would have cut a potential cooperator's "fucking throat" and telling another witness to "keep her fucking mouth shut"—the court found these dangers were "concrete and serious" enough to "favor[] detention." *Id.* The same is true here. Wagner's many and explicit calls to violence against federal law enforcement and its supporters not only endanger officers and agents, but they also illuminate what his, "in context, thinly veiled threat[]" against J.S. truly means. *Id.* at *5.

Finally, that "the frequency of threats and disconcerting behavior on the part of [Wagner] ha[d] escalated" just before his arrest further supports detention. *United States v. Jeffries*, No. 3:10-CR-100, 2010 WL 3619946, at *5 (E.D. Tenn. Sept. 10, 2010) (using escalation, among other things, to order detention). Wagner had escalated to frequent, unhinged posts and rants just before his arrest. And Wagner admitted

27

to law enforcement during his arrest that they should not let him back out—he intended to kill. Admissions like this weigh strongly in favor of detention. *Lidderdale*, 795 F. Supp. 3d at 1027 (detaining, in part, because the defendant himself "was afraid he would continue" making threats). Indeed, Wagner was displaying precisely the sort of red flags that he had "hit a boiling point" that courts considering bond in interstate threats and cyberstalking cases must take seriously. *Id.* at 1031.

### ii. The district court did not properly consider Wagner's dangerousness.

The district court failed to meaningfully grapple with the evidence of Wagner's dangerousness. Its analysis fell short in four ways.

*First*, when the district court acknowledged Wagner's dangerousness, it wrongly discounted it because it did not believe that all of Wagner's statements were "actual threats." (R.24: 3/26/26 Hrg. Trans., 145). Indeed, it stated, "there are a lot of things that point to at least some . . . concerns" about Wagner's "active" "danger[ousness]." *Id.* at 147-48. Yet because it found that not all of Wagner's statements were "actual threats," it discounted that dangerousness. That was error, particularly considering Wagner's escalating behavior in the days before

28

and just after his arrest. *Jeffries*, 2010 WL 3619946, at *5. When he says, "don't let [him] back out," and expresses an intent to kill, believe him.

*Second*, the district court ignored the serious nature of Wagner's very specific threats and calls to violence, seemingly buying Wagner's account that this was all online bluster. But it was far more than that. Wagner threatened J.S. (and his family), tried to locate N.S., and sent a former top federal official's private information to his "team" to mete out just "consequences." Wagner's concrete calls to violence at precise locations and times against specific targets endanger real people. *See Lidderdale*, 795 F. Supp. 3d at 1028–29. Given what the magistrate judge in Minnesota called "voluminous" evidence of Wagner's serious dangerousness, the district court erred when it failed to meaningfully address that evidence. *United States v. Wagner*, Case No. 26-mj-0141 (D. Minn.), R.11: D. Minn. Det. Order, 3.

*Third*, the district court appeared to equate the public safety risk posed by Wagner and federal immigration enforcement: "And unfortunately, in our nation at this time, I think people are viewing the protection of the public kind of like a two-way street. It depends on

29

what side of the street you're on whether or not an individual might feel they are protected or in need of protection." (R.24: 3/26/26 Hrg. Trans., 147). In other words, in the court's view, Wagner's dangerousness should be discounted because federal immigration enforcement also endangers public safety. Wagner understood the district court's comment the same way. *See* ECF 8, Response to Emergency Motion to Stay, 15 (agreeing with the "two-way street" comment because the public may "need" people like Wagner to "protect[]" them "<u>from</u> the surge of inadequately trained and physically aggressive ICE agents occupying their communities") (emphasis in original). The court erred when it effectively excused death threats against federal law enforcement and private citizens because of its disagreements with certain executive branch policy.

