IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

————

**No. 26-1294**

————

**UNITED STATES OF AMERICA,**

Plaintiff-Appellant,

v.

**KYLE WAGNER,**

Defendant-Appellee.

————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
No. 26-CR-20059 (Hon. Denise Page Hood)

————————————

**DEFENDANT-APPELLEE'S OPENING BRIEF**

————————————

**FEDERAL COMMUNITY DEFENDER**

Jean Pierre Nogues
Counsel for Appellant
613 Abbott St., 5th Floor
Detroit, Michigan 48226
(313) 967-5542

# TABLE OF CONTENTS

WAIVER OF ORAL ARGUMENT .................................................................................. 1

STATEMENT OF THE CASE ......................................................................................... 1

    I.  Operation Metro Surge ...................................................................................... 1

    II. Enter Kyle Wagner—a vocal anti-ICE protestor and activist ........................ 3

    III. A public battle of words between influencers .................................................. 5

    IV. A political directive to go big and loud against anti-ICE protestors.............. 6

    V. Minnesota bond hearing.................................................................................... 7

    VI. Michigan bond appeal hearing......................................................................... 9

    VII. Wagner complies with all conditions upon release....................................... 12

    VIII. The Government's filing of its opening brief................................................ 13

SUMMARY OF THE ARGUMENT............................................................................... 14

ARGUMENT...................................................................................................................... 14

    I.  The district court properly weighed the nature and circumstances of the charged offenses........................................................................................................ 14

    II. The weight of the evidence of dangerousness does not favor continued detention. ...................................................................................................................... 16

    III. Mr. Wagner's history and characteristics support release............................ 17

    IV. The district court's conditions of release adequately address any danger. ... 20

    V. The risk of nonappearance does not support continued detention............... 22

CONCLUSION .................................................................................................................. 23

DESIGNATION OF ADDITIONAL
RELEVANT DISTRICT COURT DOCUMENTS .................................................... 24

CERTIFICATE OF COMPLIANCE ........................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*United States v. Chilingirian*, 280 F.3d 704 (6th Cir. 2002) .................................................... 14

*United States v. Comberger*, 2021 WL 1725516 (E.D. Ky. Apr. 30, 2021) ......................... 19

*United States v. Lidderdale*, 795 F.Supp.1024 (S.D. Ohio 2025) ......................................... 19

*United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021) .................................................... 18

*United States v. Richardson*, 2011 WL 5026456 (S.D. Ohio 2011) ...................................... 20

*United States v. Stone*, 608 F.3d 939 (6th Cir. 2010) ............................................................. 14

**Statutes**

18 U.S.C. § 2261A ................................................................................................................... 6

18 U.S.C. § 875 ........................................................................................................................ 6

18 USC § 3142 .................................................................................................................. 8, 14

## WAIVER OF ORAL ARGUMENT

To avoid unnecessary delay in deciding the appeal and because the record is adequate to decide the single issue presented, counsel does not request oral argument in this matter.

## STATEMENT OF THE CASE

### I.    Operation Metro Surge

In December 2025, the Department of Homeland Security (DHS) announced Operation Metro Surge, an immigration enforcement effort targeting the Twin Cities of Minneapolis-St. Paul, Minnesota.  *See*, *e.g.*, [https://en.wikipedia.org/wiki/Operation_Metro_Surge](https://en.wikipedia.org/wiki/Operation_Metro_Surge) (last accessed Apr. 22, 2026).  DHS mobilized approximately 2,000 Immigration and Customs Enforcement (ICE) agents and 1,000 Customs and Border Patrol (CBP) officers to the Twin Cities, and within the first three months of 2026 arrested nearly 4,000 people—the vast majority of whom had no criminal records or pending criminal cases.  *See id.* Approximately 35% of these arrestees were not designated "targets", but were found during indiscriminate street sweeps of Minneapolis neighborhoods where DHS agents looked for community members who appeared to fit their picture of unlawful immigrants. *See id.*

The greater Twin Cities community—including citizens, lawful residents, activists, attorneys and political leadership—responded peacefully to what the Attorney General of the state of Minnesota and the mayor of Minneapolis both called an "invasion" by federal officers. *See id.* The federal government's response to the protests and criticism was clear:

> Attempts by US citizens to observe or protest federal immigration raids have been met with surveillance, threats, arrests, and use of force including beatings, the use of chemical irritants, flashbangs, and LRADs. Journalists have been arrested after covering protests against ICE. Despite widely publicizing dozens of arrests of protestors, and referring to arrestees as violent "rioters" who assaulted federal agents, the Department of Justice repeatedly reduced formal charges against protestors to the level of a misdemeanor, or dismissed their charges altogether. This pattern led to criticism from former federal attorneys that the arrests and charges were sought in order to intimidate opponents, rather than seek convictions.

