RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0227p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT



UNITED STATES OF AMERICA,

                *Plaintiff-Appellant*,

    *v.*

KYLE WAGNER,

                *Defendant-Appellee*.

No. 26-1294

---

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:26-cr-20059-1—Denise Page Hood, District Judge.

Decided and Filed:  August 12, 2026

Before:  NORRIS, BLOOMEKATZ, and HERMANDORFER, Circuit Judges.

---

### COUNSEL

**ON BRIEF:**  Danielle Asher, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant.  Jean Pierre Nogues, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Appellee.

    HERMANDORFER, J., delivered the opinion of the court in which NORRIS, J., concurred.  BLOOMEKATZ, J. (pp. 18–42), delivered a separate dissenting opinion.

---

### OPINION

---

    HERMANDORFER, Circuit Judge. A grand jury indicted Kyle Wagner for cyberstalking and transmitting interstate threats.  The conduct giving rise to the indictment followed a series of escalating communications in which Wagner threatened federal law-enforcement officers and their supporters, solicited resources to evade detection by the

authorities, and entertained an inquiry about killing a former government official. A magistrate judge ordered Wagner detained pretrial. But the district court changed course and permitted Wagner's release. Though acknowledging that the record exhibited some risk of Wagner's danger, the district court reasoned that certain release conditions—like requiring Wagner's assurances that he will limit his internet access and avoid making additional threats—would adequately ensure public safety. The Government appealed and sought an emergency stay of the release order, which we granted. We now reverse the district court's decision.

I

A

Kyle Wagner is a self-professed member of Antifa[1]—short for anti-fascist—based in Minneapolis, Minnesota.

Wagner has stated that he's willing to die in what "he view[s] as" an "ideological battle" against "violent fascist government actions and its supporters." Wagner Br. 3-4. Around January 2026, Wagner undertook a series of escalating steps to oppose Immigration and Customs Enforcement's actions in Minneapolis and broadcast his efforts to a social-media following. As the month progressed, Wagner's social-media posts transitioned into direct calls for violence against federal agents and their supporters.

A few examples paint the picture. Wagner proclaimed that the situation in Minneapolis was "kill or be killed." E.D. Mich., Complaint, R.1, PageID 9. In that same post, Wagner encouraged his online followers to "hunt" ICE by "sacrific[ing]" their "vehicles." *Id.* at PageID 8. In other posts, Wagner declared that he and his followers were "f\*\*king coming for" ICE and were "coming for [ICE's supporters] too." *Id.* at PageID 6, 13. Wagner urged his followers to "f\*\*king fight" ICE and "put[] hands" on law-enforcement agents and "take their f\*\*king guns."

---

[1]Referencing a 2025 Executive Order, the Government identifies Antifa as "a designated domestic terrorist organization." Gov't Br. 24; *see* Designating Antifa as a Domestic Terrorist Organization, 90 Fed. Reg. 46,317 (2025) (describing Antifa as "a militarist, anarchist enterprise" that "uses illegal means to organize and execute a campaign of violence and terrorism"). Wagner disputes that characterization and claims that Antifa is instead "a broad, community-based movement composed of individuals organizing against racial and economic injustice." Wagner Br. 19 n.9 (citation omitted). Because our decision turns only on evidence of Wagner's specific conduct, we can leave the parties' broader debate about the nature of Antifa to the side.

*Id.* at PageID 11, 23-24. He suggested that he and his followers should "have a little f\*\*king fun" by "identify[ing] every single" ICE agent, "at the barrel of a gun" if necessary. *Id.* at PageID 17. Wagner also lamented that protestors had yet to "march on f\*\*king Whipple"—the federal building in Minneapolis—"with guns." *Id.* at PageID 26. He therefore directed his followers to "[g]et your f\*\*king guns and stop these f\*\*king people." *Id.* Wagner prefaced that directive by exclaiming that he was "not talking about peaceful protests anymore." *Id.* Other videos of Wagner's stressed that Minneapolis was "where ICE has come to die." *Id.* at PageID 16.

At points, Wagner disavowed any intent to commit physical aggression. Still, Wagner's followers—spanning Minnesota and beyond—understood him to be calling for violence. In response to one of Wagner's posts, an Instagram user referenced firearms, commenting that it's "[t]ime for [ICE agents] to meet your friends. Namely AR15 and 9MM." *Id.* at PageID 17. Others expressed interest in joining Wagner's "cause" from out of state. *Id.*

Wagner also sought tangible resources from his followers to aid his efforts to "organize." *Id.* at PageID 13. Wagner specifically requested funds to help him "evade" detection by law enforcement. *Id.* And he provided the name of several financial-payment accounts for use in transferring him money. *Id.* In all, Wagner's followers sent him between $10,000 and $15,000.

After Wagner posted calls for "[b]oots on the ground" to a local intersection near ICE agents and urged his followers to "[g]et your f\*\*king guns and stop these f\*\*king people," Instagram deleted Wagner's account. *Id.* Yet he quickly resurfaced with a different account—employing the username "@antifa.kaos"—and a new series of online postings. *Id.* at PageID 27. Among other things, Wagner used his updated account to publish a video of him distributing gas masks and riot shields at a protest.

Wagner's activities were not just public facing. In one private Signal chat, a user allegedly contacted Wagner with a request to help "kill" a man named J.P., a former high-ranking government official. E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 131, 139. Wagner responded in the chat that "we do stuff, me and my family of friends" and "[w]e like to know about people who deserve consequences." *Id.* at PageID 131. He then asked for "credible

verifiable information" that he could pass onto his "team" so it could "assess the situation." *Id.* at PageID 131-32.  In another chat, Wagner allegedly stated that he "may have found" the address and phone number of N.S., an individual "who did investigative work." *Id.* at PageID 134-35.

On January 29, 2026, Wagner allegedly "doxxed" J.S., "a pro-ICE individual," by publishing what he claimed was J.S.'s name, phone number, birth month and year, and address. E.D. Mich., Complaint, R.1, PageID 5.  Alongside that information, Wagner described J.S. as a "bb nazi boy" and said "we can all knock on strangers doors . . .  See you soon kiddo – stay safe out here." *Id.* at PageID 30.  After the alleged doxxing, J.S. and Wagner apparently discussed fighting in a cage match.  In a subsequent post, Wagner allegedly published what he thought was the address and phone number of J.S.'s parents.

B

Several days later, the Government filed a criminal complaint charging Wagner with one count of cyberstalking and one count of transmitting interstate threats for his alleged doxxing of J.S.  Wagner was subsequently arrested in Minnesota.  During his arrest, Wagner allegedly began "pushing" agents and "spitting on them" while stating that he would "beat" them.  D. Minn., Detention Hearing Tr., R.13, Page 38.  He also told the arresting agents "[d]on't let me out." *Id.* During his booking photo, Wagner flashed two middle fingers at the camera.  His message: "This is for the judge." *Id.* at Page 21.

Following a detention hearing, a magistrate judge in Minnesota ordered Wagner detained pretrial under the Bail Reform Act.  In the detention order, the magistrate judge stated that Wagner was "a danger to the community" given his "implied threat to injure, harass or intimidate J.S. and his parents" and his "voluminous" social-media posts "encourag[ing] his supporters to join him in obstructing, impeding, and assaulting officers."  D. Minn., Detention Order, R.11, Page 3.  The magistrate judge further explained that Wagner's "lack of job security," "admitted lack of stable housing," and expressed "desire to 'evade' law enforcement" rendered him a flight risk. *Id.*

Wagner's criminal case was then transferred to the Eastern District of Michigan, where the Government had filed the criminal complaint. A grand jury in the Eastern District of Michigan later indicted Wagner for one count of cyberstalking, 18 U.S.C. § 2261A(2), and one count of interstate communications involving threats, *id.* § 875(c).

Meanwhile, Wagner appealed the magistrate judge's detention order. The district court held an evidentiary hearing and argument on the pretrial-detention factors. *See id.* § 3142(g). At the hearing's conclusion, the district court issued an oral ruling revoking the magistrate judge's detention order and releasing Wagner.

The district court's subsequent written order memorialized Wagner's release to his mother's home in Minnesota subject to a series of conditions. Those conditions required, among other things, that Wagner submit to GPS monitoring, "refrain from posting on social media," forgo accessing the internet with anything other than two approved devices (one phone and one computer), and that he "[n]ot engage in assaultive, threatening, or harassing behavior or statement[s]." E.D. Mich., Release Order, R.23, PageID 118.

The Government appealed the district court's order and sought a stay pending appeal. We granted the motion for a stay in a prior order.

Since then, the Government has obtained a second grand jury indictment against Wagner in the District of Minnesota. That indictment charges Wagner and several others with conspiracy to impede or injure a federal officer, solicitation to commit a crime of violence, and transmitting interstate threats. Wagner has entered a plea of not guilty.

II

The Bail Reform Act sets out the factors courts must use in determining whether to detain or allow the release of a criminal defendant before trial. In the mine-run case, the Act's policy favors release. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). But like any "default position," that policy can be overcome. *Id.* Relevant here, the statute directs that courts "shall order the detention of" a defendant pretrial if "no condition or combination of conditions will

reasonably assure the appearance" of the defendant "as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

When assessing those risks, courts must consider (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the" defendant, (3) the defendant's "history and characteristics," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." *Id.* § 3142(g). The Government must prove dangerousness by clear and convincing evidence. *Stone*, 608 F.3d at 945.

For the reasons below, we hold that the Government has met its burden of proving Wagner's dangerousness. And given the nature of Wagner's prior conduct, we further conclude that no condition or combination of conditions will reasonably assure the safety of J.S. and the community. The Bail Reform Act therefore mandates Wagner's pretrial detention.

A

We begin with the standard of review. When assessing pretrial detention under the Bail Reform Act, we have held that "mixed questions of law and fact" and "legal conclusions" are subject to "de novo consideration." *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985). More recently, in *Stone*, we reiterated that the "ultimate question whether [pretrial] detention is warranted" is subject to "de novo" review. 608 F.3d at 945 (citing *Hazime*, 762 F.2d at 37). By contrast, "[w]e review the district court's factual findings for clear error." *Id.* Our framework— de novo review for the ultimate application of the statutory factors to the detention determination, and clear-error review for findings of fact—tracks the circuits' prevailing approach to reviewing detention decisions under the Bail Reform Act. *See* Jefri Wood, *The Bail Reform Act of 1984* § VII, pp.57-58 (Fed. Jud. Ctr. 4th ed. 2022) (collecting cases).