*Fourth*, the court improperly discounted the danger that Wagner poses from home confinement with access to internet or phone messaging. Instead, it relied completely on Wagner's agreement to abide by pretrial services' device-monitoring conditions (discussed in further detail below). But Wagner could easily start a new social media account—as he did when Instagram blocked his first account due to the

30

threatening nature of his posts. And Wagner's dangerousness is not limited to his own actions, but also his ability to pass information to his "team" who stands ready to commit violence at his behest. (R.24: 3/26/26 Hrg. Trans., 132). The court considered none of this when it released him on bond.

Wagner's release to Minnesota provides no assurance that he will not endanger the public or his victim.

### iii. The district court erred in concluding that Wagner did not pose a nonappearance risk.

In weighing the evidence for nonappearance, the district court also made several mistakes.

*First*, the district court ignored most of the evidence demonstrating that Wagner poses a substantial risk of nonappearance. It never mentioned Wagner's lack of stable housing, his advertised "safe houses" or evacuation plans, or his $10,000+ in online donations from followers (some donated explicitly to help him evade the law). And—critically—the court never weighed his explicit online promise to "evade" law enforcement.

*Second*, when the court did acknowledge some evidence of Wagner's nonappearance risk, it was only to minimize it. It sanitized

31

Wagner's two-middle-fingers "for the judge" message, by saying he may have "feelings . . . about the judiciary, or even certain members of the judiciary." (R.24: 3/25/26 Hrg. Tr., 156). And it noted that Wagner was "self-employed," but did not weigh how income ranging from $5,000 to $10,000 a month, plus significant online donations (that he failed to disclose initially), would increase his ability to flee. (*Id.* at 136).

*Third*, the court committed a legal error when it assessed Wagner's nonappearance risk only as his ability to flee to another country. (*Id.* at 148–49). Specifically, it held that "the normal indicators of flight" were not present, clarifying that Wagner does not have a passport—though it acknowledged that "Minnesota is pretty close to Canada." (*Id.* at 149). But the Bail Reform Act requires courts to assess the likelihood of a defendant's appearance in court, 18 U.S.C. § 3142(b), not the likelihood that he will flee to a non-extraditable country.

*Fourth*, the district court failed to individualize its risk-of-nonappearance assessment. Instead, it concluded that it has previously released defendants to be supervised on bond in other districts. (R.24: 3/25/26 Hrg. Tr., 148). But this says nothing about whether it is appropriate to release Wagner to Minnesota—the individualized

32

determination required under the Bail Reform Act. *Stone*, 608 F.3d at 946. The court incorrectly released Wagner based on its experiences in other, unrelated cases.

In a way, the district court is right that Wagner does not display the "normal indicators" of nonappearance: from touting safe houses and evacuation plans to publicly promising to evade federal law enforcement to raising money to carry out that evasion, the evidence shows that his nonappearance risk is far higher than the average defendant. Wagner is incapable of being supervised and he should be detained.

## B. The weight of the evidence against Wagner is strong.

The weight of the evidence of Wagner's dangerousness is strong. *See Cooper*, 2019 WL 4259454, at *3 (noting in a threats case that evidence like "screen shots of" online posts are good "evidence supporting a finding of danger"). Indeed, the Minnesota magistrate judge called it "voluminous." *United States v. Wagner*, Case No. 26-mj-0141 (D. Minn.), R.11: D. Minn. Det. Order, 3. This favors detention.

The weight of the evidence also supports Wagner's nonappearance risk. He lacks a steady job and home, has an outstanding out-of-state warrant and pending criminal charges, was listed as an absconder, and

has eight failures to appear. Wagner also received donations from his followers, explaining that he was "on the run" and needed money to "evade" law enforcement, ultimately earning between $10,000 and $15,000 in donations. Wagner also touted his access to safe houses, and his evacuation plans to escape law enforcement. In his booking photo, Wagner boldly displayed his contempt for the power and authority of the courts, raising two middle fingers while saying "this is for the judge." The weight of the evidence is against releasing him.