*Id.* (internal citations omitted). Of particular note, two U.S. citizen protestors—Renee Good and Alex Pretti—were shot and killed by ICE agents on January 7 and January 24. Then-DHS Director Kristi Noem publicly called Good and Pretti "terrorists," but Minnesota law enforcement agencies subsequently sued DHS and the Department of Justice for withholding investigative evidence into what really happened. *See, e.g.,* *https://en.wikipedia.org/wiki/Killing_of_Alex_Pretti* (last accessed Apr. 22, 2026).

2

## II.   Enter Kyle Wagner—a vocal anti-ICE protestor and activist

Kyle Wagner was one of the citizens protesting DHS's actions in Minneapolis. Mr. Wagner identified as anti-fascist in his political ideology, and he viewed ICE's indiscriminate sweeping up of undesirable residents and brutal suppression of protest as actions akin to the actions of Nazi operatives in 1930s Germany.[1]  (R. 1: Complaint, 14-15.)[2] He denounced ICE officers as "gestapo," "aggressors", and "murderers." (*Id.*, 4.) He participated in marches; he distributed gas masks and shields for protestors to protect themselves against government teargas and beatings. (*Id.*, 27-28.) Most prominently, he maintained a highly visible and vocal social media presence.

An examination of Wagner's posts is available for review in the Complaint, and shows that he spoke in colorful metaphor about an ideological battle between

---

[1] The Government's Statement of the Case claims, without any evidence, that Mr. Wagner "views the federal government and federal law enforcement as 'Nazis', and he feels morally compelled to resist and fight them at every turn, preaching violence as the only solution." (Doc. 12: 11).  Mr. Wagner did call ICE agents "want-to-be Nazis cosplaying like they're f****** military." (R. 1: 7, 21).  He did call right-wing agitators like Jack Lang and J.S. "Nazis." (*Id.*, 19, 21, 29.) He never expressed anything of the sort against any other federal employees or other law enforcement officers—indeed, he even called for the National Guard's intervention against unlawful actions by ICE. (*Id.*, 8.)

[2] The Complaint filed in the Eastern District of Michigan runs from Pg.ID 1-31.  R.1. The Government's Opening Brief designates a relevant Page ID range for the Complaint of 48, 51-53, 55, 57-62, and 65-70, none of which correspond to the actual document. *See* Doc. 12, p.53.

progressivism and what he viewed as violent fascist government actions and its supporters. (*Id.*, 11-20.)  But he emphasized nonviolence in practice:

- "Keep your heads.  We're not the violent ones. . . ." (*Id.*, 11).
- "When I say 'ice came here to die' I mean the organization – I mean the concept itself – the functional mechanism of 'Immegration [*sic*] Control and Enforcement' . . . I mean the ideology of the institution came to these streets to bleed out and go away forever." (*Id.*, 20.)
- In response to a planned pro-ICE rally promoted by far-right activist and January 6 participant Jake Lang, Wagner said, "Join me Sat.  When these fascists gather on Saturday – What -IF- we have a silent protest…?  They want screaming and yelling – but instead we will gather and stop them from causing more harm – and we will show them self control – in practice. . . . We will all – gather along their parade route – and give them a proper perimeter – while they exercise their 1st amendment rights – and we will not attack them." (*Id.*, 21.)
- After the rally, Wagner contrasted the peaceful actions of his counterprotests with the violent actions of ICE: "I'd like to personally thank everybody that came out and counter protested. . . . We don't tolerate your hate boys. . . . We told you you're not welcome here – your hate was not allowed in these streets – you're welcome for sending you home safe. . . Renee good didn't get that luxury – you childish nazi fucks." (*Id.*)

When his fellow protestor and acquaintance Alex Pretti was killed on January 24 while trying to help another protestor being beaten by ICE agents, Kyle expressed his anger and frustration in a set of social media postings that went viral.  (*Id.*, 22-26.)  It is true that his tone intensified.  He was angry.  He used more colorful language and metaphors of violence.  He now wore a bulletproof vest (*id.*, 25); given what just happened to Good and Pretti, this was prudent.  And now, he advocated for protestors who legally possessed firearms to exercise their Second Amendment rights by marching with visible guns, and to defend themselves if unlawfully attacked.  (*Id.* at 26.)