The dissent favors a more deferential standard for reviewing the ultimate detention conclusion. And it reads our precedents to leave that option on the table. But *Hazime* directly addressed when and how deference factored into review of detention determinations. *See* 762 F.2d at 36-37. And it concluded that de novo review governed the ultimate issue of detention. *Id.* That *Hazime* then remanded for further consideration does not mean the standard "did not

contribute to the judgment," Dissenting Op. 28 (citation omitted)—after all, had the dissent's across-the-board deference rule prevailed, *Hazime* might have simply affirmed.  So like other courts and commentators,[2] we take *Hazime* and *Stone* to mean what they say:  We review de novo "whether detention is warranted."  *Stone*, 608 F.3d at 945.

Subsequent caselaw developments do not license a departure from that rule.  No intervening Supreme Court decision contains "directly applicable analysis" that is "inconsistent" with what "we've said" about the standard of review for detention decisions.  *RLR Investments, LLC v. City of Pigeon Forge*, 4 F.4th 380, 390 (6th Cir. 2021) (citation omitted).  The dissent's reliance on different standard-of-review analyses in other law-fact contexts does not reveal anything that "mandates modification" of our Bail Reform Act decisions.  *Id.* (citation omitted). So whatever the first-instance case for applying deferential review, we lack power here to revisit our precedents.  *See Soaring Eagle Casino & Resort v. NLRB*, 791 F.3d 648, 662 (6th Cir. 2015).

We also disagree with Wagner's argument that *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002), supports abuse of discretion review.  *Chilingirian* involved a convicted defendant's request for release pending appeal—not release pretrial—and never cited *Hazime*. *Id.*  Instead, *Chilingirian*'s abuse-of-discretion assertion rested exclusively on *Lee v. Jabe*, 989 F.2d 869 (6th Cir. 1993).  *Lee*, though, dealt with a state prisoner's challenge to the denial of bail pending adjudication of a federal habeas petition.  *Id.* at 870.  *Lee* is not a Bail Reform Act case, and so it does not implicate our Bail Reform Act rule.

B

We now turn to the merits.  The Government argues that Wagner is a danger to both J.S. and the broader community.  It also argues that Wagner is a flight risk.  We agree with the Government that it carried its burden on dangerousness.  Because that conclusion is sufficient to support Wagner's detention, we need not address risk of flight.

To establish a defendant's dangerousness, the Government must "identify an articulable threat posed by the defendant to an individual or the community."  *United States v. Munchel*, 991

---

[2]*See, e.g.*, Wood, *Bail Reform Act* § VII, p.58; *United States v. Manafort*, 897 F.3d 340, 346 n.2 (D.C. Cir. 2018); *United States v. Westbrook*, 780 F.2d 1185, 1189 n.7 (5th Cir. 1986).

F.3d 1273, 1283 (D.C. Cir. 2021). That requirement does not limit detention to only those defendants who have "engaged in violence" personally. *Stone*, 608 F.3d at 947 n.6 (collecting cases). A "threat" sufficient to establish dangerousness "need not be of physical violence, and may extend to non-physical harms." *Munchel*, 991 F.3d at 1283 (citation omitted). And when determining whether the Government has met its burden of proving dangerousness, "we may consider as evidence" conduct that "does not relate to the offenses charged." *Stone*, 608 F.3d at 953; *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). With those points in mind, we consider the four § 3142(g) factors in turn.

*1. Nature and Circumstances of the Offense.* Wagner's conduct led a grand jury to indict him on two felonies involving threatened harm to others—cyberstalking and transmitting threats through interstate communication. The cyberstalking charge alleges that Wagner acted "with the intent to kill, injure, harass, and intimidate" J.S. by using "the internet and the social media application Instagram[] to engage in a course of conduct that caused, attempted to cause, and would reasonably be expected to cause substantial emotional distress to J.S." E.D. Mich., Indictment, R.10, PageID 49-50 (citing 18 U.S.C. § 2261A(2)). The interstate-threats charge alleges that Wagner "knowingly transmitted in interstate commerce" a "communication containing a threat to injure" J.S. "with knowledge" and "reckless disregard that the communication[] would be viewed as a threat." *Id.* at PageID 50 (citing 18 U.S.C. § 875(c)). Both charges stem from Wagner's attempt to "doxx[]" J.S. and his parents with a message that, in context, appears to threaten J.S. with harm. E.D. Mich., Complaint, R.1, PageID 29-30. Given those charges, the nature and circumstances of the offenses weigh in favor of Wagner's detention on dangerousness grounds. *See United States v. Hagar*, 822 F. App'x 361, 369 (6th Cir. 2020) (deeming similar charges "extremely serious").

Neither Wagner nor the dissent disputes that the charged offenses are serious. And indeed, this Court has before characterized Wagner's charged offenses—cyberstalking and transmitting interstate threats—as categorically "crimes of violence." *United States v. Lidderdale*, 2025 U.S. App. LEXIS 33235, at *9-10 (6th Cir. Dec. 18, 2025) (collecting cases). Wagner's interstate-threats charge requires a "threat to kidnap any person or [a] threat to injure the person of another." 18 U.S.C. § 875(c). Courts have likewise read the cyberstalking statute

to cover a more limited category of threatening speech. *See, e.g.*, *United States v. Yung*, 37 F.4th 70, 80 (3d Cir. 2022). That forecloses the district court's observation that the charged offenses could sweep in minor conduct like schoolyard "bullying." E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 149-50. So discounting Wagner's charges on that ground was legally unsound.

That leaves Wagner to argue that the "alleged criminality in this case" lacks weight given the particulars of his conduct. Wagner Br. 15. Driving Wagner's position is that the threats were "directed at a single individual, J.S.," "who purposefully trolls his political opponents to generate responses and views by followers." *Id.* But we are aware of no rule that permits cyberstalking or interstate threats so long as the victim has a controversial persona. Nor is now the time to litigate the Government's ability to ultimately prove Wagner's guilt at trial. Wagner posted J.S.'s information and address to his many followers, called J.S. "nazi boy," and said "see you soon kiddo." E.D. Mich., Indictment, R.10, PageID 50 (cleaned up). A grand jury concluded that such communications constituted evidence of "a threat to injure the person of another." *Id.* The district court, too, indicated that the specific charges against Wagner were "very serious." E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 149-50. All that weighs against attempts to mitigate the nature and circumstances of Wagner's offenses by downplaying the risk of potential harm to J.S or others.

Nor are we persuaded by the dissent's comparative assessment of Wagner's conduct. The fact that Wagner's conduct could have been worse does not mean it weighs in favor of dangerousness only "slightly." Dissenting Op. 30. To the contrary, the district court noted that "there are a lot of things" in the record "that point to at least some active . . . concerns relative to [the] danger posed by the defendant" to J.S. and others. E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 146-47. We agree.

*2. Weight of the Evidence.* The "weight of the evidence" also points towards Wagner's dangerousness. 18 U.S.C. § 3142(g)(2). "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948.

Wagner's specific incident with J.S. followed weeks of posts that included communications the district court found could be interpreted as "actual threats" against federal law-enforcement authorities and their supporters.  E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 145.  Those posts—appearing in the record verbatim—included calls for Wagner's followers to "put[] hands on" ICE, "fight" ICE, and "[g]et your f**king guns and stop" ICE.  E.D. Mich., Complaint, R.1, PageID 23-24, 26.  In some of those posts, Wagner explained that he was "done with peaceful protests," that he was "not talking about peaceful protests anymore," and that it was "kill or be killed."  *Id.* at PageID 9, 24, 26.  Such threatening statements "weigh[] strongly in favor of dangerousness."  *Stone*, 608 F.3d at 949.

In addition to those posts, Wagner communicated with a Signal user about killing J.P., a former government official.  In that conversation, which occurred two days before his arrest, Wagner said that if the user provided him with "credible verifiable information," he would pass it along to "people who can" mete out "consequences" to J.P.  E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 131.  The unknown Signal user responded "[h]ow can I trust you?"  *Id.* at PageID 132.  The record reflects that Wagner and the unknown user then connected via an incoming call.  *Id.*  Afterwards, the user sent additional information about J.P., including a "phone number, address, [and] E-mail."  *Id.*  In response, Wagner stated, "[w]e have to walk through fire."  *Id.*  That Wagner pitched himself as able to assist in soliciting a murder evidences his dangerousness.  So does a separate January 2026 incident in which Wagner distributed a "current address" for an individual named N.S. with the message: "I may have found where he's hiding."  *Id.* at PageID 135.

Wagner's counterarguments do not persuade.  To start, Wagner contends that "[t]he government's case on the charged offenses is weaker than its brief suggests."  Wagner Br. 16.  And throughout these proceedings, Wagner has insisted that his prosecution boils down to a political vendetta.  But those responses do not affect the detention calculus.  As already explained, the "weight of the evidence" referenced in § 3142(g)(2) "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt" on the indicted offenses.  *Stone*, 608 F.3d at 948.  Wagner's characterization also does not account for

the grand jury's indictment, which "by itself, establishes probable cause to believe that [Wagner] committed the crime[s] with which he is charged." *Id.*

Wagner next takes issue with the Government's reliance on his social-media posts and chats to prove dangerousness. His argument is both legally and factually flawed. As a legal matter, "we may consider as evidence of dangerousness" a defendant's "statements indicating a violent intent" even though those statements "do[] not relate to the offenses charged." *Id.* at 953. Courts routinely consider a defendant's threatening statements, among other speech, when determining whether the defendant poses a danger to the community.[3]

As for the facts, they do not support the characterization of Wagner's posts as exclusively calls to "practice non-violent obstructive protest techniques." Wagner Br. 19-20. The district court acknowledged the "very strong argument that there was some protection of the public involved" in detaining Wagner pretrial. E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 147. And the record supports that finding. Wagner, among other things, called for his followers to "f**king fight" ICE, "put[] hands on" ICE, and "[g]et your f**king guns and stop these f**king people." E.D. Mich., Complaint, R.1, PageID 23-24, 26. Wagner also called for his followers to "hunt ice" and expressed frustration that they had yet to "march on f**king Whipple with guns." *Id.* at PageID 8, 26.