## C. Wagner's history and characteristics support detention.

In evaluating a defendant's history and characteristics, the district court should consider, among other things, his employment history, his character, and his community ties. *See* 18 U.S.C. § 3142(g)(3)(A). A defendant need not have a record of prior violent convictions or dangerous conduct to be detained as a danger to the community—the Bail Reform Act requires only a showing of present dangerousness. *United States v. Rodriguez*, 950 F.2d 85, 88–89 (2d Cir. 1991) (rejecting idea that the government must prove a history of violence or dangerous conduct to detain a defendant pretrial as a danger to the community); *see also Stone*, 608 F.3d at 950. Indeed,

34

courts routinely order detention in interstate-threats cases where a defendant has no violent criminal history or weapons. *See, e.g.*, *Comberger*, 2021 WL 1725516, at *4 (noting no past violence or other threats); *Cooper*, 2019 WL 4259454, at *3 (noting no weapons or criminal history).

In *United States v. Bailey*, No. 8:25-CR-387, 2025 WL 2897026, at *5 (M.D. Fla. Oct. 10, 2025), for example, the court ordered the defendant detained because he had made "intimidating, frightening, and violent videos" threatening the CEO of X, contextualized by a "pattern of threatening murder and his self-proclaimed hatred for certain groups of people." The defendant had no violent criminal history, though he had discussed weapons. *Id.* Same for Wagner, who has no violent criminal history, but who made a specific threat of violence against a particular person, while having previously made many threats—including murderous threats involving weapons—against a particular group of people (federal law enforcement and their supporters).

Or take *United States v. Cole*, 465 F. Supp. 3d 1175 (W.D. Wash. 2020). There, a neo-Nazi defendant was charged with threatening

35

communications when he affixed to certain homes posters saying, "you have been visited by your local Nazis" and depicting an image of a hooded figure with a Molotov cocktail. The court detained the defendant even though he had "no criminal history or history of violent acts." *Id.* at 1178. Like Wagner, the defendant had shown the victims that he knew "where they live"; he "sought to instill fear and intimidation in" them, making "them feel unsafe in their own homes"; he actively tried to "avoid law enforcement," including by ignoring warrants; and had "ties to an extremist" organization. *Id.* Like in *Cole*, Wagner should be detained.

Admittedly, "the Court knows little about [Wagner's] personal characteristics, beyond his proclivity for threatening and advocating violence." *Comberger*, 2021 WL 1725516, at *6. But it knows that Wagner's complete disregard for judicial authority shows the lack of respect he will likely have for any conditions of release. And Wagner has no ties to the charging district. (R.17: Def.'s Mot., 62-63). Detroit is about 700 miles from the proposed bond location. (*Id.* at 67). Wagner's online solicitation of monetary support and lack of stable employment only underscore his financial instability and risk of nonappearance. So

36

Wagner's history and characteristics make him both a danger to the community and a nonappearance risk.

## D. The district court's bond conditions do not adequately protect the community.

There are no conditions or combination of conditions that will adequately address Wagner's well-documented desire for violence and ensure the safety of the community. Because "the alleged threatening conduct takes place on the internet," it would be "access[ible]" no matter where Wagner lives. *Cooper*, 2019 WL 4259454, at *4. The district court's bond conditions are inadequate. Given "the infinite number of possible communication methods, it would undoubtedly be nearly impossible to police all of [Wagner's] communications and interactions to ensure he ceases the sort of conduct that he has already demonstrated on several occasions." *Comberger*, 2021 WL 1725516, at *6; *see also United States v. Poulsen*, 521 F. Supp. 2d 699, 706 (S.D. Ohio 2007).

Importantly, the district court failed to consider the likelihood that Wagner will comply with these conditions. The best predictor of future behavior is past behavior. No matter how onerous the bond restrictions are, if the defendant will not comply, the conditions are

37

worthless. That's the situation here. Everything in the record indicates that Wagner despises and will skirt federal authority at the first opportunity. Release on bond offers someone like Wagner, with a dogmatic commitment to violence, too much freedom to continue his criminal pursuits. Wagner's mom as a third-party custodian, a GPS tether, and device-monitoring software do not solve this problem. Wagner's crimes require only an electronic device and/or the internet. He can easily use or access unmonitored devices to threaten, stalk, and foment violence, which he has repeatedly done from the confines of his home.