4

Wagner never himself possessed or marched with weapons, nor did any gun violence on the part of Minneapolis protestors ensue. Visible strength and defiance was the goal, and it worked. Wagner soon bragged online that "We have pushed ICE to leave this city in droves. . . . we have made our voices heard. Viva la resistance." (*Id.*, 27.) And once the Trump Administration began to respond to the rising negative public opinion against ICE's actions in Minnesota, he again bragged, "Got rid of [then-CBP commander-at-large Greg Bovino, who was reassigned away from Minneapolis operations] yesterday. Also sent a lot of ICE agents packing. It's working people. The pressure is getting results." (*Id.* at 28-29.)

### III.    A public battle of words between influencers

Meanwhile, Wagner's prominent online presence was getting lots of attention from far-right influencers. And as influencers do, they responded to each others' posts. After pro-ICE influencer J.S. posted a video of himself knocking on the door of a left-leaning Minnesota journalist, Wagner noted that J.S. himself had previously been "doxxed" by reposting it and pointing out, "we can all knock on strangers doors." (*Id.*, 29-30.) J.S. responded not in fear, but by sending Wagner a direct message challenging

5

him to a "cage fight", a challenge which Wagner publicly accepted. (*Id.*; R. 27: 3/24/26 Tr., 181, 183.)[3]

## IV. A political directive to go big and loud against anti-ICE protestors

Kyle Wagner has been charged by indictment with one count of cyberstalking, in alleged violation of 18 U.S.C. § 2261A(2), and one count of communicating a threat transmitted via interstate commerce, in alleged violation of 18 U.S.C. § 875(c). (R. 10: Indictment). The alleged victim in these two charges, J.S., was purportedly in the Eastern District of Michigan at the time of the transmission, which is why the case was charged in that district. (*See id.*)

This prosecution was brought following the express direction of senior Department of Justice officials who instructed federal prosecutors to "go big and go loud" against anti-ICE protesters. *See* Alan Feuer, Alexandra Berzon and Ernesto Londoño, *"Go Big and Go Loud": Inside the Justice Dept.'s Push to Prosecute Protesters*, N.Y.Times, Mar. 19, 2026, available at *https://perma.cc/7X3H-7XTA* (last accessed Mar. 30, 2026). The then-Attorney General's own public statement upon Mr. Wagner's arrest accused him of conduct for which he was never charged—purportedly "doxx[ing] and

---

[3] This is, apparently, a trendy thing to do. *See*, *e.g.*, Dareh Gregorian, "Hunter Biden challenges Trump's oldest sons to fight in a cage match," NBC News, April 10, 2026 (*available at https://perma.cc/Y59U-5NPF*) (last accessed Apr. 23, 2026.)

call[ing] for the murder of law enforcement officers"—and explicitly framed the case as a political message from "the Trump Administration." *See* Justice Dept. Office of Public Affairs Press Release, Feb. 5, 2026, available at *https://perma.cc/Y65K-T34U* (last accessed Mar. 30, 2026). Even the White House press secretary publicly displayed Mr. Wagner's photograph, declaring him "a domestic terrorist" who "will be held accountable," despite the absence of charges alleging domestic terrorism. *See* Steve Karnowski, Minneapolis man accused of cyberstalking, threatening ICE supporter amid crackdown in Minnesota, Associated Press, Feb. 10, 2026, available at *https://perma.cc/8A83-3FYS* (last accessed Mar. 30, 2026).

This context is critical for understanding the way in which the Government now characterizes Mr. Wagner as "dangerous"—despite much evidence to the contrary—in opposing his release on bond.

## V.    **Minnesota bond hearing**

Mr. Wagner was arrested in Minnesota on February 5, 2026[4] and brought before a magistrate judge in the District of Minnesota on Rule 40 removal proceedings.