Now that Wagner's threats have come under legal scrutiny, he seeks to cast them as empty bravado. But given Wagner's assertions that he was "done with peaceful protests now" and "not talking about peaceful protests anymore," several of Wagner's posts can only be understood as calls for violence. *Id.* at PageID 24, 26. Wagner's followers understood them as such, with one responding that it was time for federal agents to meet an "AR15 and 9MM." *Id.* at PageID 17. If messages calling to "march on" a federal building "with guns," "put[] hands on" ICE, and "[g]et your f**king guns and stop these f**king people" don't "promote[] physically assaulting and using weapons against federal agents," Dissenting Op. 31 (citation

---

[3]*See, e.g.*, *id.* at 953-54; *United States v. Martinez-Torres*, 181 F.3d 81, at *2 (1st Cir. 1998) (per curiam); *United States v. Torres*, 2023 WL 7391694, at *3 (10th Cir. Nov. 8, 2023) (per curiam); *see also United States v. Muhtorov*, 702 F. App'x 694, 696, 702 (10th Cir. 2017) (per curiam); *United States v. Lucero*, 2025 U.S. App. LEXIS 1662, at *2-3, 12 (10th Cir. Jan. 27, 2025).

omitted), it's hard to imagine what words would.  For good reason, then, the district court accepted that some of Wagner's posts could be read as "actual threats."  E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 145.

Wagner cannot avoid consequences for those threats by shifting the focus to times he chose more tempered words.  *Cf. United States v. Martinez-Torres*, 181 F.3d 81, at *2 (1st Cir. 1998) (per curiam).  That is especially so because Wagner's threats had "escalated in volume and violence" around the time of his arrest.  *Lidderdale*, 2025 U.S. App. LEXIS 33235, at *12 (quoting *United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014)).  Even accepting that Wagner himself did not present any "physically active" concerns of danger, E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 146-47, that does not disprove dangerousness.  A defendant need not have "engaged in violence" to warrant detention.  *Stone*, 608 F.3d at 947 n.6.

Nor does the record support efforts to brush away Wagner's private communications involving a request to "kill" J.P.  E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 131.  Wagner claims that "an undercover federal agent" contacted Wagner about J.P. as part of an "attempt[] to trick Wagner" into incriminating himself.  Wagner Br. 11.  But Wagner provides no evidence to support that claim.  And even if true, it does not help Wagner.  Regardless of who contacted him, Wagner does not dispute the allegations that he agreed to pass along J.P.'s information to his "team" so they could "assess the situation" and potentially mete out "consequences."  E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 131-32.  The dissent's assertion that Wagner was intending to "'forward'" J.P.'s "'information'" to the "'international criminal court'" fares no better.  Dissenting Op. 33 (quoting E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 139).  The proffered conversation shows that Wagner entertained a request to help "kill" J.P., not criminally refer him.  E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 131.

Wagner's counter that he lacked sufficient notice that the Government intended to proffer the J.P. conversation does not alter the district court's decision to admit that evidence into the record.  "The government may proceed in a detention hearing by proffer."  *United States v. Webb*, 238 F.3d 426, at *2 (6th Cir. 2000); *see also Stone*, 608 F.3d at 948-49.  And "[t]he rules concerning admissibility of evidence in criminal trials do not apply to the presentation and

consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f); *see also United States v. Wind*, 527 F.2d 672, 675 (6th Cir. 1975). So the district court did not err by allowing the Government to introduce Wagner's conversation about J.P., particularly since Wagner has not disputed the accuracy of that information.

   3. *Nature and Seriousness of the Danger*. Next, "the nature and seriousness of the danger to any person or the community that would be posed by [Wagner's] release" is significant. 18 U.S.C. § 3142(g)(4). Internet-based threats like those Wagner is charged with making pose well-documented harms. *See United States v. Wheeler*, 776 F.3d 736, 745 n.4 (10th Cir. 2015); *see also Elonis v. United States*, 575 U.S. 723, 747-48 (2015) (Alito, J., concurring in part and dissenting in part); Chief Justice John G. Roberts, Jr., *2024 Year End Report on the Federal Judiciary* 6-7 (2024) (discussing dangers of "dox[x]ing"). Wagner's "threatening statements regarding law enforcement officers" are also strong evidence that he "would pose a serious danger to the community if released" pending trial. *Stone*, 608 F.3d at 953; *see also United States v. Davis*, 2024 WL 3372682, at *2 (5th Cir. July 11, 2024) (per curiam). So are Wagner's private communications about J.P., which further indicate a willingness to entertain targeted threats on specific individuals.

   Wagner disagrees. In doing so, he defends the district court's apparent attempt to draw equivalency between Wagner's threats and the actions of federal law enforcement. Specifically, the district court remarked during the detention hearing that "protection of the public" was "kind of like a two-way street" that "depends on what side of the street you're on whether or not an individual might feel they are protected or in need of protection." E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 147. Both Wagner and the Government interpret that remark as a "compar[ison]" between "Wagner's actions in the community to those of ICE." Wagner Br. 21. In context, it thus appears that the district court may have discounted the dangerousness of Wagner's threats based on its view that ICE also threatened the public. Any reasoning along those lines was error. The Bail Reform Act focuses on the danger the *defendant* poses to "any other person and the community." 18 U.S.C. § 3142(e)(1). The district court's views on the Executive Branch's immigration policy have no bearing on that inquiry.

4.  *Defendant's History and Characteristics*.  That leaves Wagner's history and characteristics.  Those "weigh[] slightly against dangerousness," as Wagner has no violent criminal history.  *Stone*, 608 F.3d at 951.  But "a prior record of violence" is not "essential" to proving that a defendant is dangerous for detention purposes.  *Rodriguez*, 950 F.2d at 89.  So too, "a person could be deemed a danger to the community sufficient to justify detention even without posing a threat of committing violence in the future."  *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021).  And for the reasons already discussed, the Government "has met its burden" of "prov[ing] dangerousness by clear and convincing evidence" despite Wagner's lack of a violent criminal history.  *Rodriguez*, 950 F.2d at 89.

C

We also agree with the Government that no condition or combination of conditions will "reasonably assure" the safety of J.S. and the community.  18 U.S.C. § 3142(e)(1).  In ordering Wagner's release, the district court concluded that the various conditions it imposed—including GPS monitoring, home detention, a third-party custodian (Wagner's mother), device restrictions, and a prohibition on social-media posting—would mitigate Wagner's dangerousness.  We see two principal defects with that conclusion.

*First*, the conditions of release mostly "hinge on" Wagner's "good faith compliance." *United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990).  That is "particularly" true here, as the "crimes with which [Wagner] is charged" are "not readily susceptible to effective monitoring" because they "involve communications" with others.  *United States v. Hir*, 517 F.3d 1081, 1093 (9th Cir. 2008).  Yet the record evidence leaves little confidence that Wagner will comply with the conditions of release.

Wagner's actions around the time of his arrest undercut his asserted promises to abide by the court-imposed conditions.  Those actions include (1) flashing two middle fingers to the camera during his booking photo while stating "[t]his is for the judge," (2) "spit[ting] in the face" of the arresting agents, (3) warning those agents not to "let [him] out" and that he would "beat" them, and (4) seeking—and obtaining—resources to "evade" federal law enforcement.  D. Minn., Detention Hearing Tr., R.13, Page 21, 38; E.D. Mich., Complaint, R.1, PageID 13.

Moreover, Wagner has failed to appear for state criminal proceedings multiple times, was once "[l]isted as an absconder" by a state court, and had an active warrant for his arrest in Iowa at the time of his detention hearing. E.D. Mich., Pretrial Services Report, at 4-5. Wagner's pattern of failing to appear for prior judicial proceedings further "demonstrate[s] a disregard for law enforcement and court-imposed restrictions." *United States v. Moore*, 2024 WL 3294950, at *2 (6th Cir. Apr. 17, 2024). All told, the record evidence points toward "an unacceptably high risk that" Wagner will disregard the conditions that the district court found necessary to mitigate his dangerousness. *Hir*, 517 F.3d at 1093.

*Second*, the online nature of Wagner's conduct further diminishes the effectiveness of the district court's conditions of release. Wagner could, for example, "easily evade[]" the device-monitoring requirement by accessing another device that is not equipped with the monitoring software. *Tortora*, 922 F.2d at 887. Indeed, Wagner has already allegedly evaded a social-media company's limitations on posting once before by creating and posting from a new account. And the district court's release order, which authorizes Wagner to leave home confinement for "employment," "education," and various other reasons, E.D. Mich., Release Order, R.23, PageID 116, would provide Wagner with ample opportunities to "access the internet" via unmonitored devices, *United States v. Carpenter*, 2023 U.S. App. LEXIS 2386, at *7-8 (6th Cir. Jan. 30, 2023). Yet the district court failed to address the Government's argument that internet-monitoring conditions are easily circumvented or problematic given Wagner's particular history of internet activity.

Similarly, the GPS-monitoring and home-detention conditions "cannot be expected to prevent" Wagner "from committing crimes or deter him from participating in felonious activity within the monitoring radius." *Tortora*, 922 F.2d at 887. Neither condition prevents Wagner from accessing the internet and "committing further criminal conduct" within the confines of his mother's home "or inducing others to act in his stead." *United States v. Espino*, 2021 U.S. App. LEXIS 6755, at *5-6 (6th Cir. Mar. 8, 2021). Appointing Wagner's mother as a third-party custodian is no silver bullet, either. As Wagner's counsel stated, Wagner's mother "doesn't know everything that her son does." E.D. Mich., Detention Hearing Day 2 Tr., R.24, PageID 141. And it's unreasonable to expect her to "monitor[]" Wagner's "compliance with conditions

of bail twenty-four hours a day, seven days a week." *United States v. Dono*, 275 F. App'x 35, 37-38 (2d Cir. 2008).

Wagner and the dissent maintain that the district court's proposed conditions adequately address the danger he poses. Wagner emphasizes that most of his actions "were online," which the district court addressed by "imposing strict device restrictions" and "social media restrictions." Wagner Br. 21-22. And he says he can only "get around" those restrictions by "defeating Pretrial Services internet monitoring software or colluding with his third-party custodian." *Id.* at 22.

That position overstates the effectiveness of the district court's proposed conditions and the difficulty of circumventing them. Examples highlighting the failings of internet-access limitations abound in our caselaw.[4] And in the pretrial-release context, we have explained that "the myriad of Internet-capable devices, including those that work with data plans rather than wifi access, render policing a defendant's Internet use almost impossible." *United States v. Watt*, 2024 U.S. App. LEXIS 13950, at \*5 (6th Cir. June 7, 2024) (cleaned up); *see also United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) ("[E]lectronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology," and "monitoring equipment can be rendered inoperative." (citation omitted)). That observation applies to Wagner, as the district court allowed him continued internet access via two devices.