The district court speculated that it is *possible* that Wagner could change, asking the government whether they had ever seen someone "abide by their bond conditions even though *there's nothing to indicate they would do so.*" (R.27: 3/24/2026 Hrg. Tr., 34–35) (emphasis added). But this sort of "speculation" cannot substitute for "evidence." *See* Doc. 8, Response to Emergency Motion to Stay, 16. A district court's decision must be grounded in the record—not wishful thinking.

Further, Wagner's "disdain" for federal "law enforcement . . . casts doubt on the effectiveness of [the] conditions the [c]ourt" imposed below.

38

*Cooper*, 2019 WL 4259454, at *4. Someone who repeatedly expressed a willingness to "kill or be killed" in the fight against federal law enforcement and held up two middle fingers "for the judge" is not someone who will be bothered by a few bond conditions. Because there is no evidence that Wagner will abide by bond conditions—and a great deal saying he won't—the district court's unexplained assumption that he might comply is erroneous.

The Minnesota pretrial services office appears to have understood that, recommending that Wagner be detained. This recommendation is entitled to careful consideration given that the Minnesota pretrial services office—not Michigan's—will be supervising Wagner on bond. It is Minnesota's officers—not Michigan's—who will be put in potential danger by supervising a person who has expressed a desire to kill federal law enforcement in its community. And Minnesota knows its capabilities and resources best. But the district court effectively ignored Minnesota's recommendation, brushing it aside because it was "not as comprehensive" as the Michigan report. (R.24: 3/25/26 Hrg. Tr., 137). It's true that the Michigan report included more peripheral details. But overall, the two reports were substantively the same. Rather than

39

grapple with the two reports coming to opposite conclusions about Wagner's dangerousness and nonappearance risk, the district court inexplicably chose the recommendation of the pretrial services office *not* supervising Wagner.

Wagner has shown a pattern of threatening the physical safety of those he regards as "Nazis" and their allies. And far from being a mere keyboard warrior, Wagner's physical resistance to his arrest and his warning to the arresting agents that they should not "let [him] back out" suggest that he will not be deterred from violence by the prospect of judicial sanctions. There are no conditions that could reasonably assure Wagner's appearance as required or adequately protect the safety of J.S., any other person, or the community. He must remain detained pending trial.

40

# Conclusion

The district court's release order should be reversed, and Wagner should be detained pending trial.

Respectfully submitted,

Jerome F. Gorgon Jr.
United States Attorney

/s/ Danielle Asher
Danielle Asher
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9518
danielle.asher@usdoj.gov

Dated: April 13, 2026

## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Rule 32(f), it contains 7,405 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Danielle Asher
Assistant United States Attorney

Dated: April 13, 2026

42

# Certificate of Service

I certify that on April 13, 2026, I caused this Brief for the United States to be electronically filed with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system, which will send notification of the filing to the following attorney of record:

Jean Pierre Nogues, III, jean_nogues@fd.org

/s/ Danielle Asher
Assistant United States Attorney

43

## Relevant District Court Documents

The United States of America designates as relevant these documents in the district court's electronic record, Eastern District of Michigan case number 26-cr-20059:

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 1 | Complaint | 48, 51-53, 55, 57-62, 65-70 |
| 10 | Indictment | 49-53 |
| 17 | Motion Appealing Denial of Bond | 62-63 |
| 21 | Government's Response | 71-72, 81-82, 87, 90 |
| 23 | Order Setting Release Conditions | 114-18 |
| 24 | 3/25/26 Hearing Transcript | 131-32, 135-38, 145-50, 153, 156-57 |
| 25 | Notice of Appeal | 165 |
| 27 | 3/24/26 Hearing Transcript | 170-89, 192 |