---

[4] Plaintiff-Appellant's Statement of the Case claims that Mr. Warner "expressed an intent to kill" during his arrest. (Doc. 12: 19). But this assertion cites to the government's own brief opposing release, which itself asserts this as fact without basis. (*Id.*; see R.21: Gov't Resp., 81, 90). Thus far, the defense has found no evidence of such a statement in the discovery provided by the Government, and Defendant-Appellee

The assistant federal defender on duty had only approximately thirty minutes to interview Mr. Wagner and prepare for the detention hearing; she wasn't even given a copy of the complaint prior to the hearing. (D. Minn., R.13: Tr., 5.) Mr. Wagner—who is not a lawyer and had no previous experience in federal criminal court—insisted, against his counsel's advice, on moving forward immediately with the detention hearing rather than requesting a continuance under 18 USC § 3142(f)(2)(B). (*Id.*, 5-6, 9.) Due to the time constraints, Pretrial Services was unable to prepare a written report prior to the hearing and made only an oral recommendation for detention. (*Id.,* 10).[5] Pretrial Services reported to the parties only that Mr. Wagner had been "living couch to couch for over a year" (*see id.* at 39) and didn't explore any possibility of Mr. Wagner residing at a relative's home. After the detention/probable cause hearing was held, Magistrate Judge Schultz issued an Order of Detention. (D. Minn. R.11: Ord. of Detention.)

---

denies that he said such a thing.

[5] A written Pretrial Services report was not produced until the day after the hearing, on February 6. (*See* D. Minn. Pretrial Services Report.) It also scored Mr. Wagner as Category 3 on the Pretrial Risk Assessment instrument. (*Id.*) The PTRA "is an objective, quantifiable instrument that provides a consistent and valid method of predicting risk of failure to appear, new criminal arrest, and technical violations while on pretrial release." (*Id.*) Category 3 is halfway between Category 1 (lowest risk) and Category 5 (highest risk). Pretrial Services' own "objective", "consistent and valid" tool scored Wagner as middle of the road in terms of risks of nonappearance and danger. There is no mention of the PTRA score during the first detention hearing, perhaps because it had not yet been calculated.

## VI.   Michigan bond appeal hearing

Following removal to the Eastern District of Michigan, Mr. Wagner appealed the detention order to the district court assigned to the case. (R. 17: Mot., 61-70.)  The district court conducted a full de novo hearing that started on March 24, 2026 and continued on the following day. (R. 27: 3/24/26 Tr., 167-210; R. 24: 3/25/26 Tr., 120-164). By that time, Pretrial Services had completed a thorough investigation—including coordinating between officers in Michigan and Minnesota to conduct a home visit of Mr. Wagner's mother (*see* R. 27, 171)—and was able to update the original recommendation, now recommending release under a comprehensive set of conditions in addition to other standard conditions of pretrial supervision. Special conditions included:

- home detention;
- GPS-based location monitoring;
- substance abuse treatment;
- participation in and adherence to the computer and internet restriction/monitoring program; and
- no assaultive, threatening, or harassing behavior or statements.

(*See* E.D. Mich. Pretrial Services Report.)[6] Upon request by the court, Pretrial Services conducted a further interview of Mr. Wagner's mother and found her willing and

---

[6] The Government sought to introduce the Pretrial Services Reports from each district as record exhibits but the district court denied that request, noting that they are confidential reports of the Eastern District of Michigan and available to the parties and the court as needed and are "commonly considered to be confidential." (R.24, 124-5,

suitable to be a third-party custodian (although Pretrial Services did not recommend third-party custodianship as necessary in this case). (*See* E.D. Mich. Pretrial Services Third-Party Custodian Memo.)[7]

The parties' proffers and arguments during the March 24 and 25 hearings hewed closely those contained in their filings to the district court and, indeed, in the briefs before this Court. This included—despite the parties' proffers and arguments concluding at the end of the first day of the hearing, (*see* R. 27: 204 (government concluding its argument), 207 (defense concluding its argument)), the government interrupted the court as it became to deliver its decision on the second day to say, "just before you continue, the Government does have. . . two things that we would like to supplement the record [] that I think is helpful for the Court as you make this decision. (R 24: 124). It was only then that the government offered its theories—heretofore uncharged, unalleged, and undisclosed to the defense—that Mr. Wagner posed a specific threat to two additional individuals with the initials of "J.P., a former high-ranking government official," and "N.S., an investigative journalist in Minnesota." (R. 27: 131-34.) The defense objected to this evidentiary ambush, but the court allowed it in. (*Id.*, 125-7, 130.) Given that the defense had been provided zero information or discovery regarding N.S., it had no response. But as to the suggestion that Wagner had