The dissent chalks up those internet-monitoring decisions to "generalized concerns" driven by a "statutory presumption in favor of detention" that does not apply here. Dissenting Op. 41. And it suggests that we are announcing a per se rule that internet-monitoring conditions are insufficient. We disagree on both fronts. To start, cases questioning the efficacy of internet monitoring have focused largely on the defendants' conduct, not any detention presumption. *See, e.g.*, *Watt*, 2024 U.S. App. LEXIS 13950, at \*2-5. Consistent with that approach, courts have deemed internet-monitoring conditions insufficient even without the statutory presumption,

---

[4]*See, e.g.*, *United States v. Foster*, 2020 WL 6791572, at \*3 (6th Cir. July 20, 2020); *Carpenter*, 2023 U.S. App. LEXIS 2386, at \*7-8; *United States v. Hoilman*, 2023 WL 4074630, at \*2 (6th Cir. Apr. 24, 2023); *United States v. Watt*, 2024 U.S. App. LEXIS 13950, at \*4-5 (6th Cir. June 7, 2024); *United States v. Gruber*, 2024 WL 1366693, at \*1-2 (6th Cir. Apr. 1, 2024).

including in interstate-threats and cyberstalking prosecutions.[5]  In addition, it is Wagner's own conduct, not "generalized concerns" about internet offenses, that undercut the efficacy of the district court's conditions.  Dissenting Op. 41. Concluding that those conditions are insufficient here does not mean they would fall short in different cases presenting different facts.

Wagner also fails to adequately address the fact that the conditions' effectiveness depends upon his voluntary compliance.  He points to his actions during the week-long period when the district court's release order was in effect.  But that minimal compliance, when Wagner was under a microscope, does not outweigh the other record evidence suggesting that Wagner "is very unlikely to abide by any conditions of his release for an extended period of time, notwithstanding" any "successful furlough."  *Moore*, 2024 WL 3294950, at *2.

Faced with those realities, Wagner's "bald assertion that he is unlikely to engage in further" problematic behavior if released on the district court's conditions "does not overcome the weight" of the countervailing factors.  *United States v. Brock*, 2025 U.S. App. LEXIS 7320, at *6 (6th Cir. Mar. 28, 2025).  After all, "nothing in the Bail Reform Act" requires "dangerous defendants to be at large based upon their promise not to violate conditions of bail."  *Orena*, 986 F.2d at 633.

Ultimately, the Government has proven Wagner's dangerousness by clear and convincing evidence.  And on this record, we conclude that no condition or combination of conditions will mitigate the relevant risks.  The Bail Reform Act therefore requires that Wagner remain detained pretrial.  *See* 18 U.S.C. § 3142(e)(1).

*        *        *

We reverse the district court's release order.

---

[5]*See, e.g.*, *United States v. Comberger*, 2021 WL 1725516, at *6 (E.D. Ky. Apr. 30, 2021); *United States v. Waldman*, 2018 U.S. Dist. LEXIS 98548, at *12-13 (S.D.N.Y. June 12, 2018); *United States v. Dai*, 2023 U.S. Dist. LEXIS 237124, at *26-27 (N.D.N.Y. Dec. 19, 2023).

---

**DISSENT**

---

BLOOMEKATZ, Circuit Judge, dissenting.   In December 2025, the Department of Homeland Security launched Operation Metro Surge, a mass immigration enforcement effort that deployed thousands of federal agents to Minnesota and triggered widespread protests.   Kyle Wagner, a Minneapolis native, was a vocal opponent of Immigration and Customs Enforcement agents throughout the operation.   He regularly posted on social media, sometimes multiple times a day, to denounce ICE agents and to call for his followers to resist ICE.   Wagner also criticized ICE supporters, and, in one Instagram post, shared the purported personal information and address of a pro-ICE online influencer.   Based on this single post, the government charged Wagner with cyberstalking and transmitting interstate threats, and then it moved for his pretrial detention.   The district court found that it could reasonably protect against any risk of danger or nonappearance that Wagner posed by imposing numerous restrictive pretrial release conditions, so it ordered his release.

The government appeals the district court's order denying pretrial detention and releasing Wagner subject to these comprehensive conditions.   The government seldom appeals pretrial release orders, so why is it insistent here?   Wagner, who identifies as "antifa" (anti-fascist) and has large tattoos on his face, neck, and chest, looks aggressive in his social media videos, so it is no surprise that the White House Press Secretary held up a photo from one of his videos while touting law enforcement efforts against "left-wing agitators."   *See* Steve Karnowski, *Minneapolis Man Accused of Cyberstalking, Threatening ICE Supporter amid Crackdown in Minnesota*, Associated Press (Feb. 10, 2026, at 16:33 ET), https://perma.cc/3H3P-HUW8.   But Wagner has never committed a violent crime.   He does not own a gun and has disavowed owning one.   And there is no evidence in the record that he has ever assaulted or otherwise physically harmed anyone, save for spitting towards agents during his arrest.

Instead, as the government admits, Wagner's purported dangerousness is based almost entirely on his online speech—namely, his anti-ICE posts.   His commentary is no doubt fiery and aggressive, but it is also clearly full of bravado and rhetoric.   And the government does not point

to a single harmful action his speech has incited. Yet, because of his speech, the government says—and the majority agrees—Wagner poses a danger to the public that no conditions of release can address, so he must be incarcerated awaiting trial.

I disagree. On this record, the government has not provided "clear and convincing evidence" that Wagner is so dangerous, or proven by a preponderance of the evidence that he is at such a risk of absconding, that no set of release conditions "will reasonably assure" the community's safety and his appearance. 18 U.S.C. § 3142(e), (f)(2). Not only does the government overstate the evidence of dangerousness, but in my view, the government has not provided a convincing reason to overturn the district court's conclusion that the stringent conditions of Wagner's release—including no social media access, no communication with anti-ICE organizers, GPS monitoring, home confinement in the presence of a custodian, and electronic surveillance on all his devices—are sufficient to protect the public and assure his appearance.

Because I would defer to the district court's judgment that the pretrial release conditions will reasonably assure Wagner's appearance and protect community safety, I would affirm the district court's pretrial release order. Accordingly, I respectfully dissent.

## BACKGROUND

### I.     Factual Background

The charges in this case stem from one Instagram post Wagner made in late January 2026, but many of his other social media posts and messages are relevant to the question of pretrial detention. Therefore, I begin with the context for Wagner's social media posts and survey their content, then detail the single Instagram post that is the basis of his charges in this case.

#### A.     Wagner's Social Media History

Wagner's charged conduct took place during a particularly fraught political moment in Minnesota. In December 2025, DHS launched Operation Metro Surge and deployed thousands of federal agents to Minneapolis and St. Paul for an immigration enforcement effort.

By February 2026, DHS reported over 3,000 arrests of noncitizens from the operation.  State and local governments in Minnesota sued the federal government, seeking the end of the operation on the grounds that it was both unconstitutional and unlawful.  *Minnesota ex rel. Ellison v. Noem*, 818 F. Supp. 3d 1030, 1035 (D. Minn. 2026).  At the same time, many Minnesotans engaged in "large-scale protests" against the operation as well as "ad hoc" interference with immigration enforcement attempts.  *Id.* at 1036, 1038.  Also during the surge, federal law enforcement officers shot and killed two American citizens, Renée Good and Alex Pretti, sparking additional protests.

During Operation Metro Surge, law enforcement officers began reviewing Wagner's posts on Facebook and Instagram.  Wagner is a Minneapolis resident who was vocal in his opposition to ICE's presence in the city and its actions during the surge.  Officers cataloged Wagner's social media posts from January 8, the day after the shooting of Renée Good, until his arrest on February 3.  After his arrest, officers also reviewed some of Wagner's Signal messages.  Because the content of these posts and messages is relevant to the pretrial detention analysis, I survey it here.  As this review illustrates, Wagner's posts contained fiery anti-ICE rhetoric that was generally, though not uniformly, tempered by references to nonviolence or self-defense.

On January 9, Wagner posted a video referencing the "constant harassment" of ICE's temporary residences in Minneapolis and said, "Anywhere we have an opportunity to get our hands on them, we need to put our hands on them."  Compl., R. 1, PageID 6–7.  In the same video, he stated that Minnesota would be the first state to "stand its f------ ground."  *Id.* at PageID 7.  In another post that day, Wagner expanded on his proposed protest approach by writing, "Wherever ICE is Be there with them - make it known - do not attack them - do not let them attack You."  *Id.* at PageID 8.  And Wagner called for a "national Investigation" of ICE, the "national guard [to] be deployed to detain and dissarm [sic] ice," and the "[a]rrest" of ICE.  *Id.* That same day, Wagner posted a video with a caption saying, "Our goal is to unmask and identify ice agents - stop their ability to arrest individuals through group resistance.  We do not shoot first - if they pull the trigger - defend yourself."  *Id.* at PageID 10.

Wagner continued to call for direct nonviolent resistance to ICE and noted that he himself did not own any weapons.  On January 10, Wagner posted a video stating that protesters should

"[g]et out on the streets.  Have some f------ fun.  Keep your heads.  We're not the violent ones.  Go take their f------ masks off and take their f------ guns."  *Id.* at PageID 11.  On January 12, Wagner stated, "I am unarmed - my only weapon is my fists and my voice."  *Id.* at PageID 14–15.  He explained in another post, "I disarmed myself in 2022 during the aftermath of George Floyd . . . I chose to surrender the few hunting rifles I had to my dad - and have since been unarmed."  *Id.* at PageID 19.

On January 13, Wagner posted a video, reiterating that Minneapolis was "under occupation" and was "fighting back with every tool we have at our disposal."  *Id.* at PageID 16.  Referring to ICE agents, he explained, "We want to know who they are.  We will identify every single one of them and we will prosecute them to the fullest extent of the law.  If that has to be done at the barrel of a gun, then let us have a little f------ fun."  *Id.* at PageID 17.  He also said, "This is where ice has come to die."  *Id.* at PageID 16.  He later explained that statement meant "the organization - I mean the concept itself - the functional mechanism of 'Immigration [sic] Control and Enforcement' I mean that the ideology of the institution came to these streets to bleed out and go away forever…"  *Id.* at PageID 20.