130.) For this reason, the parties each reference the Pretrial Services Reports in their briefs as record documents but do not attach them in an Appendix.
[7] *See* fn.5.

threatened J.P., the defense then proffered that the government's evidence suggested an undercover federal agent unsuccessfully attempting to trick Wagner into making discrete threats towards J.P. to provide a basis for a federal charge. (*Id.*, 138-40.) Tellingly, the government did not deny the defense's explanation (and still has not done so).

After hearing those proffers and arguments in full, and after considering the entirety of the original and updated written Pretrial Services Reports and Third-Party Custodian memo, the district court then ordered Mr. Wagner released. (R. 23: Ord.) The order adopted Pretrial Services' recommendations but added several other stringent conditions:

- appointment of Mr. Wagner's mother as Third Party Custodian;
- "Resolve all warrants within 45 days";
- "Do not encourage others to have contact with alleged victim(s)";
- "Refrain from posting on social media, or directing others to post on his behalf";
- "Not participate or encourage participation in protests/demonstrations"; and
- "Permission of [Pretrial Services] to enter city limits of Minneapolis or St. Paul.

(*Id.*) On the record, the court additionally noted that Mr. Wagner could have access to at most one computer and one cell phone approved by Pretrial Services and loaded with supervision software. (R. 24, 153.)

11

## VII.    Wagner complies with all conditions upon release

Mr. Wagner was released from Marshal's custody following the hearing. After attending a further meeting with Pretrial Services to review the conditions and to fit and affix his GPS tether, Mr. Wagner left Detroit in the custody of his mother, who drove him through the night to his approved residence and site of his home detention in the suburbs outside the Twin Cities' limits.

From his release until his return to custody, Mr. Wagner remained in full compliance with the imposed conditions. He timely attended the required meetings with his Minnesota pretrial services officer. He avoided all use of computers and cell phones until his pretrial services officer approved specific devices and loaded them with monitoring software. He remained at the home of his third-party custodian except for approved exceptions, verified by monitoring of his GPS tether. He contacted the Cerro Gordo, County (Iowa) District Court about his outstanding bench warrant and was assigned a public defender to assist him in getting that warrant cleared and the case resolved.

Meanwhile, the government entered its notice of appeal of the district court's release order, and filed a motion seeking an emergency stay of the release order pending appeal. (*See* Doc. 2, Mot.) And when a Sixth Circuit panel granted the motion for stay and reimposed the detention order from the District of Minnesota (*see* Doc. 10: Order),

12

Mr. Wagner sought and received permission from his pretrial services officers to turn himself into the U.S. Marshals in the Eastern District of Michigan. Which he did—the very next morning.

## VIII. The Government's filing of its opening brief

Defendant-Appellee notes that the United States' opening brief does not comply with 6 Cir. R. 9 as it contains 7,405 words (excluding the Rule 32(f) exempted sections). This Circuit permits no more than 5,200 words for a brief on appeal of a district court's release order. 6 Cir. R. 9(a)(4).

## SUMMARY OF THE ARGUMENT

The district court, in weighing all the proffered facts and legal arguments, made a careful, individualized determination that took all the § 3142 factors into account.  (R. 24: 142-50.)  The district court committed no clear error in its factual findings.  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (clear error review for fact finding, de novo review for legal questions).  Certainly, no abuse of discretion occurred.  *See Chilingirian, United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002).  The district court's analysis was proven correct by the defendant's subsequent compliance on bond and self-surrender in the face of this Court's stay.  This Court should affirm the district court's bond determination.