On January 24, two Customs and Border Protection officers shot and killed Alex Pretti, a longtime acquaintance of Wagner's, in Minneapolis.  Wagner posted a video encouraging "every armed American that's within a reasonable distance of [the location of the shooting] to come and stand" and said that he had "gas masks on the ground there."  *Id.* at PageID 24.  Wagner stated, "If you're seeing this video, we're done with peaceful protests now.  The gloves come off and ICE needs to get out.  Run for the hills, boys."  *Id.* at PageID 24.  Later that day, Wagner lamented that the killing was "exactly what [he] said was going to f------ come when we didn't f------ go and march on f------ Whipple with guns."  *Id.* at PageID 26.  He also reiterated his previous message and said, "Sorry but welcome to America 2026 where the Second Amendment is the only thing that's going to keep you f------- protected from literal f------ Nazi gun men that are killing innocent people in the street with impunity.  This is not a f------ joke.  There's nothing fun to chant about it.  Get your f------ guns and stop these f------ people."  *Id.*

After Instagram banned Wagner's account, he posted from a new account to celebrate the withdrawal of ICE agents and leaders from the Twin Cities.  He said, "The fight is well and

alive. We have pushed ICE to leave this city in droves.  We have made our voices heard.  Viva la resistance." *Id.* at PageID 27.  That same day, he posted a video distributing gas masks and shields with the caption "power to the people." *Id.* at PageID 28.  The next day, Wagner celebrated, "Got rid of Bovino yesterday.  Also sent a lot of ICE agents packing.  It's working people.  The pressure is getting results." *Id.* at PageID 29. (Two days later, Wagner made the post about J.S. that is the basis for this prosecution and is detailed below.)

Shortly before his arrest, Wagner exchanged Signal messages with an unnamed person about J.P., a former government official on the Epstein "list."  Mar. 25 Hr'g Tr., R. 24, PageID 131.  The person said he had the "address, phone and E-mail" for J.P. and wanted to "kill" him. *Id.*  He asked Wagner for "help" and if he knew "anyone who would want this info to bring to justice." *Id.*  Wagner responded, "Okay.  Well, we do stuff, me and my family of friends.  We like to know about people who deserve consequences.  So if you send me credible verifiable information it will go to people who can." *Id.*  After the person identified J.P., Wagner said, "For now I just need a name and the contact info and verification you are a credible source for this info so I can put it in the hands of my team and assess the situation for your security, ours, and understand what we have to work with, okay." *Id.* at PageID 132.  The person then sent Wagner J.P.'s driver's license, phone number, address, and e-mail.  Wagner's attorney later stated that Wagner was "attempting to forward information about people who were in the Epstein files to the international criminal court" and that he entertained the messages to "help turn [J.P.] over to the authorities." *Id.* at PageID 139.  In a separate Signal exchange with a different individual, Wagner sent the result from an online search for a journalist, showing a current address and phone numbers, to the individual with the message, "I may have found where he's hiding." *Id.* at 135.  There is no additional context about these Signal exchanges, so other than the vague messages themselves, there is no evidence in the record about what, if anything, Wagner did with the information.

**B.      January 29 Instagram Post**

In this case, Wagner is not facing charges for any of the posts or messages described above.  His January 29 Instagram post is the only one the government has indicted him for here. In that post, Wagner allegedly doxxed J.S., a pro-ICE online influencer, by posting his full name,

phone number, birth month and year, and address on Instagram.  In the same post, Wagner wrote, "Awe bb nazi boy" and "we can all knock on strangers doors . . . See you soon kiddo - stay safe out here."  Compl., R. 1, PageID 30.

Some context is helpful for understanding Wagner's post.  The government describes J.S. as "a pro-ICE individual,"  *Id.* at PageID 5, and Wagner elaborates on this description by explaining that J.S. is a vocal right-wing influencer.  During Operation Metro Surge, J.S. posted a video of himself knocking on the door of a Minnesota journalist covering anti-ICE protests.  Wagner contends that his statement "we can all knock on strangers doors" was a response to J.S.'s own post.  Wagner further proffers that he reposted publicly available information from someone else's previous post about J.S. and that none of the information he posted was accurate.  In response to Wagner's post, J.S. challenged him to a boxing match.  Wagner accepted, and the two influencers posted about their plans to box each other.

Five days after the alleged doxxing, the government filed a criminal complaint in the Eastern District of Michigan, charging Wagner with one count of cyberstalking and one count of transmitting interstate threats based on the January 29 post.  *See* 18 U.S.C. §§ 2261A(2) (cyberstalking), 875(c) (interstate threats).

## II.    Procedural History

After filing the complaint, the government arrested Wagner at his residence in Minnesota.  Wagner allegedly resisted arrest and spit in the officers' direction.  In his booking photo, Wagner held up two middle fingers and said, "This is for the judge."  Gov. Resp. to Mot., R. 21, PageID 91.

Wagner appeared before a magistrate judge in the District of Minnesota for removal proceedings to the Eastern District of Michigan.  Against his appointed counsel's advice, Wagner chose to proceed with the detention hearing at the same time as the removal proceedings, rather than ask for a continuance.  Because of Wagner's choice, his counsel had only briefly interviewed him to prepare for the hearing and had not reviewed his social media posts or the footage of his arrest before the government presented them.  Likewise, Pretrial Services did not have time to conduct a thorough investigation, interview potential third-party

custodians, or draft a report.  It orally recommended detention.  After hearing from the parties, the magistrate judge ordered Wagner detained.  The magistrate judge stated that detention would be "perhaps, a closer question" if Wagner was facing charges in the District of Minnesota, but he did not think he could impose conditions that would reasonably assure Wagner's appearance and community safety.  Feb. 5 Hr'g Tr., R. 13, at Page 51–52.  The magistrate judge later clarified that he ordered Wagner detained "for one reason and one reason only," his "concern that Mr. Wagner may not have the ability, candidly, to get to Michigan to make the court appearance." *United States v. Isaac Sant*, No. 26-cr-115, Arraignment Tr., R. 184, 23.

After his removal to the Eastern District of Michigan, a grand jury indicted Wagner for cyberstalking and transmitting interstate threats.  Wagner then appealed his detention order to the district court.  In advance of the detention hearing, Pretrial Services for the Eastern District of Michigan interviewed Wagner, spoke to his mother, and ultimately issued a report recommending his release under suitable conditions.  The district court reviewed the Pretrial Services Report from the District of Minnesota (drafted after the first detention hearing) as well as the "more extensive" Pretrial Services Report from the Eastern District of Michigan.  Mar. 24 Hr'g Tr., R. 27, PageID 171.  Over the course of two days, the district court also heard proffers from the parties and argument on the pretrial detention factors.

Reviewing the evidence de novo, the district court ordered Wagner released with both standard and special conditions of release.  The district court adopted the conditions recommended by Pretrial Services, including home detention, GPS monitoring, and restricted and monitored access to the internet through one approved computer and one phone.  The district court also adopted conditions that Wagner had proposed—appointment of his mother as third-party custodian and prohibitions on posting to social media, participating in anti-ICE protests, or entering Minneapolis or St. Paul.  And it imposed additional conditions sua sponte, including a prohibition on engaging in any assaultive, threatening, or harassing behavior or statements.  At the end of the hearing, the district court warned Wagner that both the court and Pretrial Services took their jobs "very seriously" and would carefully monitor and enforce his compliance with the conditions.  Mar. 25 Hr'g Tr., R. 24, PageID 156.

The government appealed the district court's release order and moved for an emergency stay pending appeal.  This court granted the emergency motion for a stay pending appeal.  Wagner, who had been on pretrial release at the home of his third-party custodian for one week, received permission to turn himself in and did so the next morning.[1]

## ANALYSIS

The Bail Reform Act of 1984 reflects the constitutional principle that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  In recognition of the defendant's "presumption of innocence," 18 U.S.C. § 3142(j), the statute's "default position" is that "a defendant should be released pending trial."  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  Accordingly, the statute permits pretrial detention only if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  To determine whether there are conditions of release that can reasonably protect against risk of flight and dangerousness, the court must consider (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger posed by the defendant's release.  *Id.* § 3142(g).  To justify pretrial detention, the government must prove by "clear and convincing evidence" that no conditions "will reasonably assure the safety of any other person and the community."  *Id.* § 3142(f)(2).  Alternatively, the government must prove by a preponderance of the evidence that no conditions will reasonably assure the defendant's appearance in court as required.  *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).

Here, the government challenges the district court's determination that the conditions of release it imposed would reasonably assure the safety of the community and Wagner's appearance in court.  The government contends that it has met its burden to prove Wagner's

---

[1]After Wagner was detained, he was indicted in the District of Minnesota, along with fourteen others, for conspiracy to impede or injure a federal officer, solicitation to commit a crime of violence, and transmitting interstate threats.  Our review is limited to this case, so I do not consider the second indictment.  But I note that none of Wagner's codefendants in that case have been detained pretrial.

dangerousness and risk of nonappearance, and it argues that no conditions of release could avoid these risks.  Because I disagree with the government's assessment of dangerousness, the risk of nonappearance, and the efficacy of the pretrial release conditions, I would affirm the district court's release order and conditions of release.

## I.        Standard of Review

Before turning to the merits, I address our standard for reviewing pretrial detention orders and highlight an unresolved question in our precedents.  Our court has never clearly resolved the question of the appropriate standard of review.  And our sister circuits have split on the issue.  *See* Jefri Wood, *The Bail Reform Act of 1984* § VII (Fed. Jud. Ctr. 4th ed. 2022).

In reviewing district court determinations about pretrial detention, we must review factual findings, legal questions, and so-called mixed questions of law and fact that ask whether the factual findings meet the legal standard to justify detention.  The district court's factual findings are reviewable only for clear error.  *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 394 (2018). And its legal conclusions are reviewed de novo.  *Id.* at 393.  The appropriate standard of review for the mixed questions, however, is a more complicated question.

Not all mixed questions receive de novo review.  *Id.* at 395–96.  Instead, the Supreme Court has explained that the proper standard for a mixed question may turn on a determination that "one judicial actor is better positioned than another to decide the issue in question."  *Miller v. Fenton*, 474 U.S. 104, 114 (1985); *see also U.S. Bank*, 583 U.S. at 395–56.  Here, the district court is better positioned than our court to resolve the question of whether any condition or combination of conditions will reasonably assure the defendant's appearance and the safety of the community.  District courts handle pretrial detention issues routinely, but we seldom see them.  So, in my view, we should apply a deferential review to the district court's judgment.

Appellate courts apply deferential review to mixed questions in other analogous areas.  In the context of criminal sentencing, for example, the Supreme Court has applied a deferential standard of review to the district court's application of a Sentencing Guidelines term because of "the relative institutional advantages enjoyed by the district court in making the type of

determination at issue." *Buford v. United States*, 532 U.S. 59, 64 (2001). We are similarly deferential when the application of a sentencing enhancement involves a fact-intensive question that the district court is better positioned to answer. *See, e.g.*, *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). The district court's same institutional advantages are involved in a pretrial detention decision. A "district judge sees many more [pretrial detention orders] than does an appellate judge," and this "[e]xperience" helps the district court make its decisions. *Buford*, 532 U.S. at 64. Further, in reaching its decision, "factual nuance may closely guide the legal decision, with legal results depending heavily upon an understanding of the significance of case-specific details." *Id.* at 65. And the fact-bound nature of any pretrial detention decision may "limit[] the value of appellate court precedent." *Id.* at 66.