## ARGUMENT

I.    **The district court properly weighed the nature and circumstances of the charged offenses.**

In its brief, as in its prior filings in this case, the government devotes considerable space discussing Mr. Wagner's social media posts about ICE operations in Minneapolis—First Amendment-protected posts for which he has not been charged with any crime—while spending relatively little effort addressing the alleged acts for

14

which Wagner is actually charged. (*See* Doc. 2, 2-9).[8]  But the actual charges and alleged criminality in this case are limited to cyberstalking and interstate threats directed at a single individual, J.S.   An individual who responded to this "threat" by directly contacting Mr. Wagner and challenging him to an organized, spectated prize fight.  (R. 1: 29-30; R. 27: 181, 183.) This is not the reaction of a person who reasonably feared for their safety.  This was the reaction of a provocateur who purposefully trolls his political opponents to generate responses and views by followers.  It's all part of the influencer game J.S. plays.

> And the district court properly recognized that.
>
> And in some of the instances that were read in the wordage used yesterday, they could be things that were actual threats, or the use of words that could be viewed in more than one way when used against persons in a way that might not be as specific a threat with an intention to carry out some bad outcome.

(R. 24: 145.)  The nature of the alleged offense, in the context of the social media landscape where the loudest, most strident voices get the most views, simply did not appear to the court to be nearly as "threatening" as the government wanted it to believe. Indeed, the district court observed that

> there are a lot of things that point to at least some active [—but] not active in the sense of physically active[—] concerns relative to the danger posed by the defendant. . . I would note [that] it's my understanding that the alleged victim of the cyberstalking and the threats was a person in the state

---

[8] Similarly, the government's complaint in this case devotes 26 of its 30 pages (87%) to sensationalizing Mr. Wagner's uncharged and constitutionally-protected online speech regarding ICE operations in Minneapolis.  (*See* R.1: Complaint, Pg.ID 3-29).

of Michigan, and that the defendant has been in Minnesota, and that part of one of the things that I might do is keep them pretty far apart.

(*Id.* at 146-7.)

## II.    The weight of the evidence of dangerousness does not favor continued detention.

The government's case on the charged offenses is weaker than its brief suggests. The threat charge rests on language the magistrate himself found to be no more than "implied." (D. Minn. R.11: 3)  And everything else that Wagner said—detailed in twenty-seven pages of the complaint—was constitutionally protected political speech. (E.D. Mich. R.1: 3-29.)  If it was actually credibly dangerous enough to warrant detention, the government would be able to charge him under the theory that it was an exception to protected speech.  But they haven't—because they can't. While Mr. Wagner's posts about ICE are admittedly provocative and, at times, intemperate, they must be understood in their context. The posts were made during a period when two Minneapolis-area civilians (one of whom (Pretti) Wagner had known personally for 15 years (*see* D. Minn R.13: 41)) had been killed by federal law enforcement officers during protests and immigration enforcement activities. Mr. Wagner's exhortations to stand ground and defend against ICE—whatever one thinks of their wisdom—were expressions of political opposition, and he repeatedly and expressly cautioned his followers against instigating violence.  Defense counsel at the Michigan bond review hearing provided that full context, paraphrasing the mitigating portions of Mr. Wagner's

16

posts where he warned against instigating violence. (R. 27: 206-7.) The district court heard this, and understood this context. It was not required to accept the government's one-sided characterization of this speech.

The district court also properly discounted the government's last-ditch effort to suggest Mr. Wagner posed a danger to "J.P." or "N.S." (R. 27: 131-34; see also Doc. 12, 23-4). Phantom victims are in no danger, particularly when all the threatening statements are being made by an undercover agent unsuccessfully trying to trick a target into incriminating himself. (*See* R. 27: 138-40.)

## III. Mr. Wagner's history and characteristics support release.

Mr. Wagner has no criminal history of violence—none. He has no weapons offenses and no history of assaultive conduct. His prior criminal record consists of minor traffic citations, and a youthful drug-related offense in Colorado for which he successfully completed a diversion program and was subsequently vacated. (*See* E.D. Mich. Pretrial Services Report.). And he had only one outstanding bench warrant, issued in 2016 on a 2011 Iowa marijuana possession case in which a deferred judgment had already been entered—Wagner only found out about the outstanding warrant at his Minneapolis detention hearing. (R. 27: 184-5.)