Outside of sentencing, the Supreme Court has likewise reiterated that not all mixed questions of law and fact warrant de novo review. *See U.S. Bank*, 583 U.S. at 396. The Court explained that "appellate courts should usually review a decision with deference" when it "immerse[s] courts in case-specific factual issues." *Id.* After all, appellate courts are not in the best position to "marshal and weigh evidence, make credibility judgments" and address "multifarious, fleeting, special, narrow facts that utterly resist generalization." *Id.* (citation omitted). Determining whether a defendant should be detained pretrial requires the district court to "take[] a raft of case-specific historical facts, consider[] them as a whole, balance[] them one against another—all to make a determination" whether conditions of release can reasonably assure the defendant's appearance and the safety of the community. *Id.* at 397. Under the Court's reasoning, pretrial detention appears to be the type of fact-intensive mixed question that warrants deferential review. *See id.* at 399. Therefore, in my view, both the institutional advantages of the district court and the fact-intensive nature of the question call for the application of deferential review to mixed questions in district court pretrial detention decisions.

True, our decision in *United States v. Hazime* stated that de novo review applies to these mixed questions in the pretrial context. 762 F.2d 34, 37 (6th Cir. 1985). But this standard-of-review question was not at issue in *Hazime*, nor was it part of the reasoning leading to the court's holding or decision to remand. *See Wright v. Spaulding*, 939 F.3d 695, 701–02 (6th Cir. 2019). In *Hazime*, the parties disputed the scope of our review for factual questions in pretrial detention

appeals.  Our court rejected the position that it had a "non-delegable responsibility to make an independent determination of the merits of the bail application" and held that it would review the factual findings of the district court for clear error.  *Hazime*, 762 F.2d at 36.  The court then stated, without elaboration or citation to any precedent, that its "standard in reviewing mixed questions of law and fact and the legal conclusions of the District Court, however, remains that of *de novo* consideration."  *Id.* at 37.  And the court did not review the district court's detention order under either standard because it remanded for the district court to "clarify" a threshold question about whether it treated the statutory presumption of flight "as burden shifting or evidentiary" and whether the presumption was constitutional.  *Id.*  Thus, the standard of review for mixed questions did not "contribute to the judgment."  *Wright*, 939 F.3d at 701.  And the fact that later decisions have cited *Hazime* for the standard of review, *see, e.g.*, *Stone*, 608 F.3d at 945, does not transform it into a reasoned judgment addressing the issue, *see United States v. Dixon*, 509 U.S. 688, 706 (1993).

Adherence to this nonbinding language in *Hazime* is even more concerning given that its unsupported and blanket assertion that de novo review applies to mixed questions is inconsistent with Supreme Court precedents, explained above, declaring that mixed questions are not all alike.  It is also inconsistent with our court's practice of re-examining standards of review on mixed questions based on those Supreme Court precedents.  For example, we long reviewed de novo all mixed questions implicated in sentencing, but we "pivoted from de novo" to deferential review in some circumstances and held that the appropriate standard of review must be decided on a "guideline-by-guideline" basis.  *United States v. Merritt*, 102 F.4th 375, 379–80 (6th Cir. 2024).  Outside of the sentencing context too, we now take a "case-by-case approach" to the standard of review for all mixed questions of law and fact rather than applying a blanket rule of de novo review.  *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 407 (6th Cir. 2022) (quotation omitted).  Accordingly, I disagree with the majority that *Hazime* controls the standard of review for mixed questions in these appeals.

With humility to the district court's superior expertise in these cases, I would review the district court's application of the facts to the pretrial detention standard with "due deference."  *United States v. Shanklin*, 924 F.3d 905, 919 (6th Cir. 2019).

No. 26-1294                     *United States v. Wagner*                     Page 29

## II.      Dangerousness and Flight Risk

Turning to the merits with this deferential approach, I would hold that the government has not met its burden to show by clear and convincing evidence that no set of pretrial release conditions can protect public safety or by a preponderance of the evidence that no set of conditions can assure his appearance in court.  Before considering the specific pretrial release conditions the district court imposed—and whether they can mitigate the government's concerns—I review the government's claims about Wagner's dangerousness and risk of nonappearance.

### A.      Nature and Circumstances of Charged Offenses

Under the first statutory factor, we must look at both the "nature" and "circumstances" of Wagner's charged offenses.  "The distinction between 'nature' and 'circumstances' clarifies that the former refers to the generic offense while the latter encompasses the manner in which the defendant committed it."  *United States v. Singleton*, 182 F.3d 7, 12 (D.C. Cir. 1999).  Therefore, the Bail Reform Act directs the court to look at both the labels and the specific facts underlying Wagner's indictment.  At the same time, the Act cautions that "[n]othing in this section shall be construed as modifying or limiting the presumption of innocence."  18 U.S.C. § 3142(j).

Beginning with the nature of the charged offenses, Wagner was indicted for cyberstalking and interstate threats.  *Id.* §§ 2261A(2), 875(c).  The district court described the offenses as "serious" but recognized that the seriousness of such acts could vary from "bullying" among young students to "serious crimes, including up to physically harming people in Federal Court."  Mar. 25 Hr'g Tr., R. 24, PageID 149–50.  Like the district court, I affirm that both charged offenses are serious and that transmitting interstate threats is a crime of violence because it involves violent threats.  18 U.S.C. § 3142(g)(1); *see United States v. Pietila*, No. 1:23-cr-78, 2023 U.S. Dist. LEXIS 114354, at *3–4 (W.D. Mich. July 3, 2023).  But I further agree with the district court that the seriousness of the offenses varies significantly and requires looking at the specific allegations of how the charged offense was committed.

Turning to the circumstances of the charged offenses, the government explains that Wagner made an Instagram post sharing "what he believed was J.S.'s birth month and year,

phone number, and parents' home address" along with the message "Awe bb nazi boy . . . we can all knock on strangers doors . . . See you soon kiddo - stay safe out here." Gov't Br. at 9. Wagner expands on this allegation by proffering that (1) he reposted information that was already publicly available from an earlier attempted doxxing of J.S., (2) none of the personal information he posted was accurate, and (3) J.S. responded to the post by challenging Wagner to a boxing match, which Wagner accepted, showing that Wagner's post did not create any new or real danger to J.S. Wagner also explains that the message about "knock[ing] on strangers doors" was a reference to J.S.'s own post from outside the apartment of a Minnesota journalist. Therefore, the circumstances of Wagner's offense, a back and forth between online personalities, do not indicate that he was likely to endanger J.S.

Our other cases regarding pretrial defendants facing these charges confirm that the circumstances of Wagner's conduct do not militate strongly in favor of detention. In *United States v. Lidderdale*, for example, the defendant's severe, repeated, and graphic threats much more clearly supported a finding of dangerousness. No. 25-3663, 2025 U.S. App. LEXIS 33235, at *1–2 (6th Cir. Dec. 18, 2025). The government alleged that the defendant "sent dozens of threats, in letters and emails" containing "graphic threats, suggesting that the recipients (and sometimes their family members) would be killed 'from a bullet fired by my gun penetrating your skull with little warning' or that '[e]ach [victim] will receive the gift of their names etched onto a single bullet. Their skull is the target the bullet is the gift.'" *Id.* Along with the written threats, he allegedly sent an "inscribed bullet to one recipient and a white powder" to others, and the recipients were "traumatized" by the messages. *Id.* at *2–3. Wagner's single post of publicly available and inaccurate personal information is not comparable to that threatening course of conduct.

Accordingly, I recognize that the nature of Wagner's charged offenses is serious, but I believe that the circumstances of Wagner's post, which appear to be a war of words between online personalities, weigh only slightly in favor of a finding of dangerousness. I also do not think the nature and circumstances of the charged offenses establish a risk of nonappearance.

### B. Weight of the Evidence

Next, I look to the "weight of the evidence against" Wagner. 18 U.S.C. § 3142(g)(2). In our circuit, this factor looks at the weight of the evidence of dangerousness or risk of nonappearance, "not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948.[2]

As to Wagner's dangerousness, the government relies on Wagner's social media posts and Signal messages. The government does not argue that Wagner himself engaged in violence or even that his posts incited actual violence. Instead, the government contends that Wagner's posts constitute calls for his followers to engage in violence against ICE and ICE supporters.

Although I do not condone Wagner's rhetoric, I would defer to the district court's assessment of Wagner's dangerousness and judgment that any concerns about public safety can be ameliorated through conditions of release. As to the dangerousness of Wagner's posts, the record does not contain the full posts, so there is limited context for many of his statements. But even this limited context paints a more nuanced picture than the government's position that Wagner "promoted physically assaulting and using weapons against federal agents." Gov't Br. at 22.

Read in context rather than as isolated snippets, Wagner's posts do not reflect the dangerousness that the government argues they do. For example, the government points to Wagner's statement "fight ice. This is kill or be killed." But earlier in that post, which Wagner made two days after the shooting of Renée Good, he called for the National Guard to disarm ICE and for ICE to be arrested. Compl., R. 1, PageID 8–9. He also said in the same post that "Wherever ICE is Be there with them - make it known - do not attack them - do not let them attack You" and "if they aggress - we meet them where they move - let them exhaust themselves." *Id.* at PageID 8. The government also isolates Wagner's statement from earlier

---

[2]Many of our sister circuits treat this factor as looking to the weight of the evidence of the defendant's guilt. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 792 (1st Cir. 1991); *United States v. Traitz*, 807 F.2d 322, 324 (3d Cir. 1986); *United States v. Jackson*, 845 F.2d 1262, 1265 (5th Cir. 1988); *United States. v. Apker*, 964 F.2d 742, 744 (8th Cir. 1992) (per curiam); *United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003). Because we instead look to the weight of evidence of dangerousness or nonappearance risk, there is a great deal of overlap between our analysis under this factor and the subsequent ones.

that same day, "Anywhere we have an opportunity to get our hands on them, we need to put our hands on them," but Wagner went on to say that Minnesota would "stand its f------ ground" against ICE—a defensive position. *Id.* at PageID 6–7. And Wagner's other post that day said "stand your ground - if you're armed - declare it" and "We do not shoot first - if they pull the trigger - defend yourself." *Id.* at PageID 10.