The government emphasizes Mr. Wagner's behavior during his arrest: spitting on and "resisting" the agents processing his arrest; making statements about "not letting him out;" flipping the bird to the camera in his booking photo. (*See* Doc. 2 at 10-11.) But the district court considered this evidence and properly weighed it. A chaotic and hostile response to arrest—while certainly not commendable—does not establish that no conditions of release can ensure safety. The relevant question is whether Mr. Wagner—subject to home detention, GPS monitoring, device restrictions, third-party custodian supervision, and a comprehensive ban on social media and protest activity— poses a danger that cannot be adequately managed. The district court reasonably concluded that he did not.

The government's reliance on Mr. Wagner's self-identification as a member of Antifa and as a "crazy leftist" is troubling. Political affiliation, political self-description and anti-government activism are not themselves evidence of dangerousness under the Bail Reform A ct. *See, e.g., United States v. Munchel*, 991 F.3d 1273, 1283-4 (D.C. Cir. 2021) ("That Munchel and Eisenhart assaulted no one on January 6; that they did not enter the Capitol by force; and that they vandalized no property are all factors that weigh against a finding that either pose a threat of 'using force to promote [their] political ends.'") The suggestion that Mr. Wagner's political identity and his fiery rhetoric, rather

18

than his actual conduct, renders him unfit for supervised release is antithetical to the principles of individual liberty that the Act is designed to protect.[9]

*United States v. Lidderdale*, 795 F.Supp.1024 (S.D. Ohio 2025), and *United States v. Comberger*, 2021 WL 1725516 (E.D. Ky. Apr. 30, 2021) are distinguishable from this case. Lidderdale was sending specific death threats directly to specific public officials. *Lidderdale*, 795 F. Supp at 1028 ("Lidderdale was not coy about his intentions. They were announced to his victims with terrifying specificity"). Comberger was an alleged human trafficker who had previously said online that government informants deserved bullets between the eyes or their throats cut and then warned a specific witness to "keep her fucking mouth shut." *Comberger*, 2021 WL 1725516 at *4. But here, the government does not allege that Mr. Wagner threatened specific government officials, or that he made specific threats about how he intended to harm anyone. No, he told people to defend themselves against violent ICE agents, but to otherwise practice non-violent

---

[9] The Government tries to make hay of the Trump Administration's designation of "Antifa" as a "domestic terrorist organization." (Doc. 12: 33.) But it has been repeated pointed out by watchdog organizations (as well as pre-Trump era law enforcement agencies) that "antifa" are neither terrorists nor an organization. Rather, it is "a broad, community-based movement composed of individuals organizing against racial and economic injustice." *See* Hatewatch Staff, "Designating Antifa as Domestic Terrorist Organization is Dangerous, Threatens Civil Liberties," Southern Poverty Law Center, available at *https://perma.cc/56BX-WYXF* (last accessed Apr. 23, 2026). The designation merely "grant[s] federal law enforcement broad powers, under the federal terrorism code, to surveil and investigate anyone labeled as antifa. . . [and] allow[s] federal law enforcement to broadly target anyone involved in protests viewed unfavorably by the Trump administration, even retroactively." *Id.* Wearing a hoodie that says "I am antifa" does not make one a terrorist.

obstructive protest techniques. He predicted that successful nonviolent armed resistance would "kill" the ideology and policies that ICE was imposing upon his city; he did not encourage anyone to, or threaten to himself, physically harm any specific individual. And he pointed out to a man who had doxed a journalist that he could be (and had been) doxed himself.

Nor is *United States v. Richardson* apposite. 2011 WL 5026456 (S.D. Ohio 2011). Richardson was a state trooper who tampered with witnesses "knowing a criminal investigation was ongoing against him." *Id.* at *6. That court concluded that his non-violent obstruction of justice "pose[d] a sufficiently serious danger to the community such that pretrial detention is warranted" precisely and "particularly given his status as a law enforcement officer." In contrast, Mr. Wagner wasn't in a position of legal authority, and wasn't witness tampering or obstructing criminal investigations. He was just a loudmouthed local with a bunch of tattoos protesting for the civil rights and human dignity of immigrant families, and confronting far-right cyberbullies for trying to intimidate his fellow activists.

## IV. The district court's conditions of release adequately address any danger.

20

The government argues that Wagner would pose an unacceptable danger, even with the court's strict conditions, and that the court erred in its analysis in four ways. (*See* Doc. 12, 37-40.) Not so.