Many of the other statements the government cites also read differently when placed in context. The government quotes Wagner as stating, "This is where ICE has come to die," but he clarified that the statement referred to "the ideology of the institution" which "came to these streets to bleed out and go away forever," not to the death of any ICE agent. *Id.* at PageID 16, 20. The government also quotes Wagner's words, "hunt ice," but immediately after that statement, he said, "vehicles can be sacrificed - disable their vehicles." *Id.* at PageID 8. Read in context, Wagner's reference to "hunt[ing] ice" was not advocating for violence against ICE agents but was instead focused on immobilizing their vehicles. In another post, Wagner acknowledged that ICE had "increased the severity of their tactics in an attempt to scare [protesters] into submission," but he said that despite those tactics, "We will identify every single one of them and we will prosecute them to the fullest extent of the law." *Id.* at PageID 16–17. Wagner then stated, "If that has to be done at the barrel of a gun, then let us have a little f------ fun," showing that he continued to advocate for the public to identify ICE agents and prosecute them in court, even if they were threatened at the "barrel of a gun." *Id.* at PageID 16–17. But, again, that does not mean he is advocating for protesters to use violence offensively. By taking snippets of his posts out of context, they appear more violent than they are. And some of Wagner's other statements, which the government does not cite, emphasized nonviolence or self-defense tactics: "Keep your heads. We're not the violent ones." and "We do not shoot first - if they pull the trigger - defend yourself." *Id.* at PageID 10–11.

Arguably, Wagner's most threatening statements came on January 24, the day that government officers shot and killed Pretti, one of his longtime acquaintances. Wagner railed against the shooting, which he viewed as the inevitable consequence of ICE's presence and tactics in the city, saying, "This is exactly what I said was going to happen. This is exactly what I said was going to f------ come when we didn't f------ go and march on f------ Whipple with

guns." *Id.* at PageID 26.  He repeatedly said that he was "done with peaceful protests" and "not talking about peaceful protests anymore," reflecting a shift from his earlier posts. *Id.* at PageID 23–26.  After the shooting, Wagner said that protesters' options were "Go and f------ fight them. Or shut the f--- up and die for them," complained that some people "want to f------ talk about their f------ feelings instead of putting hands on these murderers," and told his followers, "Get your f------ guns and stop these f------ people." *Id.* at 23–24, 26.  While the January 24 posts reflect a change in tone, I agree with the district court that even these words "could be viewed in more than one way"—they could be read as "actual threats" or, alternatively, as not "as specific a threat" but instead a reflection of Wagner's belief that ICE agents would continue to kill protesters unless they defended themselves, if necessary with force.  Mar. 25 Hr'g Tr., R. 24, PageID 145.

It is notable that, even on January 24, Wagner never expressed any threat or intent to engage in any violence himself.  During the protests after Pretti's death, Wagner delivered gas masks to protesters and wore a bulletproof vest, but both gas masks and bulletproof vests are defensive and a reflection of his view that protesters would need to protect themselves from officers' use of force.  Wagner also repeatedly stated in his earlier posts that he did not own a gun.  Further, the government does not argue that Wagner's posts incited any violence on January 24 or otherwise.  And while the government contends that Wagner's posts escalated over time, his posts in the days after Pretti's death celebrated the withdrawal of ICE agents from Minneapolis.  If his January 24 posts are read as escalating rhetoric, his January 26 and 27 posts can be read as de-escalating.

Outside of Wagner's social media posts, the government cites to his Signal messages with another user who expressed a desire to kill J.P., a former government official mentioned in the Epstein "list."  It is true that Wagner responded to the messages by requesting "credible verifiable information" that he could send to his team, but nowhere in the exchange did Wagner agree to assist in any criminal activity.  Mar. 25 Hr'g Tr., R. 24, PageID 131.  Wagner proffered that he was "attempting to forward information about people who were in the Epstein files to the international criminal court" and that he entertained the messages to "help turn [J.P.] over to the authorities."  *Id.* at PageID 139.  Neither the government nor Wagner present any evidence about

what he did with J.P.'s information, although the answer may be nothing, since Wagner was arrested shortly after the exchange. Regardless, I think that Wagner's vague response to messages from a user who sought to kill J.P. can, at most, weigh slightly in favor of a finding of dangerousness.

Wagner's other Signal exchange is even less substantial. Wagner conducted an online search for a journalist named N.S. He then sent the result showing a current address and phone number to another person with the message "I may have found where he's hiding." *Id.* at PageID 135. There is no additional information about the exchange. It is possible to make any number of assumptions about the message and Wagner's intent, but the government has presented no evidence that justifies reading it as threatening.

In sum, the government construes Wagner's social media posts and private messages as "voluminous" evidence of his dangerousness, Gov't Br. at 29 (quotation omitted), but I read the evidence as presenting a more nuanced picture of his political beliefs and intentions, cast with plenty of bravado and rhetoric. Relevant to my analysis, the government does not allege that Wagner engaged in any violence or threatened to engage in any violence himself. The government instead argues that it has proven Wagner's dangerousness through his calls to violence. Even setting aside the fact that having thousands of "followers" on a social media platform is not equivalent to having a "large, receptive, and responsive audience," *id.* at 23, 25, none of Wagner's supposed calls to violence are alleged to have come to fruition. That others made isolated comments on Wagner's posts that refer to weapons does not prove his dangerousness either. Of course, the district court need not wait for violence to occur to justify pretrial detention, but the government fails to show that Wagner's rhetoric was likely to cause any. Accordingly, I agree with the district court that the government's evidence of social media posts and Signal messages is insufficient to meet its burden to establish by "clear and convincing evidence" that Wagner is so dangerous that no conditions of release could protect the community.

Turning to Wagner's risk of nonappearance, I am similarly unpersuaded by the government's limited evidence. The government points to Wagner's outstanding warrant from Iowa, where he was listed as an absconder, and his previous failures to appear. On a

misdemeanor marijuana possession case from Iowa a decade ago, Wagner was listed as an absconder only after the court entered a deferred judgment in the case. Wagner proffered that he had previously appeared in Iowa court to resolve the case, resulting in the dismissal of one charge and a deferred judgment on the other. Wagner learned about the outstanding warrant at his initial detention hearing and was working to resolve it during his brief period of pretrial release. His other failures to appear stem from misdemeanor traffic cases in Minnesota. Although not admirable, I do not weigh these transgressions as highly predictive of Wagner's behavior in this federal felony case under stringent conditions of supervised release.

Beyond these misdemeanors, the government attempts to prove that Wagner is a flight risk by pointing again to his social media posts and then to his booking photo. Neither are persuasive, in my view. On January 12, Wagner posted a video on social media asking viewers to "[s]upport my safety - help me evade and continue to organize." Compl., R. 1, PageID 13. This post, made weeks before he was charged with any crime, again is bravado and social media posturing. There is no evidence in the record that Wagner attempted to evade law enforcement. Officers arrested him at the residence where he had lived for the past year. That Wagner spit at the officers reflects his anger and poor judgment, but not a risk of absconding. Likewise, while Wagner's raising of two middle fingers in his booking photo with the message "This is for the judge" is distasteful, it hardly establishes a likelihood of nonappearance. Gov. Resp. to Mot., R. 21, PageID 91. Even the magistrate who initially ordered Wagner detained did not find the spitting or booking photo "terribly weighty." Feb. 5 Hr'g Tr., R. 13, PageID 52. And I would defer to the district court's judgment that they are outweighed by Wagner's comments praising the courts and repeated statements committing to fight this case, which he considers a political prosecution. Further, Wagner's brief period of pretrial release and prompt return to custody provides at least some evidence that he is not a flight risk. Therefore, I do not agree that the government has met its burden of proving that, absent detention, Wagner will not appear in court.

### C.      History and Characteristics

I next consider Wagner's history and characteristics, including his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the

community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."   18 U.S.C. § 3142(g)(3)(A). The record does not contain extensive information about Wagner's history and characteristics, but it is sufficient to weigh against a finding of dangerousness or risk of nonappearance.

Wagner is thirty-eight years old and was born and raised in Minnesota.  Outside of a four-year period where he lived with his father in Colorado, he has been a lifelong resident of Minnesota.  He maintains ties with several family members in Minnesota, including his mother. Wagner has worked as a self-employed carpenter since 2020, with variable hours and income that averages $10,000 a month.  He did not report any physical or mental health conditions to Pretrial Services.  He was addicted to prescription opioids in 2006 but completed an inpatient treatment program and has not used them in 20 years.

Most importantly, Wagner has no violent criminal history.  His criminal record includes traffic citations and misdemeanor drug offenses.  As discussed above, he was listed as an absconder in a misdemeanor marijuana possession case from Iowa after he appeared in court and obtained a deferred judgment in the case.  Wagner also failed to appear on traffic charges in Minnesota. But he has no record of violent conduct.  While our court has held that a violent criminal history is not "essential" to a finding of dangerousness, we have simultaneously noted that such a history "eases the government's burden of showing dangerousness."  *Stone*, 608 F.3d at 950 (quoting *United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991)).   After all, "[p]revious instances of violent behavior are an important indicator of future violent tendencies." *Heller v. Doe by Doe*, 509 U.S. 312, 323 (1993).  Although the absence of a violent criminal history does not categorically preclude a finding of dangerousness, I think it is the most relevant predictive evidence here of Wagner's lack of dangerousness, particularly when the evidence on the other side is excerpts of his social media posts.

Overall, then, I would hold that Wagner's history and characteristics weigh against a finding of dangerousness or risk of nonappearance.  Wagner has never been charged with any violent criminal offenses and has no history of violence.  While he failed to appear for misdemeanor state court proceedings, I am unconvinced that it establishes a risk of nonappearance for this federal felony case, especially under the stringent conditions imposed on

him.  Otherwise, Wagner has strong ties to Minnesota where he would reside and be supervised on pretrial release.  Therefore, I would recognize that Wagner's history and characteristics weigh against incarcerating him before he is convicted of any crime.

### D.        Nature and Seriousness of Danger

Finally, I turn to the "nature and seriousness of the danger" posed by Wagner's release. 18 U.S.C. § 3142(g)(4).  The Bail Reform Act authorizes Wagner's detention only if he poses an "identified and articulable threat to an individual or the community."  *Salerno*, 481 U.S. at 751.

Here again the government does not argue that Wagner will commit any violence if released but instead focuses on the potential danger instigated by his social media posts and Signal messages.  The nature of the danger posed by Wagner's release is that he will make public social media posts inciting violence or privately communicate with others about possible violence.  The seriousness of such danger is difficult to measure.  In the abstract, online posts and messages can pose a risk of inciting violence.  But as discussed above, none of Wagner's posts or messages are alleged to have caused any violence.  And, to the extent there are concerns about future violence, that is the exact kind of danger that can be mitigated by conditions of pretrial release like the ones the district court imposed—a point that I further address shortly.  On this factor regarding the nature and seriousness of the danger Wagner poses to the public, I would again defer to the district court.