First, as discussed above, the court did not clearly error in saying that many of the "threats" the government alleged did not appear very threatening at all, (see R. 24: 146-7.); even the magistrate had previously concluded that the alleged threats against J.S. were at most "implied." (D. Minn. R.11: 3).

Second, given that all of Wagner's alleged actions—beyond protesting and handing out gas masks and shields to fellow protestors who didn't want to get injured by ICE agents using excessive force—were online, the court was reasonable in addressing this concern by imposing strict device restrictions. Mr. Wagner could possess only one phone and one computer, both of which must be approved by pretrial services and equipped with supervision software, (R. 24: 153-4.); he could not post on social media or direct anyone to do so on his behalf, (*id.* at 154.); and he was ordered to home detention with GPS monitoring as well as a responsible third-party custodian, providing two additional layer of supervision and accountability, (*id.* at 152-4.)

Third, the court was not wrong to compare Wagner's actions in the community to those of ICE. Kyle Wagner hadn't shot or killed anyone. As established above, he never even threatened to do so.

Fourth, the government insists that Wagner could easily get around the social media restrictions.  Not without either defeating Pretrial Services internet monitoring software or colluding with his third-party custodian, who agreed to enforce the electronic device restrictions.  The Court was reasonable to assume that a software monitoring program implemented by its own pretrial supervision agency is up to the task, and that a third-party custodian vetted by its own pretrial supervision agency was sufficiently trustworthy and capable.

The district court articulated a detailed set of conditions tailored to the specific risks Mr. Wagner presents. The government's disagreement with that conclusion does not constitute clear error; indeed, the district court's discussion of conditions corrects the error made by the magistrate in denying bond.

## V.     The risk of nonappearance does not support continued detention.

Perhaps the most damning evidence against the government's argument that Wagner "will skirt federal authority at the first opportunity" (Doc. 12: 47) is that, in fact, Wagner turned himself in when this Court stayed his release.  He deliberately did so only after getting his travel to Detroit approved by Pretrial Services.  And by all accounts, he fully complied with all his conditions for the week that he was on release.  Indeed, as the Government is fond of saying in this case, "The best predictor of future

behavior is past behavior." (*Id.*, 46.)  This court reviews the district court's bond determination for clear error.  Did she clearly err with her conditions when he followed them, and turned himself in?  Obviously not.  There can be no greater test of a defendant's likelihood of absconding than a court order that he consent to giving up his own liberty.  Kyle Wagner passed that test.

## CONCLUSION

For the reasons stated above, this Court should affirm the district court's bond determination.

Respectfully Submitted,

FEDERAL COMMUNITY DEFENDER

s/ Jean Pierre Nogues
Counsel for Defendant-Appellee
613 Abbott St., Fifth Floor
Detroit, MI 48226
(313) 967-5542

Date: April 23, 2026

23

## DESIGNATION OF ADDITIONAL
## RELEVANT DISTRICT COURT DOCUMENTS

In addition to the District Court Documents and Page ID Ranges designated by

Plaintiff-Appellant in its Opening Brief, Defendant-Appellee designates the following

filings as relevant documents (expanded page ranges in italics):

Electronic Record, Eastern District of Michigan, case number 26-cr-20059:

| Record Number | Document Description | Page ID Range |
|---|---|---|
| R. 1 | Complaint | *1-31* |
| R. 17 | Motion Appealing Denial of Bond | *61-70* |
| R. 21 | Government's Response | *80-105* |
| R. 23 | Order Setting Release Conditions | 114-*19* |
| R. 24 | 3/25/26 Hearing Transcript | *120-164* |
| R. 27 | 3/24/26 Hearing Transcript | *167-210* |

Electronic Record, District of Minnesota, case number 26-mj-00141:

| Record Number | Document Description | Page Range |
|---|---|---|
| R. 11 | Order of Detention | 1-4 |
| R. 13 | Transcript of Preliminary and Detention Hearing held on 2/5/26 | 1-53 |

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of 6 Cir. R. 9 because it contains fewer than 5,200 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). The brief contains 5,176 words.

Defendant-Appellee notes that the United States' opening brief does not comply with 6 Cir. R. 9 as it contains 7,405 words (excluding the Rule 32(f) exempted sections).

Signed,

/s/ Jean Pierre Nogues

Dated: April 23, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the parties of record.

Signed,

s/Jean Pierre Nogues

Dated:  April 23, 2026

26