In assessing Wagner's dangerousness, the government claims that the district court "excused death threats against federal law enforcement and private citizens because of its disagreements with certain executive branch policy."  Gov't Br. at 30.  That's quite an accusation.  And read in context, the district court was merely recognizing (and lamenting) the "sad state of affairs" of public polarization.  Mar. 25 Hr'g Tr., R. 24, PageID 147.  The district court stated: "[U]nfortunately, in our nation at this time, I think people are viewing the protection of the public kind of like a two-way street.  It depends on what side of the street you're on whether or not an individual might feel they are protected or in need of protection.  And that's, of course, a sad state of affairs."  *Id.*  The district court expressed no opinion about any federal policy but merely noted that there was some public opposition to such policies.  It was not

improper for the district court to acknowledge, given the background of this case, that Wagner and others viewed themselves not as the aggressors but as those resisting aggression and thus needing protection. That observation does not mean that the district court discounted evidence of dangerousness. Quite the opposite; as the majority opinion emphasizes, the district court recognized the seriousness of Wagner's conduct. Maj. Op. at 9. The district court "looked at the entire case" to determine whether it could impose conditions to protect the public. Mar. 25 Hr'g Tr., R. 24, PageID 147. It determined that it could.

On this record, the government has not met its burden to show Wagner's dangerousness by clear and convincing evidence or his risk of nonappearance by a preponderance of the evidence. Accordingly, I would affirm the district court's order releasing Wagner under a battery of standard and special conditions.

## III.    Conditions of Pretrial Release

Even if I agreed that the government had met its burden to prove Wagner's dangerousness or risk of nonappearance, I would still affirm the district court's decision not to detain Wagner. The Bail Reform Act directs the court to incarcerate Wagner pretrial only if "no condition or combination of conditions" could secure his appearance and the safety of others. 18 U.S.C. § 3412(e)(1). In my view, the government has not met its burden to show that the district court's conditions were insufficient to reasonably assure Wagner's appearance and community safety.

Consider first the district court's stringent pretrial release conditions. The district court appointed Wagner's mother as his third-party custodian, with Pretrial Services' approval, and confined Wagner to home detention at her house. The court order restricted him to his mother's home at all times, excluding only employment, education, medical treatment, attorney visits, court obligations, or essential activities with prior approval. Even with Pretrial Services' approval, the order limited his movement to Minnesota and the Eastern District of Michigan and required him to obtain special permission to enter the Twin Cities. On top of the home detention, the district court placed Wagner under GPS monitoring, meaning law enforcement constantly tracked his whereabouts, and required him to check in with Pretrial Services. As to

technology, the district court limited Wagner to one computer and one phone with Pretrial Services' monitoring software installed, so all his activity on both devices was visible and constantly tracked as well.  Wagner was forbidden from posting on social media, participating in protests or demonstrations, or encouraging others to do so.  He was also prohibited from contacting his alleged victim or anyone else who may be a victim or witness in his prosecution, and from encouraging others to do so.  And the district court prohibited him from possessing any dangerous weapon or engaging in "assaultive, threatening, or harassing behavior or statement[s]."  Order, R. 23, PageID 118.  Wagner himself proposed many of these conditions, and he readily agreed to others imposed by the district court at his detention hearing.  During the brief period of his release on these conditions, he appears to have complied with all the requirements.

These conditions "reasonably assure[d]" the district court that Wagner would appear in court as required and would not harm anyone, and I would defer to that determination.  18 U.S.C. § 3142(e)(1).  The conditions targeted Wagner's dangerousness as the government describes it.  Recall that the government argues that pretrial detention is necessary not because Wagner will directly harm anyone, but to protect the public from Wagner's "call[s] for his thousands of followers" to engage in violence and to protect J.S. from Wagner's doxxing.  Reply Br. at 5.  By the government's account, then, Wagner's danger to J.S. and the broader community stems entirely from his online activity.  Consequently, the release conditions monitor and severely restrict Wagner's online activity, addressing that concern.  The district court limited Wagner's access to approved devices with monitoring software and forbade him from posting on social media, asking anyone to post on his behalf, or making any threatening statements.  So, Wagner is prohibited from accessing any of the social media platforms where he could make dangerous posts, and Pretrial Services is monitoring his device activity to ensure compliance.

The government argues these conditions are not enough because there is a risk that Wagner will not comply with them.  It raises two specific concerns: *first*, that the internet-based nature of Wagner's activity makes it impossible to ensure compliance; and *second*, that Wagner's personal history and attitude towards the government throughout these proceedings

show that he "despises and will skirt federal authority at the first opportunity." Gov't Br. at 38. I find neither argument convincing.

The government first argues that the pretrial release conditions are insufficient because Wagner's dangerous conduct takes place online. The government stresses that Wagner can access the internet regardless of his location, but the pretrial release conditions are not about preventing internet access entirely; they focus on monitoring and restricting his access to enhance safety. The conditions mandate that Pretrial Services will monitor Wagner's internet access on approved devices and his compliance with the prohibition on social media use. These conditions are targeted at the danger that Wagner is alleged to pose: the incitement of violence through social media posts. Even if Wagner managed to create a new social media account without getting caught by the company or the two Pretrial Services departments supervising him, it is difficult to imagine that he could build a following and successfully incite violence before getting caught. Wagner's posts would be public, and if history is any predictor, many of them would include his face, which would make his noncompliance easy to detect. Furthermore, the acute ICE activity in Minneapolis that was the primary subject of Wagner's posts has abated, meaning public interest in any posts about Minneapolis has likely declined as well. So it is far less likely that any new posts from a brand-new account would gain the attention of his prior ones made at the height of Operation Metro Surge or pose the same alleged risk of danger.

Despite these stringent limitations, the government and the majority contend that internet-access limitations are often ineffective, citing examples from some of our cases. Distilled, their argument is that because some people break conditions limiting online access, they are essentially never sufficient to protect the public from online crime or danger. But if that's so, then every defendant accused of dangerous online activity must be incarcerated pretrial. And that is not the rule. Indeed, there is a possibility of non-compliance in every case, no matter the conditions; for example, detainees sometimes remove their GPS ankle monitors or escape from their third-party custodians. Searching our cases, the government could identify examples of various pretrial conditions that are violated, just like the case examples provided by the majority here. Yet, the possibility that any condition can be violated does not mean we can presume noncompliance in any individual case.

None of the cases cited by the government and the majority demonstrate that pretrial detention is necessary to protect against the online danger alleged here.  In each of the cited cases from our court, there was—unlike here—a statutory presumption in favor of detention because the defendant was indicted for a particularly grave offense.  *See United States v. Foster*, No. 20-5548, 2020 WL 6791572, at *1 (6th Cir. July 20, 2020); *United States v. Carpenter*, No. 22-5933, 2023 U.S. App. LEXIS 2386, at *2 (6th Cir. Jan. 30, 2023); *United States v. Hoilman*, No. 22-6108, 2023 WL 4074630, at *1 (6th Cir. Apr. 24, 2023); *United States v. Moore*, No. 24-3017, 2024 WL 3294950, at *1 (6th Cir. Apr. 17, 2024). *United States v. Watt*, No. 24-5322, 2024 U.S. App. LEXIS 13950, at *2 (6th Cir. June 7, 2024); *see also United States v. Hir*, 517 F.3d 1081, 1093 (9th Cir. 2008).  In these cases, even when the defendant rebutted the statutory presumption of detention, the gravity of their charged crime still weighed heavily in our analysis. *See Watt*, 2024 U.S. App. LEXIS 13950, at *2–3.  But judicial skepticism of internet-access limitations in grave cases where there was a statutory presumption of detention does not mandate distrust of internet-access limitations writ large.  And it does not justify the same skepticism in cases, like Wagner's, where there is no such presumption.  On the contrary, there is a presumption that Wagner is entitled to pretrial release.  *Stone*, 608 F.3d at 945.  Nor are the few district court cases the majority cites, which reject internet-access limitations where the statutory presumption of detention was not present, analogous to this one.  The courts expressed skepticism about the efficacy of conditions where a defendant had already violated court-ordered internet-access limitations, *United States v. Waldman*, No. 18-4701, 2018 U.S. Dist. LEXIS 98548, at *12–13 (S.D.N.Y. June 12, 2018), or exhibited other dissimilarities that weighed against efficacy.  So none of these cases, individually or together, convince me that generalized concerns over the efficacy of online restrictions are enough to disturb the district court's judgment.

Moving beyond generalized concerns, the government next argues that Wagner is unlikely to comply with any of the pretrial conditions because he has an antagonistic attitude toward the federal government.  As evidence, the government points to Wagner's expression of animosity to the legal system.  In one social media post, Wagner asked viewers to "[s]upport my safety – help me evade and continue to organize."  Compl., R. 1, PageID 13.  And in his booking photo, he flipped the bird while saying, "This is for the judge."  Gov. Resp. to Mot., R. 21,

PageID 91. While these messages may suggest noncompliance with judicial orders, there are countervailing facts in the record too. Though boasting online that he wanted to evade law enforcement, he never tried to; officers arrested him at home. He also posted on social media several times indicating his faith in the judicial system as the answer to what he viewed as government misconduct. Wagner has also repeatedly expressed his desire to publicly fight this case—which he considers a political prosecution—in court, further undermining the government's claim that Wagner disrespects the court and will not comply with his pretrial release conditions. For these reasons, while Wagner obviously disagrees with ICE policies and perhaps with federal law enforcement more broadly, I would not assume that his political beliefs mean he will not comply with pretrial release conditions.

Of course, neither Wagner's track record nor the stringency of the conditions can guarantee Wagner's compliance. But that is not the test under the Bail Reform Act. The law requires "reasonable assurance," but it "does not demand absolute certainty that a defendant will comply with release conditions." *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) (citation modified). A "stricter regime would be only a disguised way of compelling commitment in advance of judgment." *Id.*; *see also United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985). We may want a guarantee of safety and compliance, especially in the face of social media posts that Wagner doubtlessly designed to be shocking. But we cannot detain presumably innocent defendants pretrial unless the risk of danger and absconding are so high that no conditions of release could reasonably abate them. Affording due deference to the district court, I do not believe the government satisfied that high standard here. So I would affirm the release order.

## CONCLUSION

In my view, the district court's conditions of release reasonably assure Wagner's appearance in court and the safety of the community. Accordingly, I respectfully dissent.